# FINDINGS AND ANALYSIS
# RETIRED WORKERS' COMPENSATION
# JUDGE DAVID W. O'BRIEN

## INVOLVING 29 CALIFORNIA WORKERS' COMPENSATION
## INSURANCE CLAIMS THAT ARE PART OF THE
## *REPUBLIC SERVICES, INC. vs. LIBERTY MUTUAL*
## *INSURANCE COMPANY, ET AL.*
## LAWSUIT

**PREPARED AT THE REQUEST OF:**
McBrayer, McGinnis, Leslie & Kirkland, PLLC

**January 15, 2006**

```
EXHIBIT

1 - VOLUME I
```

At the request of McBrayer, McGinnis, Leslie & Kirkland, PLLC, I have analyzed twenty-nine hardcopy claim files and CD-ROMs, and other documents listed below and provide the following report of my findings and conclusions with respect to the manner in which Liberty Mutual Insurance Company handled, administered, and managed, these workers' compensation claims on behalf of Republic Services, Inc.

I was engaged to provide independent analysis and opinion regarding the overall claims management exhibited in the subject claim files.

I have examined Liberty's claims personnel performance as that performance relates to commonly observed, sound claims management practices recognized in the workers' compensation insurance industry in California.

<u>Documents and Materials Reviewed:</u>

1.  Civil Complaint filed November 10, 2003 entitled "*Republic Services, Inc., vs. Liberty Mutual Insurance Company, et al.*";

2.  Republic Services, Inc., RFP Responses to Submissions;

3.  Liberty Mutual Claims Best Practices/ Special Service Instructions, W.C. Claims Management Minimum Customer Requirements.

## CLAIM FILES REVIEWED

| Name: | Claim No: |
| --- | --- |
| Adrian Aguilar | 684148569 |
| Nancy Stuesser | 648148935 |
| Arabyan Armen | 606261027 |
| Peter De Leon | 648149079 |
| Adolph Aldaco | 648148610 |
| Gustavo Reyes | 648148611 |
| Abelardo Diaz | 648147065 – No hardcopy of claim file |
| Rafael Pena | 648148805 |
| Fernando Sordia | 648147482 |
| Rubin Magana | 606203462 |
| Conrado Huipio | 648147630 |
| Gabriel Tabarez | 608196503 |

2

| | |
|---|---|
| Maria I. Martinez | 648148613 – No hardcopy of claim file |
| Maria G. Duran | 608182571 |
| David Alvoro | 608197982 |
| Danilo Hernandez | 648148836 |
| Sergio Monreal | 648148841 |
| Raymundo Galvan | 648148841 |
| Onesimo Marquez | 648147642 |
| Norberto Ramirez | 648147640 |
| Karen Aquillno | 648147656 |
| Fermin Pena | 608196483 |
| Fernando Sordia | 608338489 – Two claims files |
| Robert N. Gomez | 608407165 – Two claims files |
| Robert N. Gomez | 648148839 |
| Gerardo Velasquez | 606203464 |
| Patrick E. Powers | 648147907 – No hardcopy of claim file |

I have been retained as an expert in this case by plaintiff, Republic Services, Inc. I have more than forty-two years of experience in the field of workers' compensation. I have served as a Workers' Compensation Administrative Law Judge for the California Workers' Compensation Appeals Board and as both an attorney for injured workers and as a defense attorney for self-insured employers and insurance companies. I have also served as an Arbitrator and in my years of practice have been involved in more than 18,000 workers' compensation cases. Attached hereto is a copy of my Curriculum Vitae.

My findings and conclusions as to Liberty Mutual Insurance Company's handling, administration and management of these claims fall into the following general areas. They are:

1.  Failure, in many instances, to make timely contact with allegedly injured employees, within 24 hours of notice of claim, and the employers supervisor and treating physician to discuss the alleged injury and how the injury occurred, as well as what if any medical treatment was being provided.

2.  Failure to take statement from supervisor where there is a question of compensability;

3

3. Failure to undertake timely and thorough investigations with witness statements from the allegedly injured employee, employer witnesses, particularly the employees supervisor relating to alleged injury to determine compensability of these claims;

4. Failure to secure employees recorded statement in the event of questionable compensability, on unwitnessed injuries and where employment was for less than six months;

5. Failure to document that claims were timely delayed, and subsequently denied where evidence justified such denial, to avoid any presumption of compensability under Labor Code, Section 5402;

6. Failure to stay in contact with injured employees thereby resulting in their engaging counsel so as to understand their rights and responsibilities [files do not reflect appropriate ongoing communication with all parties];

7. Failure to properly manage medical treatment of injured employees;

8. Failure to contact the treating physician at appropriate intervals that is appropriate under the circumstances of the cases;

9. Failure to properly establish a strategy to bring claims to as swift a conclusion as possible;

10. Failure to strive for early settlement of cases by soliciting demands for settlement or making offers of reasonable settlement;

11. Failure to use authorized procedures to require injured workers to agree on an Agreed Medical Evaluator or otherwise change physicians where treating physician reports were unreasonable;

12. Failure to attempt to stop excessive medical treatment in many cases, particularly where chiropractors were the treating doctors;

