## FERNANDO SORDIA
Claim No: 608338489; 648147482

The employee, Fernando Sordia, age 24, while employed as a Swamper for Republic Services, Inc., alleged an injury to his left ankle on October 26, 2000 when he allegedly stepped out of a truck, lost his footing and fell forward onto his knees. He also alleged an injury on November 17, 2000 to his left foot when a co-worker allegedly ran a truck wheel over his foot. His attorney alleged another injury to his right hand on November 2, 2000.

The employee was hired on November 26, 1999.

## PAYMENTS
### [Assume for both injuries]

| Incurred | | Paid | |
|---|---|---|---|
| Medical | $ 78,912.00 | | $ 68,911.73 |
| Indemnity | $115,397.00 | | $ 92,629.12 |
| Expenses | $ 17,329.00 | | $ 15,616.18 |
| Total | $211,638.00 | | $177,157.03 |
| Outstanding | $ 34,480.97 | | |

The alleged injury of October 20, 2000 was never investigated, no statements taken, yet benefits were provided. Thereafter, on November 17, 2000 his left foot was fractured when a co-worker drove a company truck over that foot necessitating surgery. Apparently, not only did the worker run over the left foot, but then backed up and ran over it again. He had two foot surgeries, one in November 2000 and another on April 30, 2001 as a result of having the foot run over by a co-worker.

He also alleged an injury to his right hand that allegedly occurred on November 2, 2000 when it was caught between a trashcan and a truck. He received medical treatment and four stitches to that hand.

On September 25, 2001 Liberty engaged Dr. Pechman as a QME and he found the employee to be permanent and stationary as a result of his right hand laceration and his crushed left foot. That report rated 37 percent permanent disability equivalent to $29,750.00. The

30



EXHIBIT

1 – VOLUME 2

defense attorney requested authority to settle the case for $44,192.86, which included $15,000.00 for future medical. The Claims Department would not authorize that amount but recommended $33,000.00 with the opinion that the future medical was not worth $15,000.00. At that time, Liberty had the presumption of correctness as to Dr. Pechman's report, as he was the treating doctor. This meant that unless the employee could present more convincing medical evidence to the contrary, a Judge would adopt Dr. Pechman's opinion.

The file indicates that Claims sat on this case without any action for approximately 1-½ years after receipt of Dr. Pechman's report. It appears that during this time the employee was being paid temporary disability on two claims. The overpayment of temporary disability resulted from payment of temporary disability for the October 26, 2000 date of injury, [left ankle] which was never investigated, and the November 17, 2000 date of injury where his left foot was run over by a co-workers' truck.

Apparently the employee was under the care of Dr. Griffin and on September 18, 2001, Liberty petitioned for a change of physician, which was granted. On February 20, 2002 in his Minutes of Hearing, the judge indicates "Parties to attempt to select a treating doctor from five names to be furnished by defendant. Applicant may select one physician. Set up a visitation hopefully prior to next Conference."

This claim sat for 1 ½ years, as explained above, during which time temporary disability benefits were paid but no treatment was being rendered to the employee and claims did not follow up on the Judge's instructions. .

On July 13, 2005 the judge took the matter off calendar to allow an AME examination and report by Dr. Brodie. Dr. Brodie apportioned all of the disability to the November 17, 2000 date of injury.

31

The Department apparently rated that report at a 25 percent standard. A 25 percent standard equates to $16,277.50. The file indicates that when the matter came on before Judge Goldman on May 31, 2005 he continued the Trial to July 13, 2005 before Judge Zarett. At that time, the temporary disability overpayment for the period of November 17, 2000 through January 10, 2002, amounted to 419 days equivalent to $17,444.73. Claims had apparently also paid the wrong weekly temporary disability rate for 1-½ years at $490.00 per week when in fact it should have been $198.56 per week.

Considering the wrong weekly amount for temporary disability the file indicates that the overpayment of temporary disability indemnity might be as high as $34,972.80.

A sub-rosa conducted on the employee on February 15, 2005 shows that he was a very active 28 year old and Claims' team manager recommended that more sub-rosa film be obtained.

The documents that were available in the claims file do not indicate the outcome of this case or if the future sub-rosa films were ever obtained.

## CONCLUSION

Although I do not know the final outcome of this case, it is obvious that the alleged injury of October 26, 2000 should have been denied inasmuch as it was not reported until 20 days after its allegedly occurred and Liberty conducted no investigation to determine whether this was a valid claim or not. This claim for which benefits were paid in the amount of $23,524.76 should be disallowed. As to the foot injury claim where his foot was run over by a co-worker driving the truck that claim correctly was admitted but there was an overpayment of temporary disability indemnity in the amount of approximately $34,972.80 for which there is a question as to whether a judge will allow a credit of that amount against permanent disability. Certainly a portion of that amount should be allowed as a credit against future benefits because there was fraudulent

32

activity on the part of the employee by cashing two temporary disability checks received at the same time when he had to know that he was being overpaid.

The most significant mismanagement of this case in my opinion was that of not going forward on Dr. Pechman's report of September 25, 2001 by either securing a settlement or going to Trial. This case lingered from September 25, 2001 until at least May 31, 2005 when Judge Goldman continued the case to July 13, 2005 and I have no information as to what happened after that date. It would seem reasonable to disallow most of the indemnity that was paid amounting to $115,397.00, which apparently does not include the final settlement monies. Approximately 11 ½ months of temporary disability would seem to be reasonable for the fractured foot, which would be approximately $9,000.00 and accepting Dr. Pechman's permanent restrictions equated to $29,750.00, a reasonable amount for indemnity would be approximately $38,750.00. I would therefore disallow $76,647.00 of indemnity and half of the medical for approximately $40,000.00 in that treatment was allowed to run from September 25, 2001 up until 2005. Therefore, in my opinion, there has been an overpayment of approximately $116,000.00 in the claim file for the injury of November 17, 2000 and $23,524.76 for the alleged injury of October 26, 2000.

<u>**RUBIN MAGANA**</u>
Claim No: 608203462

The employee, Rubin Magana, age 22, while employed as a truck driver for Republic Services, Inc., alleged an injury to his left shoulder, neck, spine, left calf, and psyche on September 30, 1999 when his truck lost its breaking as he drove down a hill striking a passenger car killing two passengers and seriously injuring two others in the car.