13. Failure to authorize surveillances at the earliest and proper time, including sub-rosa;

14. Failure to exercise reasonable efforts to recover funds through subrogation from third parties;

15. Passage of too much time without claims adjuster being actively involved in the files other than paying benefits;

16. Settlement of claims without authority from Republic Services, Inc., where such authority was required;

17. Failure to determine if Republic Services, Inc. was able to provide modified or alternative work to injured employees to stop temporary disability benefits, pursuant to Republic Services return to work program requiring case manger to work closely with employers Workers' Compensation supervisor;

18. Failure to act promptly upon receipt of an Agreed Medical Evaluator's report to resolve the claim;

19. Failure to request depositions of allegedly injured employees where depositions were necessary;

20. Failure to utilize defense counsel when necessary to expedite adjustment of claims;

21. Using an Agreed Medical Evaluator who has a reputation of liberally finding permanent disabilities on all allegedly injured employees;

22. Failure to adopt an action plan to return injured employees to regular, modified or alternative work within the employers return to work program;

5

23. Failure of claims personnel to become familiar with injured employees job functions and communicate the job information to the treating physician; and

24. Prior to assigning claims to a defense law firm to outline to the defense attorney the outstanding issues as well as the reason for the referral.

25. Use of numerous claims adjusters, sometimes as many as seven, handling one claim file.

*The following is my Analysis, Findings and Conclusions as to each specific claim:*

## ADRIAN AGUILAR
Claim No: 648148569

The employee, Adrian Aguilar, age 32, while employed as a Swamper by Republic Services, Inc., alleged an injury to various parts of his body including his low back and both lower extremities on June 28, 1999 as a result of a truck accident.

He had been employed by Republic for four to five years.

The accident occurred when the truck's drive shaft broke causing the truck to roll over onto its right side in a ditch. The employee, riding as a passenger in the truck was not wearing a seatbelt and was partially thrown from the truck. Although his torso was inside the truck, his legs were outside.

As a result of the accident, the employee fractured his right tibia, had contusions on both legs and suffered neck and low back pain.

The injury was reported to Liberty Mutual on June 29, 1999.

The employee stated to investigators that he was not wearing his seatbelt, yet the driver of the truck said that he removed employee's seatbelt from him after the accident.

The employer's safety manager stated that the employee was not wearing his seatbelt, and had the employee been wearing his seatbelt he would not have been partially thrown out of the truck and sustained as much disability;

6

However, the claims file does not contain any evidence that Liberty Mutual investigated whether the employee did or did not have on a seatbelt.

The claim was settled by Compromise and Release for $450,000.00 on March 5, 2003.

## PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $232,908.00 | $180,000.00 |
| Indemnity | $524,104.00 | $522,925.45 |
| Expenses | $ 14,348.00 | $ 12,327.40 |
| Total | $771,360.00 | $715,829.70 |
| Outstanding | $ 55,530.30 | |

## FINDINGS & CONCLUSIONS

This claim file was totally out of order insofar as the dates various documents were received by the Claims Department. It appears as though the file was shuffled with dated documents that should have been in the front of the file found in the back of the file and vice versa. There is no consistency insofar as the receipt of documents in the claims file. Substantial claim file disarray.

I find mismanagement of this claim in two general areas:

### Lack of Adequate Investigation

The file indicates that Claims was aware from a report from Dr. Bohn that the employee had been involved in an automobile accident in February 1999, just a few months prior to the industrial injury truck accident of June 28, 1999. The doctor indicates that the employee received physical therapy for the February 1999 injury. It is also indicated in the file that at the time of the June 28, 1999 accident the employee had been arrested on three occasions for driving without a license.

As soon as Claims was aware of his earlier accident for which treatment of some type was rendered, the employee's deposition should have been taken so that the information

7

pertaining to that earlier accident could have been uncovered and medical records subpoenaed so that Dr. Bohn and subsequent doctors would be aware of possible prior disability for apportionment and other purposes. This was never investigated, based upon the records in the file, and subsequently when the matter came on before a judge, the value of the case increased drastically because the judge was of the opinion that the employee's condition rated 100 percent permanent disability. He based his analysis on the permanent and stationary medical reports that were in the file at that time, which included a defense report from Dr. Sadoff that rated 69 percent equivalent to $96,360.00 and applicant's medical reports, one of which rated 25 percent [psychiatric] and another at 55 percent [orthopaedic] for a total of 77 percent equivalent to $112,585.00. The judge felt that based upon what he had learned from the file that the employee was unable to return to the open labor market and based upon the case, *LeBoeuf*, the 77 percent would adjust up to 100 percent permanent disability.

Now if the medical reports on which the permanent and stationary findings were made had discussed apportionment even a small percentage, which may have been probable if Claims had uncovered the information relating to the February 1999 automobile accident, then there might have been a totally different picture for the judge to see, in that any apportionment would have brought the applicant's medical reports that rated at 77 percent below the 70 percentile which is the level at which brings into play the life pension.

The case was settled by a structured settlement for $450,000.00 on March 5, 2003 and it was the judge's comments that caused the Claims Department to raise its settlement offer above its projected $150,000.00 value, to meet the $450,000.00 demand.

It would have not taken very much apportionment of permanent disability to the February 1999 automobile accident, bring the value of this case down drastically from $450,000.00

8

particularly when you consider that the 77 percent of applicant's medical report needed only a reduction of 8 percent to fall below the life pension level of 70 percent.