33

## PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $30,945.60 | $30,945.60 |
| Indemnity | $64,853.60 | $64,853.60 |
| Expenses | $ 1,277.20 | $ 1,277.20 |
| Total | $97,076.40 | $97,076.40 |

## FINDINGS & CONCLUSIONS

As early as October 28, 2000 Liberty had a permanent and stationary report from Dr. Nelson and on January 11, 2002 another psychiatric report from Dr. Monglio, which both rated by the Disability Evaluation Unit, at 24 percent. It would seem that since both reports rated the same the permanent disability value as of January 11, 2002 was $14,480.00. An employee's psychiatric doctor found the employee permanent and stationary on October 6, 2002. On October 23, 2000 applicant's attorney advised Liberty that he was willing to recommend a Stipulation of 24 percent permanent disability plus future medical. The case eventually settled by means of a Compromise and Release for $25,000.00 on May 15, 2004. Applicant's attorney had twice made a demand for settlement upon Liberty without response and therefore the employee's counsel filed a Declaration of Readiness. This is what prompted Liberty to bring a defense attorney into the case who apparently came on board on April 30, 2002 and as noted above, the case was settled in less than one month with defense counsel and the employee's counsel agreeing on the settlement. In my opinion, the settlement should have been $19,580.00 inasmuch as we normally add on 10 percent of the permanent disability to buy out future medical. I can see no reason why that was not applied in this case.

## Alcohol Investigation

The file is unclear as to whether there was an adequate investigation to determine if the consumption of alcohol by the employee was a contributing cause to this injury. The hospital records appear to indicate that he did have an alcohol level in his body, which was abnormal for

34

him. The blood analysis taken at Santa Paula Memorial Hospital on September 30, 1999, the day of the accident clearly indicates a question as to the alcohol content of the employee's blood. It appears as though this was not follow up on by Liberty to determine whether there was a defense to this claim based upon intoxication. At least, the issue should have been explored, as it could have been an excellent negotiating tool to settle this case.

### Third Party – Subrogation

Initially Claims considered the possibility of a third party claim in that the brakes, according to the employee, gave out causing him to be unable to control the truck going down the hill; however, there is no evidence that an adequate investigation as to the cause of the brake failure was carried out and matter was dropped once the employee's attorney felt that there was no potential for third party action. This is no reason not to have proceeded on to fully investigate the potential for subrogation. The file does not indicate on what the employee's counsel was basing his opinion.

Being unable to determine whether there was indeed a possible third party action, and whether there was evidence to support an intoxication defense, I am of the opinion Republic should not be liable for any expenditures in this case.

### CONRADO HUIPIO
Claim No: 648147630

Employee, Conrado Huipio, age 41, while employed as a truck driver for Republic Services, Inc., alleged an injury to his spine, left groin and left lower extremity on May 14, 2001 as a result of lifting a heavy trashcan.

The employee was hired by the employer in 1996.

35

## PAYMENTS

| Incurred | | | Paid |
|---|---|---|---|
| Medical | $25,706.99 | | $25,706.99 |
| Indemnity | $48,735.25 | | $48,735.25 |
| Expenses | $ 5,273.35 | | $ 5,273.35 |
| Total | $79,715.59 | | $79,715.59 |
| Outstanding | $ -0- | | |

This claim was settled by a Stipulation of 25 percent permanent disability equivalent to $16,277.50 with provision for further medical on January 6, 2003.

There were a number of flaws in the manner in which this claim was managed by the adjuster from the beginning to the end.

### Lack of Investigation

The employer indicated to Claims that it was suspicious of this employee's claim, as he did not report it to his supervisor until the day following the alleged injury. The injury was not witnessed. It appears from the claims file that there was no attempt to take the supervisor's statement or the employee's statement early on in the case. There was no three-point contact within 24 hours.

At most, this claim appears to be a minor low back strain yet by failure to follow through it turned into a substantial medical outlay and permanent disability of 25 percent.

### Failure of Claims Adjuster to Contact Employee
### To Cause Him to Engage Counsel

Although the alleged date of injury is May 14, 2001 the file indicates that there was no attempt by the claims adjuster to contact the employee until June 18, 2001, more than one month after the alleged date. The file indicates that the adjuster placed a telephone call to the employee for the initial contact. The employee was not home so a message was left with his daughter to call. Although he continued to work sometimes on modified duty and sometimes on regular

36

duties, he was seen by various doctors and Dr. Feldman in a report dated July 25, 2001 finds no need for surgery, no need for any epidurals, just back strengthening exercises.

On January 2, 2002, the file indicates that the claims adjuster wrote to the employee noting that he had received no treatment since September 25, 2001. Approximately twenty days after the date of this letter, the employee engaged counsel to represent him. What should have happened, was rather than the letter, the claims adjuster should have telephoned the employee through the employer and attempted to resolve this matter at that time. That would have been a time when the employee is still working for the employer and not receiving any medical treatment. This would have been an ideal time to settle this case. On January 24, 2001 applicant's counsel advised Liberty that the employee was going free choice for medical treatment and here is where the value of the case escalates.

The applicant's deposition was taken on July 16, 2002 at which time he was off on temporary disability by Dr. Hoang selected by applicant's counsel. Dr. Sadoff an orthopaedic surgeon selected by Liberty in his report dated July 25, 2002 indicates that he feels the employee is not making a full effort during the doctors' tests. He finds him to have a completely normal neurological physical examination. At that time of course he is no longer working as the attorney's selected physician took him off work. Dr. Sadoff found him permanent and stationary with respect to no very heavy lifting. Inasmuch as Liberty did not provide the doctor with a job description he could not comment upon whether the employee was a Qualified Injured Worker.

The employee's counsel filed the Application for Adjudication of Claim on January 23, 2002, which as I previously indicated was approximately one month after the claims adjuster wrote to the employee rather than telephoning him in an attempt to resolve the case.

37

Even Dr. Wood in a report dated July 16, 2001 found no evidence of any significant pathology and indicated that the employee could do his normal work duties. There is no copy of the deposition in the claims file.

## FINDINGS & CONCLUSIONS

In my opinion, this claim was mishandled by the Liberty claims adjuster initially by failing to perform a proper investigation to determine if the alleged injury was indeed industrial. The employer was suspicious of this claim but the adjuster made no attempt to perform an investigation

Of course the failure to investigate was further compounded by the failure to contact the employee and dispose of this case prior to him having engaged counsel on January 23, 2002.

I would therefore disallow the total costs incurred.

### GABRIEL TABAREZ
Claim No: 608198503

The employee, Gabriel Tabarez, age 44, while employed as a Maintenance Worker for Republic Services, Inc., alleged an injury to his left shoulder on December 29, 1998 while lifting a bin.

The employee was hired by the employer on October 11, 1993.

### PAYMENTS

| Incurred | | Paid |
|----------|--------------|-------------|
| Medical | $26,421.32 | $26,421.32 |
| Indemnity | $56,851.51 | $56,851.51 |
| Expenses | $   887.79 | $   887.99 |
| Total | $84,160.62 | $84,160.62 |
| Outstanding | $ -0- | |

38

This case was settled by means of a Compromise and Release in the amount of $25,000.00 on May 30, 2001 and approved by Judge McHenry on that date. I would disallow the $3,000.00 penalty assessed against Republic that was found against Liberty's mishandling.