I cannot see any documentation whatsoever in the claim file indicating that this employee's deposition was ever taken to not only learn more about the February 1999 accident, but other possible injuries or illnesses in his life that might have had an affect upon the ultimate permanent disability found by the various doctors.

## Failure to Consider Serious & Willful Misconduct Claim Against Employee

California law allows the reduction of permanent disability otherwise payable to an injured employee if the employee's injury was caused by his or her serious and willful misconduct.

This law also holds that if the permanent disability resulting from the injury equals 70 percent or more and the serious and willful misconduct of the employee cannot be held against him or her.

In this case, the employee stated on a number of occasions that he was not wearing the seatbelt. The driver of the truck stated that he removed the employee from his seatbelt following the injury. This conflicted with what the employee statement to investigators. However, the safety manager who investigated the matter was of the opinion that the employee was not wearing his seatbelt and had he been properly using the seatbelt he would not have been partially thrown out of the truck that resulted in a major injury to his right lower extremity. It is a misdemeanor in California not to wear a seatbelt and it was even more important that the employee wear his seatbelt in this situation because the truck did not have doors, merely a chain across the entrance to the truck. Therefore, he clearly should have been wearing his seatbelt and his own statements were that he was not doing so.

9

Although the applicant's medicals, which rated 77 percent would preclude applying the serious and willful partial defense it certainly would be applicable if you considered only the defense medicals. It would seem that had a proper investigation been performed and apportionment was applicable, then we would be below the 70 percent ultimate permanent disability and a serious and willful defense could have been raised against the employee and reduce the permanent disability by one-half.

From the claims file it appears that the raising of the serious and willful defense against the employee was never considered by the Claims Department.

It is my conclusion, based upon the evidence in the claims file, that had this case been properly managed, the value placed upon it by Liberty in the amount of $150,000.00 would have been the most likely outcome for settlement of this claim. I am therefore of the opinion that this claim was overpaid by the sum of $300,000.00 because of the lack of commonly observed, sound claim management practices by Liberty's adjusters.

## NANCY STUESSER
Claim No: 648148935

The employee, Nancy Stuesser, age 60, while employed by Republic Services, Inc., as a Customer Service Representative, alleged a respiratory infectious disease on December 10, 1998 and a continuing trauma claim for the same type of injury for the period of 1998 to December 2000 as a result of inhaling pigeon droppings at her work site.

She stopped working in December 2000 and filed her claim on April 24, 2001.

The pigeon droppings surrounding the ventilation system in the ceiling of the work site were allegedly 1-½ inches thick.

Both the defense and applicant's examining physicians found that the employee's pulmonary condition was job related and both found her to be 100 permanently, totally disabled.

10

The actual exposure date was found by the examining physicians to be December 1, 1996 to November 30, 1997 for which Liberty had insurance coverage from February 1, 1997 to September 30, 1997 and Golden Eagle Insurance Company and Kemper Insurance had the other period of coverage. However, Kemper went into receivership so Liberty and Golden Eagle agreed that Liberty would be liable for 50 percent of the claim and Golden Eagle 50 percent. Actually, Liberty had 61 days of coverage and Golden Eagle had 62. CIGA, who was joined on behalf of Kemper, was dismissed because of insurance coverage by other carriers, that is, Liberty and Golden Eagle.

## PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $267,721.00 | $ 23,051.50 |
| Indemnity | $414,910.00 | $ 59,008.07 |
| Expenses | $ 37,084.00 | $ 22,999.15 |
| Total | $719,715.00 | $105,058.72 |
| Outstanding | $614,656.28 | |

This claim was initially denied by Liberty but the claim was eventually admitted after the defense physician in a report dated June 17, 2003 found the employee's medical condition to be 100 percent industrially caused, as was the opinion of the employee's examining physician.

On August 15, 2003 Liberty, who had been elected against by the employee, stipulated to an industrial injury and commenced temporary disability indemnity benefits on December 30, 2000. Neither examining physicians found any basis for apportionment of permanent disability.

The employee would not agree to a Compromise and Release agreement because of need for future medical so the case was stipulated at 100 percent permanent disability with further medical. The papers were signed on August 25, 2004 with Golden Eagle agreeing to 50 percent of the liability and Liberty at 50 percent. Liberty apparently adjusts the payments and then receives reimbursement from Golden Eagle.

11

## FINDINGS & CONCLUSIONS

I find no reason to question the management of this case or the ultimate outcome.

### ARABYAN ARMEN
Claim No: 608261027

The employee, Arabyan Armen, age 33, while engaged as a Tire Man for Republic Services, Inc., alleged an injury to his low back while changing a truck tire on July 8, 2000.

He alleged that on Saturday, July 8, 2000, he injured his low back while lifting a tire but did not report the injury to his supervisor until the following Monday. Dr. Johnson's First Report of Injury states that he first examined the employee on July 12, 2000.

He worked for the employer for approximately nine years.

The employee filed a Claim Form with his employer on July 12, 2000 and became represented by counsel on July 31, 2000. His attorney filed an Application for Adjudication of Claim on July 31, 2000 alleging back and psychiatric injury.

Liberty sent a delay letter to the employee on August 15, 2000 indicating that a full investigation was needed as well as his recorded statement. The letter advised him that he would be notified of Liberty's decision to accept or deny the claim by October 5, 2000.

I could not locate the final claims document indicating acceptance or rejection of the claim but liability was eventually accepted.

### PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $379,310.00 | $143,639.24 |
| Indemnity | $158,539.00 | $ 74,211.02 |
| Expenses | $ 31,085.00 | $ 8,784.42 |
| Total | $568,934.00 | $226,634.68 |
| Outstanding | $342,299.32 | |

12

On August 4, 2000, an MRI of the employee's spine performed at L1-2, L2-3, L3-4, L4-5, and L5-S1 were essentially normal with minimal bulging at L4-5 and L5-S1. Dr. Olin in a report dated August 15, 2000 found slight to moderate lower back pain aggravated by standing, lifting, climbing, etc., and headaches every few days. He placed the employee on temporary total disability for an estimated 14 days. Then Dr. Yousif, a neurologist who was called in as a consultant, took over medical treatment. Another MRI was performed on November 21, 2000 with a finding of disc bulging at T12-S1 and L5-S1.

Dr. Sohn [orthopaedic surgeon] was selected by the parties as an Agreed Medical Examiner and in a report dated October 11, 2001 he found the employee to be temporarily totally disabled and possibly in need of spine surgery.

On December 14, 2001 Liberty authorized Dr. Yousif to perform the surgery and it was performed on February 11, 2002.

Prior to the surgery, the employee was given numerous epidural injections and continuous physical therapy.

On December 20, 2002 Dr. Sohn, the Agreed Medical Examiner, reported that the employee was permanent and stationary, if no additional surgeries were to be performed, and he limited the employee to light work with no prolonged weight bearing with provisions for future orthopaedic evaluations and anti-inflammatory medication, as needed.

This restriction by Dr. Sohn on December 20, 2002, is the same restriction and rates the same [65 percent] that he subsequently found and reported in his report of December 12, 2004 (note that this is about two years after the first report of Dr. Sohn.) This work restriction of 65 percent permanent disability amounts to $65,662.50.

Following Dr. Sohn's December 20, 2002 report, massive medical care was provided to the employee by Dr. Yousif and other doctors which helps explain the huge $379,310.00 medical expenditure on this claim.

A sub-rosa investigation was performed in July 2004. No useable films were obtained.

The employee secured a psychiatric report from Dr. Greenspan dated December 22, 2003, which found a major industrial depressive disorder, condition permanent and stationary with a severe loss of function.

The parties agreed to Dr. Preston [psychiatrist] as an Agreed Medical Examiner, and in a reported dated May 11, 2004, he diagnosed a pain and adjustment disorder with slight impairment and recommended future psychiatric care with no apportionment.

The last entry in the claims file is an indication that the defense attorney objects to applicant's Declaration of Readiness, as the defense attorney needs to cross-examine Dr. Preston.

The claims file was in a total state of disarray with many documents out of order and documents that I would expect to find in a claims file were not in fact in the file.

The CD-ROM that I was able to review indicates that defense counsel agreed that Dr. Sohn's 65 percent rating equated to $65,662.50. The claims file does not indicate the final disposition of this case.

### No Three-Point Investigation at Time Claim First Presented

This claim was suspicious from its beginning in that it was a Monday morning reported injury. The employee alleged that he was injured on Saturday but did not report the injury until Monday, at which time he was sent to a doctor. There should have been an investigation at the employer's place of business to determine why the injury was not reported on Saturday, whether the driver of the truck on which the tire was repaired was aware of any injury and the policy at the employer's plant, as to the reporting of injuries. Further, there was no investigation to

14

determine whether the employee engaged in sports on weekends wherein it would be possible for such an injury to occur. Complete failure of initial investigation of a questionable Monday morning reported injury with utter failure to comply with the 24 hour contact with supervisor and the treating physician to discuss merits of picking up liability.

### Failure to Promptly Initiate Outside Investigation To Determine the Degree of Disability

This employee was allowed to continue on temporary total disability for more than three years without any type of outside investigation being instituted until approximately July 2004. Although sub-rosa films were obtained at that time [six days of surveillance] they were apparently of no great value, as they did not show him engaged in any type of physical activity, other than walking.

### Failure to Bring Matter to the Attention of the Appeals Board Based on Dr. Sohn's [AME] Report of December 20, 2002

Work restrictions that Dr. Sohn set forth in that December 20, 2002 report are identical to the work restrictions he put in his report some three years later on January 6, 2005 as well as December 12, 2004. That is the limitation to light work that rated apparently at 65 percent permanent disability equating to $65,662.50. Had this case been brought to the attention of a judge in 2002, following receipt of the AME's report, it is most likely that the endless medical treatment that was rendered thereafter would have been prevented and the matter closed out in 2002. It is obvious from reading this file that Claims simply allowed applicant's attorney to keep the employee under continuous medical treatment by medical doctors who succeeded in running the medical treatment bills up to $379,310.00 from the last entry I see in the claims file. It is important to note that the MRI performed on November 21, 2000 from T12-L1 to L5-S1 [six levels] was essentially normal. Likewise, MRIs by Dr. Sanders on August 4, 2000 indicating L1-2 normal, L2-3 normal, L3-4 normal, L4-5 minimal bulging, L5-S1 slight bulging. The fact

15

that Dr. Sohn indicated in the Spring of 2002 that the employee was using a cane certainly should have awakened the claims adjuster to perform an outside investigation at that time with possible sub-rosa films. Obviously, as time passed employee's counsel warned him of this likelihood of an outside investigation so an early investigation would have been reasonable for an adjuster to have instituted in this case. The file indicates that Liberty authorized disc surgery on February 11, 2002 but thereafter for more than three years the employee appears to be given numerous epidurals without any significant relief. At most, you expect no more than three epidurals.