## FINDINGS & CONCLUSIONS

I have no reason to disagree with the handling of this claim and ultimate settlement other than to say Liberty should have made an offer to settle this case as soon as it had a medical report from Dr. Tasto on October 6, 2000 that indicated the employee was permanent and stationary.

Twice applicant's counsel demanded an offer but Liberty did not take action to resolve the case until after applicant's attorney filed a Declaration of Readiness and the matter was set for a Mandatory Settlement Conference. This is another example of the practice of Liberty not acting promptly upon medical reports that indicate some disposition should be immediately made.

### MARIA MARTINEZ
Claim No: 648148613

I cannot make any comment on this file inasmuch as there was no claims file was made available for my review nor any CD-ROM notes.

### MARIA DURAN
Claim No: 648149936
[Was 60818257 (608182571)]

The employee, Maria Duran, age 36, while employed as a Sorter by Republic Services, Inc., alleged an injury to her left knee, left shoulder, and upper back when she slipped on a piece of plastic at work causing her to fall on to her left knee twisting her upper back.

The employee worked for the employer for about three years prior to her alleged injury.

39

## PAYMENTS

| Incurred | | | Paid |
|---|---|---|---|
| Medical | $19784.58 | | $19,784.58 |
| Indemnity | $62,168.05 | | $68,168.05 |
| Expenses | $  719.60 | | $  719.60 |
| Total | $82,672.23 | | $82,672.23 |
| Outstanding | $ -0- | | |

Initially Liberty and the employee who was represented by counsel proposed a stipulation to permanent disability of 40 percent based upon Dr. Nagelberg's report, which equated to $33,188.69.

The matter as to the Stipulation was set for Mandatory Settlement Conference for March 7, 2001 but Liberty made no appearance although the employee and her counsel did. The parties were allowed thirty days to submit a Stipulation or a Compromise and Release. The Stipulation was approved by a judge on May 1, 2001.

Dr. Nagelberg entered the picture as an Agreed Medical Examiner as a result of a telephone conversation between the claims adjuster and the employee's counsel. The employer was unable to take the employee back to work because of her work restrictions and therefore she was provided with rehabilitation benefits. The agreement to use Dr. Nagelberg as an Agreed Medical Evaluator was made between Claims and the employee's counsel on May 23, 2000. Subsequently, on May 22, 2001 Liberty sent the employee's counsel a completed Compromise and Release agreement to settle the case for the sum of $39,188.60, which was approved by a judge on March 27, 2002.

## FINDINGS & CONCLUSIONS

Based on my personal knowledge and experience with Dr. Nagelberg, it was certainly improper for the claims adjuster to agree with employee's counsel to have Dr. Nagelberg serve as the Agreed Medical Evaluator. During this period of time, I have never seen a case where the

40

defense would agree on Dr. Nagelberg who is notoriously liberal and used by applicant's attorneys, to serve as an Agreed Medical Evaluator. You would not expect a successful knee surgery, as was performed in this case, to rate as high as 40 percent permanent disability. This should have come in at a maximum of 11 percent permanent disability. Further, there is no reason for the defense to agree to pay an additional $6,000.00 for future medical, which was the initial demand. Liberty should have come back with a counter offer of $3,000.00 rather than agree to the initial demand for $6,000.00 to settle out future medical. The generally accepted practice of settling future medical is to add an additional 10 percent of the permanent disability to cover the future medical.

In my opinion Liberty overpaid this claim by approximately $20,000.00 by agreeing that Dr. Nagelberg should be the Agreed Medical Evaluator in this case.

### DAVID ALVORD
Claim No: 608197982

The employee, David Alvord, age 38, while employed as a temporary summer Laborer [helper] (working towards his AA Degree in finance in the Fall) by Republic Services, Inc., alleged an injury to his low back on July 9, 1998 while stacking tires.

Apparently he commenced working for the employer early in the summer of 1998 and his supervisor was his sister.

### PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $ 10,596.04 | $ 10,596.04 |
| Indemnity | $ 22,364.72 | $ 22,364.72 |
| Expenses | $ 3,394.87 | $ 3,394.87 |
| Total | $ 36,355.63 | $ 36,355.63 |

The file contains no documentation as to whether Liberty conducted any investigation of this claim. The employee was a summer worker intending to go back to school in the Fall and

41

his sister was his supervisor. He was off work for about one month, received an epidural on December 24, 1998, returned to work for the employer after one month and then quit working in October 1998 to return to school.

We subsequently learn that in May 1999 he commenced working full time at Wal-Mart and at his deposition in 1999 he testified that he worked full-time [48 hours per week] and lost no time from work since starting with Wal-Mart in May 1999.

He was treated by Dr. Richie and in a report dated July 6, 1999 Dr. Richie reports that he has not seen the employee since October 6, 1998 so he discharged him from care.

On February 22, 1999 the employee retained counsel to represent him in this case.

The alleged injury was unwitnessed.

The matter was settled by means of a Compromise and Release for the sum of $20,000.00 on October 12, 2000. The settlement was based upon a permanent disability rating of 24 percent, which equated to $14,480.00.

It appears as though the settlement of $20,000.00 included a potential penalty for failure to pay temporary disability from January 8, 1999 to May 1999 when he started working full-time for Wal-Mart. At another point in the claims file it appears that failure to pay temporary disability was during the period August 19, 1998 to October 6, 1998 when he returned to school. It seems that he was only able to work part-time during that period and the adjuster should have been paying a wage loss according to the defense attorney. Further, there appears to be a potential penalty for failure to respond to a demand for rehabilitation, which was sent by employee's attorney on February 9, 1999.

The 24 percent permanent disability was based on the Agreed Medical Evaluator's report from Dr. Renbaum dated June 28, 2000.

42

There is a memorandum in the claims file, as to a conversation that the adjuster had with the employee early in January 1999. The summary of that memo is "He started off as stating I have heard nothing from Liberty Mutual Insurance Company since September 1998 and I need to know the status of my case. I told him to give me some time to review his case. I put him on hold. I came back and stated that what exactly do you need to know? He stated that he is trying to get into electronics and needs a Compromise and Release from us. I told him that a Compromise and Release is a settlement that is based on P.P.D. level. To date, we have yet to receive the permanent and stationary report from Dr. Giddy.

The employee stated that the saw the M.D. yesterday and that he was P/S. I told him that the claims manager would have to review the report to evaluate it for any possible P.D.

The employee stated that he just needs something from us so that he can move forward with his electronics thing. I told him that a notice would be sent to him once the P/S report is evaluated. The employee stated that the report should be on its way as the M.D. placed it on the transcriber's desk. I told him that the claims manager should have it by the time she returns from vacation on January 28."