I can find no evidence in the claims file or on the CD-ROM to indicate that the employee's deposition was taken in a timely manner to uncover possible pre-existing medical problems that might lead toward apportionment of permanent disability.

## FINDINGS & CONCLUSIONS

In conclusion, it is my opinion that this case has been mishandled from the very inception, lack of investigation, failure to take the employee's deposition until July 26, 2004 and failure to bring the matter to a judge's attention based upon Dr. Sohn's [AME] report of December 20, 2002. In addition they let the matter drag on for four years which added additional medical expense.

In my opinion Republic should not be liable for any portion of this claim for which Liberty paid out as last indicated in the claims file, $212,268.58, for failure to conduct an adequate initial investigation to determine if the employee's injury was indeed caused by lifting the tire on the date he alleged.

If the claim should be deemed compensable then Liberty should have proceeded to a judge's Trial based upon Dr. Sohn's December 20, 2002 report wherein Dr. Sohn, the AME, gave permanent work restrictions. By failing to proceed to Trial at that time endless medical

16

expenses were subsequently incurred amounting as best as I can estimate to an additional $150,000.00, which Republic should not be liable for. If we consider the failure to institute an immediate investigation, the whole claim expenditure should be disallowed, except for $9,000.00 of initial medical legal expense.

### PETER DELEON
Claim No: 648149079

The employee, Peter DeLeon, age 40, while employed as a mechanic by Republic Services, Inc., alleged an injury to his right ankle and low back on December 12, 2000 as a result of twisting his right ankle when he allegedly stepped into a pothole in the company yard and then fell backwards.

There is substantial discrepancy as to how the alleged injury occurred, as will be discussed later.

The employee had worked for the employer for only two days prior to the alleged injury.

### PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $208,321.00 | $123,349.66 |
| Indemnity | $180,251.00 | $ 92,074.84 |
| Expenses | $   7,589.00 | $   5,168.01 |
| Total | $396,161.00 | $220,592.51 |
| Outstanding | $175,568.49 | |

There appear to be many missing documents from the claim file. Based upon the documents in the file it appears to me that this very suspicious claim should have been litigated.

As noted above, the employee had worked for the employer for only two days when he allegedly injured his back and other parts of his body when he fell into a pothole or fell out of a truck, which event occurred was never determined.

His supervisor said he told her that on December 2, 2000 at about 1:00 p.m. he fell backwards when he stepped into a pothole at work. The supervisor agreed that there were

17

potholes at the work site. However, he told another co-worker that he slipped getting out of a truck. There is no question but what the employee on or about the time of this alleged injury was suffering from a very serious back condition because he had emergency back surgery at Kaiser Permanente on that December 15, 2000 at which time a large disc was noted at L3-4. A laminectomy was performed at Kaiser on that day by a Kaiser surgeon. The injury allegedly occurred on a Saturday December 2, 2000 and he told a co-worker that he had a sore ankle. He did not mention his back. He claimed that on the following Sunday morning he felt stiffness in both his ankle and his back. On Monday December 4 he worked his entire shift and performed all of his duties. Tuesday at work he claimed that he felt a minor pain in his right ankle and low back but still worked a full shift. On Wednesday December 6 he allegedly felt back and ankle pain but finished his work shift. He worked off and on until December 14 at which time he went for an MRI at Kaiser. The following day, December 15, 2000 surgery was performed at Kaiser to his low back.

The medical reports indicate that he sustained a low back injury prior to employment with Republic while working for Coach USA. Nowhere in the claim file can I discern that those medical records relating to the prior injury were ever secured even though he advised the doctor that he previously received medical treatment for his back. Dr. Sadoff, a defense reporting doctor, states that he saw the employee on May 7, 2004 and he was continuing under medical treatment and that he had had a previous injury to his back but the employee told Dr. Sadoff that he fully recovered from the earlier back injury. I can see nowhere in the claims file that those earlier medical records were secured. Following the Kaiser surgery he had additional surgery involving lumbar fusion at L3-5 on April 16, 2003. Although the file indicates that the employee's deposition was taken after the first surgery a copy of the deposition is not in the claims file. The file does not indicate that Liberty made any attempt to secure the medical

18

records from Kaiser, which might have, with sufficient scrutiny, indicated that the need for surgery was not because of any recent incident thereby putting responsibility on the Coach USA injury. Dr. Sadoff in his report of May 7, 2004 stated that he finds no basis for apportionment provided the employee is telling him the truth. A doctor should not have to rely upon the employee's recollection for such a finding but should have been provided the records from Coach USA involving the medical treatment for the prior back injury. The claims file does not indicate at what time in the year 2000 that the employee had the back injury with Coach USA and considering the fact that he only worked for Republic for two days, prior to the alleged injury, it is crucial to know the date of the back injury at Coach USA. The case becomes very complicated in 2002 and thereafter because the back surgery at Kaiser apparently failed and the employee started having psychological problems as indicated by Dr. Bender, a urologist. The investigator who conducted an investigation from Crawford indicates in his report of January 24, 2001 that the employee's attendance record was "perfect" up to the date of injury but it should be noted that he only worked for two days, prior to the alleged injury.