## FINDINGS & CONCLUSIONS

The summary above illustrates this case as another example of where Liberty's claims adjusters failed to resolve a claim by settlement at a time when the injured employee, if indeed this employee was injured, is seeking a settlement. Note that after the claims adjuster failed to take advantage of the offer to settle or at least make an offer to the employee in January 1999. Therefore, he retained counsel on February 22, 1999 and here is where the case builds by the employee's attorney taking medical control and getting additional treatment forcing the defense to have to agree upon an Agreed Medical Evaluator.

43

There is evidence in the file that the employee had sustained a prior back injury and indeed had major right knee surgery yet no medical records were solicited to determine if the prior back injury continued up to the alleged date on July 9, 1998. Further, as noted above, there was simply no investigation whatsoever to determine whether this injury was actually an industrial injury. Notice that this was an unwitnessed incident.

It would have been a simple matter for the claims adjuster to make a token offer of settlement in January 1999 in that the employee was going back to school and it could have been conditioned upon the receipt of the medical report that the employee told the adjuster was in the mail or was in the process of being typed. Failure to do caused the employee to seek counsel and this is another example of the failure of the Liberty Mutual claims adjusters to take control of their cases.

Further, the adjuster was fully aware that the employee had gone to work full-time for Wal-Mart beginning in May 1999 and had missed no time from work. There is no reason why Wal-Mart could not have joined based on a continuing trauma or certainly at least Wal-Mart's records should have been subpoenaed. It is most likely that Wal-Mart put the employee through a medical evaluation before he was hired that might have disclosed no limitations whatsoever. No attempt to pursue the Wal-Mart work.

I would disallow the entire claim based upon the failure of Liberty to do an investigation and for allowing this claim to build into a total pay out of $36,355.63 when it probably could have been closed out for something less than $3,000.00.

### DANILO HERNANDEZ
Claim No: 648148836

The employee, Danilo Hernandez, while employed as a Mechanic by Republic Services, Inc., alleged an injury to his left knee on December 20, 2000 when he allegedly stepped on an unknown object twisting his left knee.

44

## PAYMENTS

| Incurred | | | Paid |
|---|---|---|---|
| Medical | $ 27,491.00 | | $ 17,091.31 |
| Indemnity | $ 7,236.00 | | $ 3,573.85 |
| Expenses | $ 16,739.00 | | $ 15,924.60 |
| Total | $ 51,466.00 | | $ 36,589.76 |
| Outstanding | $ 14,877.00 | | |

The claim hard copy has many missing documents particularly when you observe that this case has been open for more than four years. It is important to note that the employee gave three different versions as to how the alleged accident occurred. One was that he stepped on a box, another one was that he twisted his knee getting out of a truck, and another was that he was removing a transmission and stepped on an unknown object. Dr. Stokes, in his report of January 24, 2001 states, "Patient states he was coming off a large truck and missed his step and twisted his left knee. Loud pop and immediate swelling." His initial version to his employer was that he stepped on an unknown object while removing the transmission and twisted his left knee.

It is obvious that the employee gave Dr. Stokes a false history as he failed to tell the doctor that he had a left knee injury in 1998 while working for Ronco Leasing and he falsely tells Dr. Stokes that he had no prior accidents. On January 12, 2001 Claims was aware that Liberty's Sacramento office was handling the earlier injury. The Memorandum states, "I am currently handling a left knee injury for Republic that to date 12/20/00. You are handling the claim's Stip Award left knee injury while he worked for Ronco Leasing." There is nothing in the claim file to indicate that the earlier Ronco Leasing injury file was ever copied or subpoenaed to be attached at least at the Appeals Board this December 20, 2000 alleged injury.

In a report dated May 6, 2002 Dr. Rossi stated that all of the employee's disability and need for medical is attributable to his June 5, 1998 injury while working for Ronco Leasing. Even with this zero report in the file Liberty agreed to an agreed medical evaluation by Dr.

45

Wertheimer. The AME report did apportion 90 percent of the employee's knee disability to the 1998 injury. The Disability Evaluation Unit rated the AME report dated July 31, 2003 at 24 percent permanent disability equal to $14,480.00.

Claims misplaced the July 31, 2003 AME until March 14, 2004. Actually Claims did not follow up on the AME report for a period of about eight months. It is difficult to discern from the file as to how Claims did eventually get a copy of the AME report.

The file seems to indicate that the employee settled the 1998 injury based upon a 28 percent permanent disability to the same part of the body. Claims did not bother to determine whether the 28 percent Stipulation for the 1998 injury contained future medical for the knee.

From the last entry in the claims file that I can see there has been no finalization of this case either by Stipulation or Compromise and Release and it is now imminent that the new permanent disability, if any on this case, falls under the new *Senate Bill 899* law particularly as to apportionment.

## FINDINGS & CONCLUSIONS

Due to the failure of Liberty to investigate this case particularly in view of the different versions as to how the alleged injury occurred, and the knowledge that the employee had and Award for the same knee at 28 percent permanent disability and probably future medical from Ronco Leasing, this case should have been denied. At most it should have been settled for $500.00, as was the initial proposed offer in the file.

### SERGIO MONREAL
Claim No: 648148787

The employee, Sergio Monreal, age 28, while employed as a Truck Driver for Republic Services, Inc., alleged an injury to his left hip and left knee on August 24, 2000 as a result of falling off a trashcan. He also alleged injured his low back when a wheel broke on a trashcan he was pushing. [Also alleged he sustained injury to his left knee while climbing on a stepladder to

46

a truck. Alleged he slipped twisting his left knee.] Continuing trauma Application filed for the period of 1990 to January 1, 2001 alleging injury to left hip, left knee, right hip, right knee, neck and back. The employee also filed a specific injury to his right hip, right knee, neck and back.

The employee has been employed by the employer since 1990.

## PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $117,772.00 | $108,272.18 |
| Indemnity | $ 99,183.00 | $ 82,577.42 |
| Expenses | $ 16,431.00 | $ 14,257.07 |
| Total | $233,386.00 | $205,106.07 |
| Outstanding | $ 28,279.33 | |

Liberty provided the employee with a total hip replacement surgery on February 8, 2001. Surgery was authorized after five requests.

The permanent disability was resolved by referring the employee to an Agreed Medical Examiner, Dr. Scheinberg who prepared a report dated April 8, 2003, which rated 61 percent permanent disability plus the need for future medical. The case was settled by means of a Stipulation on October 2, 2003 after agreement to 45.75 percent permanent disability for total of $40,163.00 permanent disability.