Inasmuch as the employer has medical control during the first thirty days following an industrial injury there is no explanation in the claims file as to why Liberty allowed the employee to take over his medical treatment barely thirteen days after the alleged injury.

There are no records in the claims file that would give me any understanding as to the disposition of this case.

It is my conclusion that this case should have been denied and the matter taken to Trial in light of the inconsistent statements of the employee as to how the injury occurred and given particular note to the fact that he had only worked for the employer for two days prior to the alleged injury. There was total failure of Liberty to fully investigate this alleged claim, particularly in view of the inconsistent statements by the employee as to how the injury occurred.

19

Therefore, I would disallow this entire claim and responsibility should not be placed upon Republic for any payment.

### ADOLFO ALDACO
Claim No: 648148610

The employee, Adolfo Aldaco, age 61, while employed as a Driver/Front Loader by Republic Services, Inc., alleged an injury to various parts of his body, including neck, low back, right upper extremity and right lower extremity on December 6, 1999 while pulling a large container into a trailer. He alleges that he experienced sudden pain in his neck but kept on working. The pain got worse over the weekend. He reported the injury to his supervisor on the following Monday.

The employee worked for the employer since 1990.

### PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $186,256.00 | $140,452.80 |
| Indemnity | $157,617.00 | $ 73,254.57 |
| Expenses | $ 18,086.00 | $  9,885.74 |
| Total | $361,959.00 | $223,593.00 |
| Outstanding | $138,365.89 | |

This is another very suspicious claim in that it was not reported until Monday morning whereas the injury was allegedly brought about by the act of pulling a container into a trailer on the prior Friday. There appears to have been no investigation as to what occurred over the weekend. No questioning of the employee's supervisor or of co-workers as to the employee's recreational activities, etc.

Even though he had worked with the employer for some nine years prior to the injury, this does not necessarily mean that he was indeed injured on Friday so it was important to investigate his weekend activities.

The employee filed, in addition to the specific injury, a continuing trauma claim for the period December 1998 through December 16, 1999 alleging injury to his neck, low back, right leg, right side, and both upper extremities.

### Failure to Perform Adequate Investigation of This Claim

As noted earlier Liberty failed to conduct a thorough investigation immediately following the alleged injury of December 6, 1999. Further, I can find no evidence in the claims file that the applicant's deposition was ever taken or that any type of surveillance was placed upon him during the long period of time that the claim was in existence from December 6, 1999 to the stipulation to 75 percent permanent disability on December 10, 2002.

Apparently, a few months following the Stipulation, the employee filed a Petition for New and Further Disability. The Petition for New and Further was apparently filed on November 18, 2003 with additional body parts alleged. The claims file indicates that the defense attorney recommended on January 29, 2004 that the employee be deposed. Such a deposition early on in the case seems extremely important in that employee's doctor, Dr. Sperling, on February 16, 2000 stated in a report that he sustained an automobile accident injuring his neck on February 1, 1996. Apparently at that time his head hit a windshield and he had neck pain. Medication was prescribed. Apparently an x-ray taken on February 18, 1996 on or about the day of the accident indicated "cervical spine moderate degenerative changes." This is somewhat similar to the x-rays that were taken after the alleged industrial injury of December 6, 1999. Dr. Sperling further indicates that from 1996 following that automobile accident up until 1999 he was depressed had sexual dysfunction and was taking Viagra. All of this earlier medical information should have been provided certainly to Dr. Sadoff, the defense orthopaedic surgeon. Apparently Dr. Sadoff was in fact never provided with this information, which would have most probably been a basis for apportionment. Apportionment in the cervical area would have been

21

very important because of the surgical procedure provided by Liberty was for degenerative changes at C5-6 for which surgery was performed on August 6, 2001 to that level only even though an MRI on July 26, 2001 showed severe degenerative changes at C3-4 and C4-5. In considering apportionment, which obviously claims did not given much attention to in this case, it is significant to note that Dr. Michael Slutzker in a report to Liberty on December 30, 1999 indicates that this 64-year old employee on December 6, 1999 began noticing an exacerbation of prior intermittent pain in the upper back, neck, low back and legs. At that time, the main complaint was numbness in both hands, which has been intermittent for the past year. He further notes increasing low back pain over that period. Certainly this doctor and the other doctors in the case should have been questioned either by letter or deposition, as to what part the automobile accident of February 1, 1996 played in these complaints. It is important to consider that in California Workers' Compensation law getting a 70 percent permanent disability substantially increases the value of a case because a life pension applies for all permanent disability of 70 percent or more. Whenever a claim seems close to the 70 percent permanent disability level, an adjuster should exert ever effort to secure some level of apportionment to stay under the 70 percent level.

## Stipulation to 75 Percent Permanent Disability was Unwarranted

Although there are different figures in the claims file as to what the various reports rated and how the parties arrived at the 75 percent stipulation for permanent disability it appears that the parties considered the applicant's report, particularly Dr. Sperling, to rate 90 percent permanent disability and the defense report to rate 20 percent permanent disability. If you accepted the practice of taking the split, the split would have been 60 percent permanent disability. That would give a difference of substantial magnitude in that the defense reports would equate to a value of $11,280.00 versus the employee's medical report that equated to

22

$139,495.00. Although it is customary to agree upon a split between defense and applicant medicals in California, I have never seen an agreement to split such a wide difference. Normally we split when the difference in ratings around 10 percent but not the wide split taken in this case between a 20 percent and 90 percent rating as surely one side is very wrong in their analysis as to the extent of permanent disability. With such a wide split, unless an applicant is willing to take a rating closer to the defense rating, the case should go to Trial.