## FINDINGS & CONCLUSIONS

I find no reason to disagree with the management of this claim other than the five-month delay in authorizing the surgery. Once the claims adjuster engaged defense counsel the claims process speeded up and the matter was disposed.

## RAYMUNDO GALVAN
Claim No: 648148841

The employee, Raymundo Galvan, age 42, while employed as a Truck Driver for Republic Services, Inc., alleged an injury to his right shoulder on January 2, 2001 as a result of picking up a stack of newspapers.

The employee was hired by the employer on February 19, 1989.

## PAYMENTS

| Incurred | | Paid | |
|---|---|---|---|
| Medical | $ 91,120.00 | | $ 83,680.81 |
| Indemnity | $131,563.00 | | $ 78,060.00 |
| Expenses | $ 14,087.00 | | $ 7,544.95 |
| Total | $236,770.00 | | $168,645.75 |
| Outstanding | $ 68,124.15 | | |

At the time of my review of this claim there is no indication as to the outcome either by Stipulation or Compromise and Release or a Trial before a judge.

There are many missing documents in the file. There is no indication in the file as to whether the claim was properly denied or accepted within the 90-day period following filing of the Claim Form. Normally you would expect to see a copy of a Notice of Delay, admission or denial of the claim in the file. None of these documents are in this file. By means of a deposition taken on February 7, 2002 [more than one year after the alleged injury] it was learned that the employee worked with his brother early in 2001 while also working for Republic Services, Inc. His brother's company is called G & G Hauling & Roll Off Services. This company picks up trash similar to what Republic does and takes it to landfills. He testifies at the deposition that he has only driven trucks for his brother and does no lifting. Apparently he last worked for Republic Services, Inc. on July 12, 2001 and continued thereafter working his brother.

48

### Lack of Adequate Investigation

Claims failed to conduct a proper investigation of this claim particularly in light of the inconsistencies in the employee's statement. At one point he claims the injury occurred to his left elbow while he was picking up newspapers and another version is that the injury occurred while he was lifting up cans. He stated that he advised a co-worker Solis of the injury or at least that Solis witnessed the accident and that he reported the injury to his supervisor, Peter, who took him to a clinic. There is no indication of any statement taken from either of these persons to verify whether the injury did indeed happen.

The employer became particularly suspicious of the claim when the employee dropped a calling card that indicated his brother's business. The claims file does not contain what we would normally expect to see, a Notice of Delay letter, or an actual denial letter. Therefore, I cannot determine whether this claim became presumptively compensable under *Labor Code §5402* by failure of the Claims Department to timely deny the claim within 90 days of the date of knowledge of the claim.

### Failure to Join Employee's Brother by Means of a Continuing Trauma Application

Inasmuch as it was known even prior to having surgery on his left elbow, which surgery was on September 27, 2002, that the employee was working for his brother with similar work, Claims failed to file a continuing trauma claim to join his brother's insurance carrier in this matter. The treating doctors had no reason to doubt the employee's statements as to the cause of the injury because Claims did not provide the doctors with any additional information as to the employee working for his brother doing similar work during much of the year 2001 and continuing into the year 2002.

49

## Failure to Follow Up on Recommendations by Defense Attorney

## As to Information Learned During the Deposition

The defense attorney recommended that Claims conduct an investigation to determine whether the employee was doing more work for his brother than he claimed during the deposition. There he testified that he was merely driving his brother's trucks. The defense attorney gave the names of three businesses that his brother performed services for and asked the Claims send an investigator out there to see if anybody had any information as to the exact work duties the employee performed while working for his brother. This appears not to have been followed up on. The information that he was doing more than driving would have certainly supported the filing of a continuous trauma claim even though in my opinion, the mere fact that he was driving would be enough to aggravate, if a doctor so stated, his left elbow.

In light of the failure of Liberty to properly adjust this claim, I would deny all benefits paid.

### ONESIMO MARQUEZ
### [2 CLAIMS]
Claim No: 648147642

The employee, Onesimo Marquez, age 44, while employed as a Truck Driver for Republic Services, Inc., alleged an injury to his left shoulder and neck on May 30, 2001 as a result of his attempting to stop a truck from rolling toward a car by putting his left shoulder and weight against the truck. The employer had no reason to deny claim and advised claims case was compensable. Dr. Sperling provided shoulder surgery February 15, 2002.

He sustained an earlier alleged injury to his low back and neck while working for Republic on August 12, 1998 for which he was given no work restrictions but he and Republic stipulated to an Award to his back, neck and shoulders with no permanent disability indemnity but awarded him future medical care as needed. He petitioned to reopen this earlier Award and that explains the second claim filed.

50

## PAYMENTS
### [May 30, 2001 Injury]

| Incurred | | | Paid |
|---|---|---|---|
| Medical | $ 80,289.00 | | $ 75,000.22 |
| Indemnity | $128,188.00 | | $ 68,683.84 |
| Expenses | $ 12,398.00 | | $   1,458.34 |
| Total | $220,875.00 | | $145,142.40 |
| Outstanding | $ 75,732.60 | | |

## PAYMENTS
### [August 12, 1998 Injury - Petition to Reopen]

| Incurred | | | Paid |
|---|---|---|---|
| Medical | $   2,347.88 | | $   2,347.48 |
| Indemnity | $      201.84 | | $      201.84 |
| Expenses | $   1,515.18 | | $   1,515.18 |
| Total | $   4,064.50 | | $   4,064.50 |

A major failure of Liberty in this case was to either settle by Stipulation or Compromise and Release the case shortly after Dr. Berman submitted his permanent and stationary report of July 8, 2002, or go to Trial. However, claims did not get a copy of Dr. Berman's report until January 2003. In that report, Dr. Berman, reporting on behalf of Liberty, found the employee to be permanent and stationary with preclusion from heavy lifting and overhead activities. This took a 30 percent permanent disability standard. Dr. Sperling, reporting on behalf of the applicant in a report dated December 2, 2002 found the employee to be permanent and stationary with also a restriction of no heavy lifting, which took a 25 percent standard, which could have adjusted the limitations in the shoulder to a 35 percent standard.

Liberty did not engage a defense attorney to handle this matter until June 11, 2003.

51

Once the defense attorney entered the picture and submitted a letter to the claims adjuster on June 11, 2003, a strategy was worked out and many excellent recommendations were made by the attorney.

Once the defense attorney became involved in this case we learned the employee was involved in a very serious and non-industrial injury in 1998 where he was off work for one year with medical treatment to his neck and left shoulder. He received a cash settlement as a result of that accident.