With the potential of apportionment to bring down the employee's medical below the 70 percent level and considering the extremely lower defense medical value of 20 percent, there never should have been a stipulation of 75 percent in this case because from past practices we know that an employee will immediately then try to go from 75 percent to 100 percent, which is indeed what happened in this case. Within three or four months after the stipulation the employee filed a Petition for New and Further Disability and the defense attorney states that the obvious intent is to get 100 percent.

I can see no reason why this case should not have been tried before a judge in light of the wide range of permanent disability estimates and considering the 1996 automobile accident.

To support the need for having to depose the applicant in this case, I call attention to the report of psychiatrist, Dr. Maloff, on behalf of the employee dated April 8, 2003 wherein he finds major depression and anxiety all being work related. This doctor indicates that the employee is no longer work oriented and because of the injury and loss of work orientation he drinks only one beer on a weekend. He is able to do gardening. This statement is obviously ridiculous and should have called for an immediate sub-rosa on this employee even as late as April 8, 2003. The doctor found no apportionment even though as indicated above the employee has been depressed and suffering from anxiety since the automobile accident in 1996.

23

### Stipulation to 75 Percent Equating To $108,445.00

### Exceeded Liberty's Authority

It should be noted that the stipulation to 75 percent permanent disability equating to $108,445.00 exceeded Liberty's authorization to stipulate or settle for no higher than $70,000.00 as authorized by Republic.

## FINDINGS & CONCLUSIONS

It seems reasonable that had this case been properly managed that the permanent disability would have come in at approximately $25,000.00, about double the defense doctor's estimation and thereby reducing the permanent disability by some $83,000.00 plus eliminating the life pension that was estimated to be valued at $20,936.00. Therefore, in my opinion, this claim was overpaid by Liberty $104,336.00 in permanent disability and life pension obligations as well as $38,445.00 in medical treatment beyond September 2001 for a total overpayment/disallowance of $142,781.00.

### GUSTAVO REYES
Claim No: 648148611

The employee, Gustavo Reyes, age 34, while employed as a truck driver by Republic Services, Inc., alleged an injury to his low back [later claimed injury to his neck, both lower extremities and psyche] on December 1, 1999 when he was pushing a container.

The employee was hired by the employer on May 11, 1989.

### PAYMENTS

| Incurred | | Paid | |
|---|---|---|---|
| Medical | $161,853.00 | $156,266.99 | |
| Indemnity | $132,126.00 | $ 98,135.05 | |
| Expenses | $ 17,436.00 | $ 13,583.12 | |
| Total | $311,415.00 | $267,985.16 | |
| Outstanding | $ 43,429.84 | | |

This claim file was in total disarray. The evidence in the file clearly indicates that the claim should never have been accepted as industrial. Apparently, not only did the employee file

a specific injury claim for date of injury from December 1, 1999 but filed a continuing trauma claim for the spine and both legs with a date of injury of December 1989 to December 31, 1999. To show the confusion that existed in the handling of this claim between the Claims Department and defense attorney, there is a memorandum in the file from Claims to the defense attorney dated March 19, 2000 wherein Claims states, "Well Leonard, I am sorry but expected more of a file review based on our phone conversations. Please advise what *Labor Code* or case law you are relying on with your opinion. Maybe I'm missing something. You promised last week you would set deposition. Need deposition prior to psychiatric QME."

Then in the memorandum from the claims adjuster to the defense attorney dated July 20, 2000 we note, "I never denied a psychiatric claim based solely on a doctor's review of records. In my experience, in order to deny a psychiatric claim the doctor must evaluate the employee and then issue a report."

Apparently, neither Claims nor the defense attorney had solicited a proper psychiatric report but only a medical report based solely on a review of medical records to rebut the employee's psychiatric report from a Dr. Curtis. Even though Claims was aware early on in the file that a doctor had reported that the employee had a prior accident in November 1997 this was never explored and Claims picked up the case. They had two medical reports, one from Dr. Sadoff dated June 26, 2001 that indicated that the alleged claim was not industrial but was all due to a November 1997 injury. The doctor states, "It is my opinion that 100 percent of the patient's current back symptomatology is due to the individual's accident of - - November 1997 as noted per Dr. Uy's report of November 29, 1999." To rebut the employee's claim of psychiatric, in addition to the orthopaedic, they already had a report from Dr. Perlo, a psychiatrist, dated March 7, 2001 wherein he found that the employee was malingering, had abused alcohol and did not sustain any psychiatric industrial injury.

The file indicates that Liberty did not even have coverage for Republic Services, Inc., at the time of the 1997 accident.

What more did Liberty need to deny this claim? Nothing!

## CONCLUSION

In my opinion because of the above analysis no benefits should have been paid on this claim. It should have been denied and taken to Trial. Therefore, I would disallow the total amount incurred, which is $298,985.16.