Dr. Sperling released the employee to return to work, which he did on December 6, 2002 but two or three days later he goes off work. It is my opinion that he went off work because he must have become aware of the limitations imposed upon him by particularly Dr. Berman and he wanted to his build his case for a much higher permanent disability Award. Certainly, Claims could have interviewed the employer to determine what happened after he returned to work on December 6, 2002 and working only three days. Why did he go off? It should be noted that when claims did arrange the appointment with Dr. Berman, they failed to request an examination of the cervical area. Only asked for a report on the left shoulder.

In any event, I find the major error in this file as the failure to follow through on investigating why the employee went off work after returning on July 6, 2002 and why a move was not made to dispose of the case at that time either by Stipulation or Compromise and Release or bring the matter to Trial. It should be noted that it took Claims some seven months to get a copy of Dr. Berman's report of July 8, 2002. No follow up to timely get that report. At the time I last examined this claims file there is still no indication if this matter has been resolved either by Stipulation, Compromise and Release or a Trial. It seems reasonable to deny all benefits paid except for the reasonable amount that would have been paid during the period of May 30, 2001 until no later than July 8, 2002 when Dr. Berman found him permanent and

52

stationary and certainly, no later than December 2, 2002 whenever Dr. Sperling found her permanent and stationary. Therefore, it would seem reasonable to disallow three quarters of the claim, which would be approximately $170,000.00.

**ROBERT GOMEZ**
**[2 CLAIMS]**
Claim No: 648147630
Claim No: 608407165

Employee, Robert Gomez, age 62, while employed as a Truck Driver for Republic Services, Inc., alleged an injury to his right shoulder on December 15, 2000 as a result of throwing a tarp over a container and a continuing injury claim to his spine for the period of 1974 to January 21, 2002.

The employee worked for the employer for 28 years.

Apparently the continuing trauma claim is based upon stress and strain of his work.

The employee was hired by the employer in 1974.

**PAYMENTS**
**[December 15, 2000 Injury]**

| Incurred | | Paid |
|---|---|---|
| Medical | $ 57,223.00 | $ 52,466.93 |
| Indemnity | $118,287.00 | $ 99,049.42 |
| Expenses | $  6,394.00 | $  1,390.00 |
| Total | $181,904.00 | $146,906.75 |
| Outstanding | $ 34,977.25 | |

**PAYMENTS**
**[1974 – January 21, 2002 Injury]**
**[For Alleged Psychiatric Stress Claim]**

| Incurred | | Paid |
|---|---|---|
| Medical | $ 8,000.96 | $ 8,000.96 |
| Indemnity | $ -0- | $ -0- |
| Expenses | $ 5,891.85 | $ 5,891.85 |
| Total | $ 13,892.81 | $ 13,892.81 |

53

Applicant's attorney amended the initial claim on July 16, 2002 to include the employee's knees.

The employee also claimed a psychiatric stress claim but at his deposition he denied stress so the psychiatric stress claim was denied.

Apparently the employee worked for a waste management company for some 26 years and then Republic bought out the earlier company and he went to work for Republic for three years thereafter.

What complicated the medical picture was the fact that the rotator cuff surgery that was performed on February 13, 2001 failed and another such surgery had to be performed by Dr. Roberts on February 19, 2003 which extended the temporary disability and obviously the costs for medical treatment.

There are many missing documents in the file and I cannot determine the outcome of the claim, as there is no indication as to whether a settlement has been arrived at either by Stipulation, Compromise and Release, or a Trial before a judge. Based upon the records I had reviewed, I can find no reason to fault the handling of this claim other than the $15,000.00 that was spent for rehabilitation whereby he was introduced to a computer program for that sum of money yet the file indicated that he did not speak English. This is difficult to understand why such a program would have been instituted.

The file is not clear as to why $8,000.96 was spent for medical treatment for the psychiatric when the claim was denied. The file does not reflect what that money was spent on but may well have been that it was for a medical-legal report.

The indemnity payments were substantial in light of the failure of the shoulder surgery when first performed.

54

Other than the question as to the rehabilitation benefits in this matter, I have no reason to otherwise fault, as stated above, the handling of this claim.

## NORBERTO RAMIREZ
Claim No: 648147640

The employee, Norberto Ramirez, age 51, while employed as a Truck Driver for Republic Services, Inc., alleged an injury to his head and back on May 25, 2001 as a result of his truck being rear-ended by an automobile.

He had been employed by the employer since 1998.

## PAYMENTS

| Incurred | | Paid |
|---|---|---|
| Medical | $ 25,133.00 | $ 19,512.39 |
| Indemnity | $109,037.00 | $ 28,308.07 |
| Expenses | $ 12,809.00 | $ 10,928.81 |
| Total | $146,979.00 | $ 58,749.23 |
| Outstanding | $ 88,729.73 | |

This claim is a classical example of the failure of Liberty Claims Adjusters to do an immediate investigation to determine how the alleged injury happened, whether in fact it could happen as alleged and secure witness statements and other evidence immediately upon reporting of the claim in order to defend the claim properly.

This is a case of a soft tissue injury that occurred as a result of a rear-end collision. The employee was driving a Republic truck and was rear-ended by a negligent third party who was not paying attention. The liability of the third party is not in dispute. What is in serious dispute is the extent of injuries to the employee's neck. There was no immediate investigation of the accident. No photographs taken of Republic's truck to determine any damage, if there was any, to the back of the truck. No photographs of the third party vehicle to show any damage to the front of the vehicle. The police report does not show any injuries sustained by any party involved in the accident. The employee drove the company truck to the yard. 21st Century was

55

the carrier for the third party and they did an excellent job of investigating this case bringing in experts to such a degree that the employee actually dropped the claim against 21st Century at a time when the negligent third party had a $100,000.00 insurance policy. The deposition by the 21st Century attorney made the employee out to be a liar and unbelievable. That deposition by the third party attorney indicated that he had settled a workers' compensation claim for $9,000.00 for an earlier injury and perhaps had another workers' compensation injury apparently injured while with another employer in 1985. The deposition by 21st Century was on January 22, 2003. The file does not disclose whether Liberty ever took a deposition of the employee. 21st Century engaged an expert on low impact injuries and had evidence that such a low impact could not cause much disability or need for treatment as the employee alleged. There is a very interesting entry in the claims file as to what went on at the Mandatory Settlement Conference in an attempt to resolve the civil action. It states in part, "Sherry Santa Cruz, subro counsel attended MSC today. Defense initial offer was $7,500. We rejected and tried to get $25,000. Eventually settled for $22,500.00 as cash recovery. I relate outcome to Suzanne Flynn our broker since she had been involved and was the individual who granted authority to take what we could get on this one. We may want the WC case manager to secure the IME report defense relied upon to assist with any potential fraud/AOE/COE issues. We might also want to see if we can get the biomechanical report from defense, which apparently says there is no way the claimant could have sustained injuries as severe as he is claiming from his MDA." The question to ask is why didn't Liberty's claims adjuster conduct as good an investigation as did 21st Century.