### ABELARDO DIAZ
Claim No: 648147085

The employee initially alleged an injury to his right knee and ankle, which he claimed was sprained while he stepped off a ladder. Subsequently he claimed injury to his left knee as well.

I have not been provided with any hard copy claims file so my review has been based only upon the CD-ROM notes that are most limited.

## PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $112,331.00 | $105,540.98 |
| Indemnity | $129,706.00 | $122,782.05 |
| Expenses | $ 9,827.00 | $ 6,549.00 |
| Total | $251,864.00 | $234,872.14 |
| Outstanding | $ 16,991.86 | |

## CONCLUSION

Because of the failure of claims to provide a hard copy of claims file, I am unable to express an opinion as to the management of this claim.

26

## RAFAEL PENA

Claim No: 648148805

The employee, Rafael Pena, age 42, while employed as a truck driver by Republic Services, Inc., alleged an injury to his right shoulder and right elbow on December 2, 2000 while lifting a trashcan. [File confusing as to date of injury. Most likely the date is October 9, 2000 inasmuch as the employee was terminated in November 2000 for running over a co-worker's foot]. He also alleges the injury occurred while lifting a bag of grass.

### PAYMENTS

| Incurred | | | Paid |
|----------|---|---|------|
| Medical | $175,828.00 | | $168,940.76 |
| Indemnity | $ 80,336.00 | | $ 67,456.54 |
| Expenses | $ 10,999.00 | | $ 10,999.75 |
| Total | $267,163.00 | | $247,395.05 |
| Outstanding | $ 19,767.95 | | |

### Lack of Initial Investigation to Determine Compensability

The claims file, which is in much disarray, has confusing dates of injury. The Employer's First Report indicates an alleged injury on October 23, 2000, yet the Claim Form filed by the employee indicates a date of injury of December 8, 2000 and the Application for Adjudication of Claim indicates a date of December 8, 2000.

However, the claims file indicates that the employee was fired in November 2000 for having run his truck over a co-worker's foot. This confusion was never clarified by a thorough investigation. It seems more likely that the Employer's Report of Injury with the October date of injury is more credible, although not clarified. Then when he was fired for misconduct, (running over a co-workers foot) he starts seeing Dr. Schaeffer, a chiropractor for an extremely lengthy period of treatment. He apparently continued working after the reported injury in October 2000 and apparently went into extensive medical treatment after the firing. It is important to note that

27

this was an unwitnessed alleged injury to the right elbow and right shoulder and when an attorney took over representation for the employee the cervical was added.

This is a very questionable claim that was not adequately investigated to determine compensability.

### Excessive Medical Treatment

Dr. Schaeffer, a chiropractor, became initially involved in this case on December 18, 2000 and treated the employee with a minimum of 140 chiropractic modalities. Between May 11, 2001 and August 15, 2001, he made 20 visits to the chiropractor. Between November 30, 2001 and March 13, 2002 [a period of about 3 ½ months] he saw the chiropractor for 80 visits. Between August 10, 2002 and September 25, 2002 he saw the chiropractor for 20 additional visits. He saw the chiropractor at least 120 times. It seems quite possible that he has had more visits to the chiropractor but I was only able to determine the alleged visits based upon the employee's request for mileage reimbursement.

It appears that Dr. Schaeffer's bill amounted to approximately $59,927.16 for more than a four-year period of chiropractic treatment without any positive outcome.

He also had ganglion nerve blocks by Dr. Bohn on at least five occasions between December 14, 2002 and March 7, 2002 for a total billing of $20,192.99.

These expenditures should have been challenged early on under *Labor Code §4050* and a medical dispute raised immediately following a few chiropractic visits. Certainly no more than seven chiropractic visits should have been allowed prior to a challenge. The law allows an insurer to require an injured employee who has selected treatment by his or her treating physician to be examined at reasonable intervals to determine if the ongoing treatment is medically reasonable. This challenge was never raised in this case.

28

The file indicates that Claims agreed to send the medical dispute to an Agreed Medical Evaluator, Dr. Pechman, without having first secured a defense QME evaluation. This is never a reasonable procedure in litigating a California claim.

It appears that the chiropractor was allowed to treat without any intervention during the period of December 18, 2001 to July 7, 2003.

It appears, though there is confusion in the file, that the case was settled based upon a Stipulation to 22 percent permanent disability equal to $12,880.00, based on Dr. Pechman's report.

Apparently, applicant's doctor, Dr. Sobol, performed right shoulder arthroscopy on July 24, 2001, described as a rotator cuff debridement. However, the shoulder was worse after the surgery. A reading of the medical reports seem to indicate that once the chiropractor became involved, that is Dr. Schaeffer, the right shoulder became more disabling, which apparently led to the surgery of July 24, 2001. Malpractice on the part of the chiropractor should have been considered.

## CONCLUSION

In my opinion, this case had been mishandled from the beginning in that an adequate investigation was not performed to determine what indeed happened if anything while working for Republic. It is possible that this a spite claim after the employee was terminated in November 2000 because it is after that date that he goes under the care of Dr. Schaeffer and other doctors and huge medical bills run up to the amount of $175,828.00.

If the claim had been properly handled, it would appear to me that at most there would have been a month or so of medical treatment with a disability rating in the range of 22 percent, which equates to $12,880.00. In my opinion, this claim has been overpaid in the amount of approximately $239,000.00.