The claimant obviously dropped his case against 21st Century because it was obviously a loser. At that 21st Century deposition he agreed that he did not injure his low back. He admits that he still has symptoms from his 1985 accident. And what is also important to note

is that applicant's attorneys that were handling the third party case dropped him as a client so he was pro per when he eventually dropped his claim against the third party for which Liberty was able to recover $22,500.00 on a potential $100,000.00 policy. Another question that should be raised is why did Liberty hold off for two years to conduct their investigation.

As the outcome from the third party litigation shows this matter should have been disposed of by a rigorous investigation, photographs taken, biomechanical experts retained, and this case would have most likely settled for nuisance value of somewhere in the vicinity of $5,000.00. I would deny all of the benefits paid other than $5,000.00 to close out the case, which I would deem to be a nuisance settlement value.

## KAREN AGUILINO

### Claim No: 648147656

The employee, Karen Aguilino, age 52, while employed by Republic Services, Inc., as a Weight Station Attendant alleged injury to both wrists during a period of 13 days ending June 13, 2001 as a result of having to use a new computer.

The employee had worked for Richmond Sanitation Services for about 23 years at which time it was bought out by Republic Services, Inc., and the employee alleged that she was then required to work with a new computer that caused her injury. This was apparently over a 13-day period.

In about May 2003 the employee engaged an attorney and filed a continuing trauma claim ending August 21, 2001 based on the compensable consequence theory. She alleged injury to her neck, head, back and left hip.

### PAYMENTS

| Incurred | | | Paid |
|----------|--|--|------|
| Medical | $ 39,495.00 | | $ 36,307.82 |
| Indemnity | $119,445.00 | | $ 56,866.69 |

57

| Expenses | $ 4,986.00 | | $ 3,109.61 |
| Total | $163,926.00 | | $ 96,284.12 |
| Outstanding | $ 67,641.88 | | |

The handling of this claim is another example of the failure of Liberty's Claims Adjusters to take seriously the responsibility for a prompt, thorough investigation of a claim. This employee had worked some 23 years at which time it was bought out by Republic and for 13 days the employee had to learn to use a new computer. It is during this period of time, 13 days, which she alleged that the use of that computer caused her wrist injury. However, the file indicates that once Republic took over the company her workweek was reduced from five to four days. This could be an example of a retaliatory claim. There was no effort made to interview her supervisors, her co-workers or anyone else to determine what it was about that computer that caused her, within a 13-day period, to sustain an injury that required massive medical treatment and to be off work for some two years or so.

Liberty should have brought in an expert as to the physical mechanics of operating the computer in an attempt to show the treating doctor that it would be medically unreasonable or indeed impossible for an employee to sustain such a wrist injury during such a short period of time. Dr. Ellis was allowed to treat her for more than two years. Dr. Summers, in a report dated January 1, 2002 stated that all of Dr. Ellis' treatment after January 1, 2002, was not reasonable medical treatment.

Even though a judge ordered the employee to submit a QME panel Request form to the Administrative Director, she failed to do so yet claims took no action to require her to comply with the judge's request and continued to treat her and pay temporary disability benefits. Because of the failure to stop the temporary disability benefits Liberty accumulated a $47,144.06 overpayment of temporary disability.

In a note to the Claims Department, the defense attorney who was eventually brought into the case indicated in a Memorandum dated December 18, 2003 that he ran into applicant's counsel at the Workers' Compensation Appeals Board, on another matter, and applicant's counsel was amazed to learn that there was such a huge overpayment of temporary disability. He said to the defense attorney, "You win some and you lose some."

The file does not indicate how the matter was disposed of but there is a note in the file whereas the adjuster states, "I was discussing with my manager. I don't think we can get our money back. Nor do I think applicant's attorney will be okay with a Compromise and Release with no money." This quotation points out very vividly the mismanagement in this case.

Certainly, Liberty failed to follow generally accepted claims practices and failed to follow its promises made in the "Special Services Instructions."

In my opinion, Republic should not be liable for any of the expenditures in this case.

### FERMIN PENA
### [2 CLAIMS]
Claim No: 608198483
Claim No: 602202122

The employee, Fermin Pena, age 51, while employed as a Truck Driver by Republic Services, Inc., alleged an injury to the right side of his head on January 29, 1999 when a bottle came down a chute hitting him requiring 7-8 stitches.

He started working for the employer on May 27, 1997.

### PAYMENTS

| Incurred | | Paid | |
|---|---|---|---|
| Medical | $ 6,302.73 | | $ 6,302.73 |
| Indemnity | $ 38,500.00 | | $ 38,500.00 |
| Expenses | $ 3,343.29 | | $ 3,343.29 |
| Total | $ 48,146.02 | | $ 48,146.02 |
| Outstanding | $ -0- | | |

59

The employee had an earlier injury on September 16, 1998 when he fractured his right middle finger when opening a door. Apparently this was a medical only claim.

## PAYMENTS

| Incurred | | | Paid | | |
|---|---|---|---|---|---|
| Medical | $ | 391.45 | | $ | 391.45 |
| Indemnity | $ | -0- | | $ | -0- |
| Expenses | $ | -0- | | $ | -0- |
| Total | $ | 391.45 | | $ | 391.45 |

The January 29, 1999 injury was settled by means of a Compromise and Release for $38,000.00 on May 22, 2002 at a time when this employee was still working for the employer.

In light of the trivial nature of the injury it is difficult to understand how Claims could justify such a huge settlement.

First, there was no investigation as to the mechanics of the injury including how severe the injury was even though stitches were required. Further, there was no investigation to determine if there was a potential third party liability claim in this matter. We do not know where the bottle that hit the employee on the head came from.

The hospital admission records of January 29, 1999 indicate that he did not lose consciousness as a result of the hit on the head. He simply had pain on the right side of his head. The injury was simply a scalp laceration about 3.5 cm long. He was only off work for two days.

Dr. Chong, a neurologist, in a report dated April 5, 1999 to Liberty found the employee to be permanent and stationary with his insomnia resolved and headaches and dizziness improved and he was released to full duty as a Truck Driver, without any work restrictions. Minimal headaches. It was at this time in April 1999 that Claims should have moved to dispose of this case while the employee was back working after having been off only two days and well before he engaged counsel.

60

The employee engaged counsel on June 2, 1999 and had Claims acted promptly upon receipt of the P&S report, this matter would most likely have been resolved particularly in light of the fact that the employee only missed two days of work. The medical work restrictions on which the large settlement was based was preclusion from repetitive twisting of the cervical spine and from holding his head in a fixed position for long periods of time. Yet we find that he is back working full duty as a Truck Driver with the concurrence of the treating physician. How can this be? If Claims was willing to approve such a large settlement then most certainly before they did so they should have put a sub-rosa on he employee to show him freely using his neck, which is obviously the case when he is driving a company truck. This is another example of where the claims adjuster sits and sits on a claim without taking any action until the employee engages counsel and a large settlement is thereafter agreed upon. Note that the employee's deposition was not even taken where it could have been established that he was working full time, doing his regular duties, having to turn his head to back up the truck, etc., with his supervisor hopefully sitting in the deposition room.

This is another sad example of the handling of a claim by Liberty's adjuster not using generally accepted claims handling procedures.

I find no reason to comment upon the finger injury, which had a medical only outlay of $391.45. In my opinion, the main claim should have been resolved for a nominal sum of $3,000.00 to close it out. There is an overpayment, in my opinion, of approximately $42,146.02 in this case.

## GERARDO V. VELAZQUEZ

### [2 CLAIMS]
Claim No: 608255979
Claim No: 608203464

The employee, Gerardo V. Velazquez, age 35, while employed as a Truck Driver by Republic Services, Inc., alleged an injury to his right shoulder and neck on July 23, 1999 while pulling a bin.

The employee began working for the employer in August 1998.

The employee alleged an earlier injury on January 8, 1999 to his right shoulder and neck while pushing a bin.

The employee also filed a discrimination claim (*Labor Code §132a*) against the employer on or about April 2002, which was settled and approved by a judge on July 13, 2002 and paid for by the employer itself.

Claims file is confusing as to the exact alleged dates of injury.

### PAYMENTS
### [July 23, 1999]

| Incurred | | | Paid | |
|---|---|---|---|---|
| Medical | $ | 9,255.54 | $ | 9,255.54 |
| Indemnity | $ | -0- | $ | -0- |
| Expenses | $ | -0- | $ | -0- |
| Total | $ | 9,255.54 | $ | 9,255.54 |
| Outstanding | $ | -0- | | |

### PAYMENTS
### [January 8, 1999]

| Incurred | | | Paid | |
|---|---|---|---|---|
| Medical | $ | 7,198.22 | $ | 7,198.22 |
| Indemnity | $ | -0- | $ | -0- |
| Expenses | $ | -0- | $ | -0- |
| Total | $ | 7,198.22 | $ | 7,198.22 |

In this case the employee alleged two injuries, one on January 8, 1999 and another on July 23, 1999 yet Liberty did nothing to investigate either of these two alleged injuries. It appears that he was terminated for some unknown reason on August 11, 2000 and it is after that termination that he gets an attorney and pushes these cases.

Apparently, a Stipulation was entered into for 36 percent and approved by a judge on March 26, 2002 for $28,560.00. There is nothing in the claims file to indicate that an investigation was performed, not only as to the alleged injury but the reason for the termination that certainly should have been looked into to see if the termination was a motivating factor for going forward on these two injury claims.

There are many, many missing documents in this file. For example, I cannot find any delay letter or admission letter to indicate whether the claim was properly admitted or denied during the first 90 days following the report of injury to see if the presumption of compensability came into play.

Nobody from Liberty attended the Expedited Hearing held on November 10, 2000 but Liberty agreed to pick up temporary disability and pay the Employment Development Department for its lien and to continue to pay based upon the AME report. However, there is no copy of that AME report in the file so I cannot discern what was found by the doctor. Apparently there was a penalty of $1,774.69 for Liberty not only untimely failing to pick up temporary disability benefits but they did not timely pay the Order that came out of the Expedited Hearing that Liberty did not attend.

I cannot discern from the claims file due to lack of documents as to whether there was justification to pick up benefits at the Expedited Hearing that Liberty did not attend. Liberty was informed by applicant's counsel by fax on December 12, 2000 that they failed to comply with

63

the judge's Order issued at the Expedited Hearing. The attorney also advised Liberty that they had the duty to pay the penalty plus interest, for failing to comply with the judge's Order.

In light of so many different dates of injury, certainly the employee's deposition should have been taken and an investigation conducted at the employer's place of business to determine what the employer knew about these alleged injuries. He told Dr. Rah, the orthopaedic surgeon, who was his treating physician, on September 5, 2000, that he was fired on August 11, 2000 but there is no indication that Liberty attempted to find out whether he was fired, why he was fired, or why he left to go on temporary disability thereafter.

Liberty should have objected to Dr. Rah's First Report of September 5, 2000. After all, he was back working and under no treatment from January 2000 until he saw Dr. Rah on September 5, 2000, which was shortly after he was terminated. This is another example of Liberty simply sitting and sitting on a claim file without any action to close out the matter. One contact by the claims adjuster with the employee prior to the employee being terminated may have resulted in his claims being settled for a very reasonable sum.

Because of the lack of proper documentation in the claim file, particularly the lack of the AME report, failure to conduct an investigation of the claim, no information surrounding the termination and lack of deposition of the employee, I am of the opinion that Republic should not be liable for any expenditures in this case.

### PATRICK E. POWERS
#### [No hard copy Claims File - Only CD-ROM notes]
#### [No Claims File To Review – Analysis Based Solely on CD-Rom Notes\
Claim No: 648147907

The employee, Patrick E. Powers, age 49, while employed as an Operations Manager by Republic Services, Inc., alleged a cumulative injury to his upper and lower back during the period of April 1, 2001 to April 1, 2002 from working on uneven surfaces. Liberty had the early three months of this continuing trauma claim for the period of June 30, 2000 to June 30, 2001.

64

The employee had an earlier injury to his back, ribs and left hand on December 12, 1997 when he slipped into a 6-foot ditch.

The employee was hired on August 4, 1986.

Co-defendant, AIG, who covered nine months of the continuing trauma, is adjusting the back injury claim.

Employee worked full-time through October 16, 2002 and at a modified desk job through December 2, 2002.

In light of the fact that there is no hard copy of a claim file to review, it is impossible for me to give a fair analysis as to the handling of this claim.

However, it does appear that this was a senior employee, Operations Manager, who had been employed by the employer for at least, or at least by another employer that was bought out by Republic, for some 40 years.

The claim being adjusted by another insurance carrier so there is no reasonable grounds upon which I can make any comment as to the handling of this claim.

### PAYMENTS

| Incurred | | | Paid | |
|---|---|---|---|---|
| Medical | $ | 2,595.00 | $ | -0- |
| Indemnity | $ | 5,040.06 | $ | -0- |
| Expenses | $ | 1,500.00 | $ | 698.92 |
| Total | $ | 9,135.00 | $ | 698.92 |
| Outstanding | $ | 8,436.08 | | |

**The above statements and opinions are based upon the documentation referred to initially in this report and are made under the penalty of perjury.**

Dated: January 15, 2006

David W. O'Brien, Esquire

65