RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 06a0302p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

REGIONAL AIRPORT AUTHORITY OF LOUISVILLE AND
JEFFERSON COUNTY,
       *Plaintiff-Appellant,*

v.

LFG, LLC; NAVISTAR INTERNATIONAL
TRANSPORTATION CORPORATION,
       *Defendants-Appellees.*

No. 05-5754

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00327—Charles R. Simpson III, District Judge.

Argued: April 25, 2006

Decided and Filed: August 17, 2006

Before: SUHRHEINRICH, GILMAN, and ROGERS, Circuit Judges.

---

COUNSEL

ARGUED: Robert W. Griffith, STITES & HARBISON, Louisville, Kentucky, for Appellant. Cary R. Perlman, LATHAM & WATKINS, Chicago, Illinois, for Appellees. **ON BRIEF:** Robert W. Griffith, W. Patrick Stallard, STITES & HARBISON, Louisville, Kentucky, Judith A. Villines, STITES & HARBISON, Frankfort, Kentucky, Charles S. Cassis, Dennis J. Conniff, Amy D. Cubbage, FROST BROWN TODD, Louisville, Kentucky, for Appellant. Cary R. Perlman, Laurence H. Levine, LATHAM & WATKINS, Chicago, Illinois, Hiram Ely III, Mark S. Riddle, GREENEBAUM, DOLL & McDONALD, Louisville, Kentucky, for Appellees.

---

OPINION

---

SUHRHEINRICH, Circuit Judge.

### I. Introduction

The Comprehensive Environmental Response, Compensation and Liability Act of 1980 ("CERCLA"), 42 U.S.C. §§ 9601-75, permits private party property owners to recover from prior private party property owners certain costs associated with the cleanup of contamination caused by the prior owners, where the cleanup costs were "necessary." "Necessary" costs means they were

**EXHIBIT 13**

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 2 of 16 - Page ID#: 5324
Case 5:03-cv-00494-KSF Document 226-3 Filed 08/18/2006 Page 2 of 17

No. 05-5754        *Regional Airport Authority v. LFG, LLC, et al.*        Page 2

incurred in response to a threat to human health or the environment, *see* 42 U.S.C. § 9607(a)(4)(B), and "consistent" with the National Oil and Hazardous Substances Pollution Contingency Plan ("NCP"), *see* 42 U.S.C. § 9607(a). The NCP requires, among other things, completion of a remedial investigation ("RI"), feasibility study ("FS"), and a record of decision ("ROD"),[1] along with an opportunity for public comment. *See* 40 C.F.R. pt. 300. In Kentucky, for any risk management-based alternatives for dealing with contamination (i.e., remediation that stops short of removing the contamination), the Kentucky Division of Waste Management ("the State") requires a baseline risk assessment ("BRA"). For soil remediation, the State must approve a soils management plan. Plaintiff-Appellant Regional Airport Authority of Louisville and Jefferson County ("the Authority") brought a CERCLA action against Defendants-Appellees LFG, LCC ("LFG") and Navistar International Transportation Corporation ("Navistar") (collectively, "Defendants") for costs the Authority allegedly incurred in the remediation of property previously owned by Defendants. The district court granted Defendants summary judgment on the CERCLA claims, holding that the remediation was unnecessary and that the Authority failed to comply with the NCP. The Authority now appeals from that judgment.

The Authority also appeals from two other judgments. The first dismissed the Authority's common-law equitable indemnification claim on grounds that CERCLA provides an adequate legal remedy. The second overruled the Authority's objection to the magistrate's order compelling the production of certain allegedly privileged documents. Included in the latter challenge is the issue of whether attorney opinion work product communicated to testifying experts is protected from disclosure–an issue of first impression in this Circuit. For the reasons that follow, we **AFFIRM** all judgments.

## II. Background

### A. Facts

In June 1988, the Authority commenced the Louisville Airport Improvement Program ("airport expansion"), whereby it intended to expand Standiford Field (also known as Louisville International Airport). In order to accomplish its objectives, the Authority needed to condemn hundreds of parcels of private property. Among those was a 130-acre parcel owned by LFG ("the Site") that had been put to heavy industrial use for nearly fifty years.[2] (*Id.*) The plan was to build new runways on the Site. Defendants admit that they used hazardous materials on the Site throughout their occupancy of the Site, and the Authority knew the Site was contaminated at the time of condemnation.

The airport expansion involved the use of federal funds, which required the Authority to complete an environmental impact statement ("EIS"). (Appellant's Br. 14.) The final EIS was prepared in 1990, three years before the Authority acquired the Site from Defendants and six years before it took possession in 1996.[3] The EIS indicated that at least some remediation would be necessary, and that the cost to remediate the Site would account for $9.5 million of the estimated $17.5 million total cost of remediation for the airport expansion.

---

[1] The ROD sets forth the proposed remedy as recommended in the RI/FS. *See United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1419 (6th Cir. 1991).

[2] Navistar owned the Site beginning in 1946. LFG bought the Site from Navistar in 1985.

[3] The Authority acquired title to the Site in 1993, but LFG continued in possession until 1996 under a lease agreement with the Authority.

No. 05-5754     *Regional Airport Authority v. LFG, LLC, et al.*     Page 3

Following subsequent environmental investigation, the Authority contacted the State regarding the contamination. In 1994, the Authority retained Camp, Dresser & McKee, Inc. ("Camp Dresser") to investigate further the extent of the contamination and the need, if any, for remediation. In November 1996, Camp Dresser reported to the Authority the results of its investigation in its Data Summary Report. The Authority then relayed this report to the State a month later.

In January 1997, the Authority began the final demolition phase of the existing structures on the Site. In February, the State sent a letter to the Authority explaining that Camp Dresser had conducted sampling at the Site. The letter further explained that the Authority should begin to focus its efforts on determining appropriate remedial alternatives. Despite this, the Authority did not evaluate the risk or any potential remedial measures, nor did it seek to complete a BRA. In fact, one month later in a weekly status report, the Authority instructed the following:

> Major redirection has taken place on this job regarding the "model" that we are using for RI/FS. The NCP for the most part has been replaced with more of a no-nonsense approach to fulfilling Kentucky's requirements under their [sic] "mini-Superfund" program. Therefore, there are but three major deliverables on the horizon: 1) An RI/FS Work Plan (our "draft" to client on 3/13/97), 2) a "Soils Management Plan" (to be produced by others), and 3) an RI/FS Report, which will include preliminary design for groundwater remedy. A baseline risk assessment will not be completed.

In May 1997, shortly after the demolition was completed, the State conditionally approved the Authority's soil management plan.

Eventually, the Authority had Camp Dresser prepare an RI/FS to analyze the Authority's options for groundwater protection and to make specific recommendations. In September 1997, the Authority received the RI/FS. The Authority presented those reports to the State for approval in October. However, the Authority decided not to remove the contamination as recommended but instead pursued a risk management-based remedy. In the words of the runway project manager, the Authority "approved a substantial departure from the classic RI/FS model." The Site's west runway was completed and open for use in December 1997.

Following completion of the west runway, the Authority directed Camp Dresser to prepare a BRA. Camp Dresser delivered its findings in April 1998. The Authority submitted the BRA to the State later that month. In a letter dated almost a year after the runway was operational, the State notified the Authority that both the RI/FS and BRA had been approved. The letter also stated that the State "would support" any effort by the Authority to hold a formal public comment period, although the State noted that it might "not be worthwhile due to the fact that the work ha[d] already begun."

On February 24, 1999, the Authority published a notice in the Louisville Courier-Journal announcing a March 4 public meeting to discuss the remediation. A meeting was so held, but no one other than the Authority's lawyers attended.

The Authority never completed a ROD. In fact, the Authority decided sometime in late 2000 or 2001 that it would not file a ROD. Instead, in March 2002, the Authority filed with the State a Remedial Plan, which summarized the BRA, RI/FS, and soils management plan, and described the actions involved in preparing the Remedial Plan. The State approved the Remedial Plan in a letter dated May 24, 2002.

No. 05-5754           *Regional Airport Authority v. LFG, LLC, et al.*                    Page 4

### B. Procedural History

On May 15, 1998, after submitting the BRA to the State but before the State's response, the Authority filed the present action against Defendants to recover environmental response costs associated with the Site. The district court granted the Authority leave to file an amended complaint in May 2001. Claims One and Two of the amended complaint sought relief under CERCLA §§ 107(a), 113, respectively. Claim Three sought relief under the Kentucky Superfund Act. Claims Four, Five, and Six alleged various state law causes of action. Finally, Claim Seven sought equitable indemnification under Kentucky common law.

Defendants' answer denied all liability and alleged counterclaims almost identical to Claims One, Two, Three, and Seven of the complaint. Defendants simultaneously filed a motion to dismiss Claims Three and Seven of the complaint for failure to state a claim. On February 15, 2002, the district court granted the motion, concluding that the Kentucky Superfund Act does not provide for a private right of action and that equitable indemnification is not proper because CERCLA provides an adequate legal remedy. On June 19, 2003, the district court granted Defendants' motion for judgment on the pleadings as to Claims Four through Six. That left only the CERCLA claims remaining.

An extensive discovery period ensued. During this time, Defendants sought to compel the production of thousands of documents relating to communications between attorneys for the Authority and employees of outside companies like Camp Dresser that worked closely with the Authority on the airport expansion. The Authority responded that the documents were protected from discovery by the attorney-client privilege. On May 4, 2001, the magistrate judge ordered the Authority to produce all but 151 documents, with the remaining 151 to be examined in camera. On November 19, 2001, following an in camera review, the magistrate judge ordered the Authority to produce the remaining documents. The Authority objected, and the district court affirmed the May 4 order but remanded the November 19 order for reconsideration of whether the remaining 151 documents were privileged communications.

On remand, the magistrate judge reaffirmed the November 19 order on grounds that the communications "were not made to provide legal advice to the client," and moreover that their "wide dissemination to employees of [Camp Dresser] would have waived any . . . privilege." On November 19, 2003, the district court affirmed the order of the magistrate judge without opinion. The Authority petitioned this Court for a writ of mandamus in September 2003. This Court denied that petition.

In June 2004, Defendants filed a motion for summary judgment on the remaining claims. The Authority filed its own motion for partial summary judgment on three elements of its CERCLA claims and on Defendants' counterclaims. The district court granted summary judgment for Defendants on the Authority's CERCLA claims. The court reasoned that the Authority could not succeed at trial, because the evidence presented did not demonstrate that the costs incurred were "necessary," or that the Authority presented "appropriate remedial alternatives" in a timely manner.

The Authority now appeals (1) the summary judgment that foreclosed its CERCLA claims, (2) the dismissal of its equitable indemnification claim, and (3) the enforcement of the magistrate judge's discovery orders.

## III. Analysis

### A. CERCLA Claims

The first issue is whether the district court erred in granting summary judgment for Defendants on the Authority's CERCLA claims.[4]

We review a district court's grant of summary judgment de novo. *Holloway v. Brush*, 220 F.3d 767, 772 (6th Cir. 2000) (en banc). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is 'genuine' if a reasonable person could return a verdict for the non-moving party." *Farhat v. Jopke*, 370 F.3d 580, 587 (6th Cir. 2004). We must view all facts and inferences drawn therefrom in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

A prima facie case for CERCLA recovery under § 107(a) has four elements: (1) the property is a "facility"; (2) there has been a "release" or "threatened release" of a hazardous substance; (3) the release has caused the plaintiff to incur "necessary costs of response" that are "consistent" with the NCP; and (4) the defendant is in one of four categories of potentially responsible parties. *Franklin County Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 541 (6th Cir. 2001). Only the third element is at issue in this appeal. We analyze separately whether the response was "necessary" and whether it was "consistent" with the NCP.

#### 1. "Necessary"

As the language of the statute implies, whether the costs were "necessary" is a threshold issue for recovery under § 107(a). *See* 42 U.S.C. § 9607(a)(4)(B) (stating that a cause of action lies for "any other necessary costs of response incurred by any other person consistent with the [NCP]"); *G.J. Leasing Co. v. Union Elec. Co. (G.J. Leasing II)*, 54 F.3d 379, 386 (7th Cir. 1995) ("The statutory limitation to 'necessary' costs of cleaning up is important. Without it there would be no check on the temptation to improve one's property and charge the expense of improvement to someone else."). Costs are "necessary" if incurred in response to a threat to human health or the environment. *See* 42 U.S.C. § 9607(a)(4) (liability attaches where "a release, or a threatened release . . . causes the incurrence of response costs"); *Carson Harbor Vill., Ltd. v. Unocal Corp. (Carson Harbor I)*, 270 F.3d 863, 871 (9th Cir. 2001) (en banc) (noting that there is general agreement that "necessary" "requires that an actual and real threat to human health or the environment exist before initiating a response action"); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459-60 (1st Cir. 1992) (affirming denial of CERCLA recovery where plaintiff failed to establish that its costs were incurred in response to actual or threatened release); *G.J. Leasing Co. v. Union Elec. Co. (G.J. Leasing I)*, 854 F. Supp. 539, 562 (S.D. Ill. 1994) ("For response costs to be 'necessary', [sic] plaintiffs must establish that an actual or real public health threat exists *prior to initiating a response action*."), *aff'd*, 54 F.3d 379 (7th Cir. 1995). Conversely, costs incurred at a time when the plaintiff was unaware of any threat to human health or the environment are not "necessary."

The Authority's response in this case was not "necessary." There is no evidence in the record demonstrating the need for a CERCLA-quality cleanup prior to constructing the runway. The

---

[4] The Authority alleged two separate CERCLA claims in its complaint, one under § 107(a) and one under § 113. As the Supreme Court has made clear, however, § 113 is available only to those parties that have been sued. *See Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 161 (2004). The Authority has not alleged that the Authority itself has been sued. In fact, the Authority effectively concedes on appeal that it has no remedy under § 113. Accordingly, we analyze only the Authority's § 107(a) claim.

No. 05-5754  *Regional Airport Authority v. LFG, LLC, et al.*  Page 6

first report, the soils management plan, was filed in May 1997–five months after demolition began. After requesting Camp Dresser to prepare an RI/FS and then passing it along to the State, the Authority nonetheless decided on its own to ignore the recommendations in the RI/FS and instead proceed with the construction as planned. After completion of the runway in December 1997, the Authority had Camp Dresser prepare a BRA. Camp Dresser did not provide the BRA to the Authority until April 1998. By the time the State approved the RI/FS and BRA in November 1998, the runway had been operational for almost a year. The timing of these events demonstrates that the cleanup costs could not have been incurred in response to a threat to human health or the environment, because the Authority did not have the relevant information at the time the costs were incurred.

The Authority responds that, at the very least, its 1990 EIS was a timely investigation into the need for remediation. Clearly, the EIS states that expanding the airport would require remediation at various locations, including the Site. However, the purpose behind the EIS, and hence its investigation, centered on the health and environmental effects of the airport expansion project as a whole, not around the health and environmental risks of the Site or any parcel as it then existed.[5] The EIS addressed whether the airport should be expanded in the first place, without regard for any specific project that would be required as part of the expansion. For example, the EIS's proposed alternatives to airport expansion were to take no action, to develop a new site/new airport, to utilize alternative modes of transportation, or to increase service from other airports. The EIS does not say, and the Authority does not contend otherwise, that the Site as it existed in 1990 posed an environmental or public heath risk.

Even absent the timing issues, neither the RI/FS nor the BRA shows that the response was "necessary." The RI/FS is irrelevant, since the Authority "approved a substantial departure" from it. The Authority cannot be heard now to say that the RI/FS is proof that the response costs were necessary. As for the BRA, the only potential threat identified was the presence of lead in the soil. To the extent that the BRA identified some risk of lead exposure to workers or on-site visitors, however, those conclusions were erroneous. First, the soils management plan (the only report approved prior to completion of the runway) had already stated that the lead concentrations at the Site were lower than what the federal Environmental Protection Agency ("EPA") has calculated to be acceptable risk levels for both residential and industrial use. Indeed, the mean total lead concentration in seven urban Louisville parks was nearly four times higher. Second, the BRA's author admitted that the lead calculations in the BRA were "not appropriate," and if she had to do it over again, she "would evaluate that in a different manner." Had the authority calculated the lead concentration levels under the EPA's CERCLA model, it would have found no unacceptable risk. Moreover, none of these reports indicated that the Site, as it sat when the Authority took control, needed remediation to protect the public health or the environment. They noted only potentially adverse impacts *of runway construction* on the Site.

Perhaps the most convincing evidence that the response costs were not "necessary" comes from the deposition testimony of Robert Brown, a representative of the Authority, that the areas not excavated as part of the runway construction were left untouched:

> Q. Okay. With regard to the unexcavated areas of those three parcels, what did you do with that land?
>
> A. Actually, in most cases, nothing.

---

[5] The opening sentence in the "Summary" section states that the EIS "addresses the potential impacts of the expansion of Standiford Field . . . as proposed by the . . . Authority." The EIS also states that "the examination of alternatives is the heart of the environmental review process. . . . Chapter 5 . . . provides necessary data and analyses to permit the formulation of conclusions respecting project impacts."

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 7 of 16 - Page ID#: 5529
Case 5:03-cv-00494-KSF Document 226-3 Filed 08/18/2006 Page 7 of 17

No. 05-5754      Regional Airport Authority v. LFG, LLC, et al.      Page 7

> Q. Okay. You just left it as-is?
>
> A. Yes.
>
> Q. Okay. If it was exposed soil, you left it as [sic] exposed; if it had asphalt on it, you left it with asphalt on it, right?
>
> A. Yes.
>
> Q. Okay. Or whatever the cover happened to be, right?
>
> A. Right.

A Camp Dresser manager also testified that the Authority did not remediate the soil deeper than necessary to complete runway construction. Had remediation truly been necessary, the Authority presumably would have (and certainly should have) performed a cleanup of the entire area.

In any event, the soils management plan makes clear that any "concerns" would have been rectified through normal runway construction and a prohibition against the use of ground and surface waters:

> The ingestion of soil particles containing constituents of concern will be controlled by covering all [S]ite soils with runway or taxiway pavement, or with clean topsoil and vegetation. Surface water and groundwater ingestion pathways would be eliminated by [the Authority's] prohibition of groundwater usage and by the prohibition of surface water bodies in the area of the [S]ite and west runway.

In other words, the "response costs" and the runway construction costs were one and the same. Therefore, allowing the Authority to recoup its "response costs" would be tantamount to a reimbursement of its runway construction costs. "To require former occupants to assume liability for cleanup costs going beyond the level necessary to make the property safe for industrial use would be to provide an unwarranted windfall to the beneficiary of the cleanup." *City of Detroit v. Simon*, 247 F.3d 619, 630 (6th Cir. 2001). Likewise here, to require Defendants to assume liability for cleanup costs not in excess of normal construction or use costs would be to provide an unwarranted windfall to the Authority.

Contrary to the Authority's position, we do not believe the district court erred in relying on the following passage from *G.J. Leasing I*:

> A theoretical threat is not enough. For response costs to be "necessary", [sic] plaintiffs must establish that an actual and real public health threat exists *prior to initiating a response action*. To show that costs incurred were "necessary" under CERCLA, a party must show (1) that the costs were incurred *in response to* a threat to human health or the environment, and (2) that the costs were necessary to address the threat. Also, CERCLA liability attaches only where a release or threatened release of a hazardous substance "causes the incurrence of response costs." In this case the evidence established that plaintiffs had other business reasons for undertaking site investigations and abatement actions. To the extent that these actions were taken for purposes other than responding to an actual and real public health threat, there is no CERCLA liability.

*G.J. Leasing I*, 854 F. Supp. at 562 (internal citations omitted). The Authority complains that the last two quoted sentences create an "ulterior motive" defense that is inconsistent with the statutory scheme. In support, the Authority cites the en banc opinion of the Ninth Circuit in *Carson Harbor*

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 8 of 16 - Page ID#: 5530
Case 5:03-cv-00494-KSF Document 226-3 Filed 08/18/2006 Page 8 of 17

No. 05-5754      Regional Airport Authority v. LFG, LLC, et al.                    Page 8

*I*. In that case, the court rejected the approach in *G.J. Leasing I*, stating that the "focus [is] not on whether a party has a business or other motive in cleaning up the property, but on whether there is a threat to human health or the environment and whether the response action is addressed to that threat." *Carson Harbor I*, 270 F.3d at 872. Thus, "[t]he issue is not why the landowner decided to undertake the cleanup, but whether it was necessary. To hold otherwise would result in a disincentive for cleanup." *Id.* (citing *Cadillac Fairview/Cal., Inc. v. Dow Chem. Co.*, 840 F.2d 691, 695 (9th Cir. 1988)).

We respectfully disagree. The passage from *G.J. Leasing I* merely fleshes out the statute's limitation on liability. To recover, a plaintiff must show that it incurred costs in response to health or environmental threats. If a party would have incurred identical costs in the absence of any threat, then the presence of the threat cannot be said to have "cause[d] the incurrence of response costs." 42 U.S.C. § 9607(a)(4). Thus, the court in *G.J. Leasing I* held that "[t]o the extent that the[] actions were taken *for purposes other than responding to an actual and real public health threat*, there is no CERCLA liability." *G.J. Leasing I*, 854 F. Supp. at 562 (emphasis added). Such a conclusion cannot possibly provide a "disincentive for cleanup," because the analysis is premised on the fact that the plaintiff would not have proceeded any differently had there been no threat of release. By definition, then, the plaintiff in that case needs no incentive to act.

This is not to say that parties are precluded from recovering all response costs incurred for self-serving motives. Parties often select a particular response based on commercial efficiency and convenience. To recover CERCLA damages in those cases, however, the parties must show that the threat to public health or the environment was the predicate for acting. Otherwise, businesses that happened to operate on contaminated property, yet took no additional measures in order to do so, would realize unearned fixed-cost advantages over their competitors. We do not believe that Congress, in enacting CERCLA, intended such a result.

Regardless, the district court did not rely on the Authority's ulterior motive in denying liability. The district court cited *G.J. Leasing I* to support its conclusion that "no reasonable jury could conclude that prior to the construction process, the contamination on site posed an actual and real threat to the environment or to public health." This conclusion demonstrates application of the proper legal standard and the only reasonable conclusion that could be drawn from this record.

### 2. "Consistent" with the NCP

While a conclusion that response costs were not "necessary" alone defeats the Authority's CERCLA claims, we address the issue of whether the costs were "consistent" with the NCP in the alternative.

A contamination cleanup is consistent with the NCP "if, taken as a whole, it is in 'substantial compliance' with 40 C.F.R. § 300.700(c)(5)-(6), and results in a 'CERCLA-quality cleanup.'" *Franklin County*, 240 F.3d at 543 (quoting 40 C.F.R. § 300.700(c)(3)(i)). An immaterial or insubstantial deviation, however, will not result in a cleanup that is "not consistent" with the NCP. 40 C.F.R. § 300.700(c)(4). The relevant provisions of the NCP for purposes of this appeal concern the RI/FS and selection of remedy, § 300.700(c)(5)(viii), and community relations and the opportunity for public comment, § 300.700(c)(6).

Section 300.700(c)(5)(viii) states that compliance with section 300.430 is "potentially" required for a private CERCLA cause of action. Section 300.430(f)(1)(ii) states:

> The selection of a remedial action is a two-step process . . . . First, the lead agency [e.g., the State] . . . identifies a preferred alternative and presents it to the public in a proposed plan, for review and comment. Second, the lead agency shall review the public comments and consult with the state . . . in order to determine if

Case: 5:03-cv-00494-KSF-JBT   Doc #: 258-16   Filed: 09/15/06   Page: 9 of 16 - Page ID#:
Case 5:03-cv-00494-KSF   Document 2283   Filed 08/18/2006   Page 9 of 17

No. 05-5754          *Regional Airport Authority v. LFG, LLC, et al.*                    Page 9

the alternative remains the most appropriate remedial action for the site or site problem. The lead agency ... makes the final remedy selection decision, which shall be documented in the ROD.

We believe that, under the facts of this case, compliance with section 300.430 is required, but the Authority's response fails each provision. First, the State did not present the preferred alternative to the public in a proposed plan, because the Authority never provided the State with the proposed plan in the first place. The only opportunity for public comment on the chosen alternative occurred years after construction on the Site was completed. Second, the State had no public comments to consider. As a general proposition, recovery should not be precluded where the lead agency could not consider public comments because there simply were none to consult. It seems a different matter, however, where there are no public comments because the "proposal" was already completed by the time the public had an opportunity to comment on it. Finally, and most importantly, the State did not make the final remedy selection decision, and there was no ROD. The State could not have made the final remedy selection decision, as the Authority completed the remedy eleven months before the State even approved the RI/FS and BRA. Moreover, the unrefuted testimony from the Authority's environmental consultant was that the Authority had made an affirmative decision not to file a ROD.[6] We conclude that the Authority failed to comply with this provision of the NCP.

Also, the Authority's preparation of the RI/FS fell short of substantial compliance with section 300.430. The purpose of the RI is "to . . . develop[] and evaluat[e] effective remedial alternatives." 40 C.F.R. § 300.430(d)(1). The purpose of the FS is "to ensure that appropriate remedial alternatives are developed and evaluated such that relevant information concerning the remedial action options can be presented to a decision-maker and an appropriate remedy selected." 40 C.F.R. § 300.430(e)(1). Here again, neither of these purposes was fulfilled because the Authority had already implemented a remedy by the time the State approved the RI/FS. Finding this type of action to be in compliance with the NCP would reduce the NCP to a mere formality. Moreover, the meaninglessness of the Authority's RI/FS is further demonstrated by the Authority's approval of a "substantial departure" from the RI/FS shortly after it was submitted for approval.

Third, the Authority did not provide an opportunity for public comment on the planned remediation. *See* 40 C.F.R. § 300.700(c)(6) (stating that "[p]rivate parties undertaking response actions should provide an opportunity for public comment concerning the selection of the response action"). Where relevant, these "community relations" provisions require, inter alia, that a party solicit concerns from the public and prepare a formal community relations plan, § 300.430(c)(2)(i)-(ii), that the party make available for public comment a report describing the preferred remedy along with alternatives, § 300.430(f)(2)-(3), and that the ROD be made available for public inspection, § 300.430(f)(6)(ii).

Once again, the Authority did none of these. The Authority did not solicit concerns from the public, prepare a formal community relations plan, or make available for public comment a report describing the preferred remedy along with alternatives. However defined, any *meaningful* opportunity for public comment must occur before the final remedial action is chosen, let alone implemented. *See Carson Harbor Vill., Ltd. v. County of Los Angeles (Carson Harbor II)*, 433 F.3d 1260, 1266-67 (9th Cir. 2006); *Union Pac. R.R. Co. v. Reilly Indus., Inc.*, 215 F.3d 830, 837 (8th Cir. 2000). Thus, the public meeting held in March 1999--at least two years after the remedy was chosen and one year after it was completed--cannot satisfy the public comment requirement. *See Reilly*, 215 F.3d at 837 (finding non-compliance with the NCP where, at the time of one public meeting, the "remedy was--for purposes of allowing meaningful public participation and comment--a

---

[6] The State's approval of the Authority's Remedial Plan in May 2002 is not an adequate substitute for the filing of a ROD, as it occurred almost four-and-a-half years after the plan was implemented.

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 10 of 16 - Page
Case 5:03-cv-00494-KSF Document 226-3 Filed 08/18/2006 Page 10 of 17
ID#: 5532

No. 05-5754   *Regional Airport Authority v. LFG, LLC, et al.*   Page 10

foregone conclusion"); *Pierson Sand & Gravel, Inc. v. Pierson Twp.*, No. 94-1472, 1996 U.S. App. LEXIS 16088, at *10 (6th Cir. June 18, 1996) (unpublished opinion) (holding that a public meeting "could have provided no 'opportunity for public comment concerning the *selection* of the response action' because the plan had already been 'selected'" (quoting 40 C.F.R. § 300.700(c)(6))). And as already noted, the EIS did not address specific remediation plans or alternatives. Therefore, the public comment on the EIS in 1990 cannot satisfy the NCP.

The Authority points to public board meetings it held from 1994 until 1998 as having provided opportunities for public comment. However, the minutes from the meetings themselves show that the only items on any agenda related to the remediation of the Site involved approval of contractors to carry out the predetermined actions.[7] The purpose of the NCP's community relations requirements is not to give the public an opportunity to comment on who will conduct the remediation; it is to comment on the underlying remediation itself. Only the former occurred during the Authority's public board meetings, and thus the meetings are of no consequence to the Authority's CERCLA claim.[8]

The Authority cites the State's "substantial involvement" in the process as a substitute for deficient public participation. The Second Circuit has held that "[w]here a state agency responsible for overseeing remediation of hazardous wastes gives comprehensive input, and the private parties involved act pursuant to those instructions, the state participation may fulfill the public participation requirement." *Bedford Affiliates v. Sills*, 156 F.3d 416, 428 (2d Cir. 1998); *cf. NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 791 (7th Cir. 2000) (finding NCP compliance where a state agency approved plaintiff's cleanup plan, monitored the remediation, and advised plaintiff when the remediation was complete). This Court has yet to decide whether this approach is sound, and we need not do so in this case, as the Authority cannot demonstrate compliance with the public comment requirements even under this standard. First, the State did not give "comprehensive input." In fact, the record demonstrates that the State did little more than respond to the Authority's filings. Second, the Authority cannot be said to have acted pursuant to the State's instructions, because all work commenced prior to State approval. *See Reilly*, 215 F.3d at 837-38 (finding no *Bedford Affiliates* "exception" because remediation began before the state agency could make the ROD available for public inspection and copying). Third, the Authority never completed a BRA as the State required for risk-based management remedies, and explicitly rejected the State's recommended actions as stated in the RI/FS. In short, the State's participation in this case falls well short of the standards for vicarious public comment.

The Authority's alternative response to the district court's finding of non-compliance with the NCP is that the NCP is a loose guideline that is satisfied if the response "results in a CERCLA-quality cleanup." 40 C.F.R. § 300.700(c)(3)(i). The Authority concludes that, because its response (arguably) resulted in a CERCLA-quality cleanup, it satisfied the NCP. The problem with this argument is that recovery under § 107(a) requires *both* "substantial compliance" with the NCP *and* a "CERCLA-quality cleanup." *Franklin County*, 240 F.3d at 543; *see also NutraSweet*, 227 F.3d

---

[7] For example, at the meeting held on January 12, 1994, the board awarded a contract to remove asbestos and demolish several buildings on the Site. At a November 20, 1996 meeting, the board awarded a contract to complete the demolition and removal of all remaining above-ground structures on the Site. And at a meeting held on February 19, 1997, the board approved additional funds for the November 20, 1996 contract to cover additional anticipated expenses.

[8] Similarly, we find no merit in the Authority's claim that the public board meetings allowed for at least as much public participation as the scheme we found in compliance with the NCP in *Franklin County*. In that case, "[t]he media covered significant developments at the site, as well as public . . . [b]oard meetings, at which the remediation was discussed and opportunity for public comment given. A . . . director was appointed to speak to community groups, to handle all media inquiries, and to respond to public records requests." *Franklin County*, 240 F.3d at 545. Quite simply, none of those facts is present here.

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 11 of 16 - Page ID#: 5533
Case 5:03-cv-00494-KSF Document 226-3 Filed 08/18/2006 Page 11 of 17

No. 05-5754       Regional Airport Authority v. LFG, LLC, et al.                  Page 11

at 791; *County Line Inv. Co. v. Tinney*, 933 F.2d 1508, 1512 (10th Cir. 1991) (per curiam) ("Section 107 provides that a person is only liable for private party response costs to the extent that these costs were incurred 'consistent with the national contingency plan.' Proof of response costs incurred 'consistent with' the NCP is, therefore, an element of the prima facie private cost recovery action under CERCLA." (citing 42 U.S.C. § 9607(a))). Thus, the fact that the Authority's response may have resulted in a CERCLA-quality cleanup alone is insufficient.

We recognize that "immaterial, insubstantial" deviations that do "not affect the overall quality of the cleanup" will not bar recovery. *Franklin County*, 240 F.3d at 545. But wholesale failure to comply with the NCP's remedy-selection process and community relations provisions—the very heart of the NCP—cannot reasonably be characterized as "immaterial" or "insubstantial."

### 3. Investigation costs

The Authority argues for the first time on appeal that it is entitled to recover its initial investigation costs even if its underlying CERCLA claim fails. *See Pierson*, 1996 U.S. App. LEXIS 16088, at *17-19; *Donahey v. Bogle*, 987 F.2d 1250, 1255-56 (6th Cir. 1993), *vacated on other grounds*, 512 U.S. 1201 (1994); *Tinney*, 933 F.2d at 1515. The Authority alleges that it spent more than $1 million investigating the environmental contamination at the Site. In order to recover initial investigation costs, a plaintiff must bring a separate claim for relief and present separate evidence in support thereof. *Pierson*, 1996 U.S. App. LEXIS 16088, at *20; *Tinney*, 933 F.2d at 1515.

Like the plaintiff in *Pierson*, the Authority "made no separate claim for [investigation costs] and failed to present any separate evidence or calculations of those costs." *Pierson*, 1996 U.S. App. LEXIS 16088, at *20. "To accept [the plaintiff's] belated attempt to salvage preclosure costs out of an adverse decision below on their unitary allegation of injury would require a remand and further evidentiary findings—proceedings which undermine the just, speedy and economical benefits of the summary judgment procedure." *Tinney*, 933 F.2d at 1515. Therefore, we reject the Authority's attempt to recover initial investigation costs at this late stage.

### 4. Summary judgment appropriate

The Authority's response costs were not necessary to protect against a threat to the public health or the environment. Nor did the Authority substantially comply with the regulations as required by the NCP. Finally, the Authority did not properly seek initial investigation costs. For these reasons, we conclude that the district court did not err in granting summary judgment to Defendants on the Authority's CERCLA claims.

### B. Equitable Indemnification

The second issue is whether the district court erred in dismissing the Authority's equitable indemnification claim under Federal Rule of Civil Procedure 12(b)(6).

We review the grant of a motion to dismiss under Rule 12(b)(6) de novo. *Eubanks v. CBSK Fin. Group, Inc.*, 385 F.3d 894, 897 (6th Cir. 2004). "The Court is required to construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of the claims that would entitle plaintiff to relief." *Id.*

The district court dismissed the equitable indemnification claim on the ground that the Authority could not bring a claim in equity because CERCLA provided an adequate remedy at law. The Authority's first response is that the equitable indemnification claim is merely an alternative theory of liability. The second response is that a CERCLA remedy may not be available as a matter of law. Specifically, the Authority notes that the Supreme Court's recent decision in *Cooper*

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 12 of 16 - Page
Case 5:03-cv-00494-KSF-JBT Document 226-3 Filed 08/18/2006 Page 12 of 17
ID#: 5334

No. 05-5754     *Regional Airport Authority v. LFG, LLC, et al.*     Page 12

*Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157 (2004), effectively precludes the Authority's § 113 claim, *see id.* at 161 (holding that recovery under § 113 is available only to those parties that have already been sued themselves), and that, if remanded, the district court could determine that the Authority is a "potentially responsible party" not eligible to bring a private cause of action under § 107, *see Centerior Serv. Co. v. Acme Scrap Iron & Metal Corp.*, 153 F.3d 344, 350 (6th Cir. 1998) (stating that CERCLA claims brought by potentially responsible parties must be brought under § 113). This, the Authority concludes, would leave no adequate remedy at law.

Parties may, of course, plead alternative theories of liability. *See* Fed. R. Civ. P. 8(e)(2), 18(a). However, Kentucky follows the traditional rule that equitable relief is not available where there exists an adequate remedy at law. *See Popplewell's Alligator Dock No. 1, Inc. v. Revenue Cabinet*, 133 S.W.3d 456, 472 n.83 (Ky. 2004) (citing *Tharp v. Louisville & N. R. Co.*, 210 S.W.2d 954, 955 (Ky. 1948) ("It is, of course, an ancient and settled principle that an equity court will not exert its powers where the litigant has an adequate remedy at law.")); *see also Shaw v. United States*, 891 F.2d 602, 603 (6th Cir. 1989) ("Under standard equity doctrine, where there is an adequate remedy at law it must be pursued."). The fact that a party is unsuccessful in proving an available legal remedy does not make the remedy inadequate. *Thompson v. Allen County*, 115 U.S. 550, 554 (1885); *Justice v. United States*, 6 F.3d 1474, 1482 n.16 (11th Cir. 1993); *see also INS v. Pangilinan*, 486 U.S. 875, 883 (1988) ("[I]t is well established that courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law." (internal quotation omitted)).

Most courts that have considered this issue have concluded that CERCLA provides an adequate legal remedy for cost-recovery claims.[9] *See Truck Components, Inc. v. Beatrice Co. (Truck Components I)*, No. 94 C 3228, 1994 U.S. Dist. LEXIS 13319, at *42-43 (N.D. Ill. Sept. 19, 1994) (unpublished opinion); *One Wheeler Rd. Assocs. v. Foxboro Co.*, 843 F. Supp. 792, 799 (D. Mass. 1994); *but see Truck Components, Inc. v. K-H Corp. (Truck Components II)*, No. 94 C 50250, 1995 U.S. Dist. LEXIS 17444, at *33 (N.D. Ill. Nov. 22, 1995) (unpublished opinion). The district court relied on the decision in *Truck Components I*, which held that "CERCLA provides an indemnification remedy. Moreover, CERCLA reflects a legislative judgment of how the equities of pollution response should be balanced. [Plaintiff] therefore has an adequate remedy at law and its equitable indemnity claim must be dismissed." *Truck Components I*, 1994 U.S. Dist. LEXIS 13319, at *43.

We find the district court's reasoning sound. "Courts sitting in chancery cannot disregard statutory law, so that where the rights of the parties are clearly defined and their situation is established by the law, the maxim that equity follows the law must be applied . . . ." *Breslin v. Gray*, 193 S.W.2d 143, 146 (Ky. Ct. App. 1946); *see also Morton v. Bank of Bluegrass & Trust Co.*, 18 S.W.3d 353, 358 n.4 (Ky. Ct. App. 1999) (stating that where an issue can be resolved on legal grounds, "equitable principles are inapplicable as equity follows the law"). CERCLA provides a statutory means of determining environmental cleanup liability, which essentially "trumps" any extra-statutory liability in equity. Moreover, "[t]here can be no indemnity without liability." *Clark v. Hauck Mfg. Co.*, 910 S.W.2d 247, 253 (Ky. 1995). Therefore, the Authority's claim for equitable indemnification would necessarily hinge on the resolution of the CERCLA claim, because CERCLA provides the sole means of determining liability. Since CERCLA itself provides an adequate remedy for damages, the equitable indemnification claim is superfluous.

As for the argument that the Authority *might* have no legal remedy if we were to remand this case and the district court were later to decide that the Authority is a potentially responsible party,

---

[9] CERCLA may not, however, provide an adequate legal remedy when a plaintiff seeks injunctive relief. *See, e.g., United States v. Waste Indus., Inc.*, 734 F.2d 159, 168 (4th Cir. 1984).

Case: 5:03-cv-00494-KSF-JBT Doc #: 258-16 Filed: 09/15/06 Page: 13 of 16 - Page
Case 5:03-cv-00494-KSF Document 226-3 Filed 08/18/2006 Page 13 of 17
ID #: 5335

No. 05-5754　　　*Regional Airport Authority v. LFG, LLC, et al.*　　　Page 13

there is simply nothing in the record to suggest that the court could make such a finding. In fact, if the Authority were deemed a potentially responsible party, § 107(a) would be rendered meaningless. Congress clearly intended to allow private parties in the Authority's situation to recover response costs from other private parties in Defendants' position, provided certain requirements were satisfied. If the Authority were precluded from recovery as a potentially responsible party, it is difficult to conceive of a private party-plaintiff that would not be similarly precluded. We need not speculate, however. CERCLA provided the Authority with an adequate remedy at law. That the facts of this case prevent recovery does not affect this conclusion.

## C. Discovery Orders

The final issue is whether the district court erred in affirming the magistrate judge's order compelling production of documents. The documents at issue fall into one of two categories: (1) allegedly privileged communications between the Authority's attorneys and certain outside parties, or (2) core attorney work product given to the Authority's testifying experts.

"The question of whether the attorney-client privilege applies is a mixed question of law and fact, subject to de novo review."[10] *Reed v. Baxter*, 134 F.3d 351, 355 (6th Cir. 1998). Where, as here, the underlying claim is based on federal law, federal common law determines the extent of the privilege. *See* Fed. R. Evid. 501; *Swidler & Berlin v. United States*, 524 U.S. 399, 403 (1998).

### 1. Communications between the Authority's counsel and certain outside parties

The district court affirmed the magistrate judge's order compelling the Authority to disclose written documents memorializing communications between counsel for the Authority and outside parties, such as Camp Dresser, involved in investigating the need for remediation at the Site. The Authority maintains that Camp Dresser and others were agents of the Authority, and thus any communications between them and the Authority's attorneys are protected by the Authority's attorney-client privilege.

The Authority's entire argument centers on its contention that the magistrate judge applied the wrong legal standard. The magistrate judge cited the Eighth Circuit's en banc decision in *Diversified Industries, Inc. v. Meredith*, 572 F.2d 596 (8th Cir. 1978) (en banc), while the Authority asserts that the correct legal standard is found in this Court's decision in *Reed v. Baxter*, 134 F.3d 351 (6th Cir. 1998).

The problem with the Authority's argument, however, is that, even if correct,[11] it does not address the reasoning of the magistrate judge. The magistrate judge found that, because the communications at issue were not made to obtain legal advice, the attorney-client privilege could not attach, even if the third-parties were agents of the Authority. In fact, nowhere in the Authority's briefs on appeal is that conclusion challenged. Applying *Reed* rather than *Diversified* would not have altered the magistrate judge's conclusion, because both cases state that the attorney-client privilege may attach only if the communications regard legal advice. *Compare Reed*, 134 F.3d at 355 ("The elements of the attorney-client privilege are as follows: (1) Where legal advice of any

---

[10] The Authority on appeal characterizes the issue as a discovery matter, and hence maintains that the proper standard of review is abuse of discretion. Defendants argue likewise, citing the Authority's brief. Of course, the parties may not stipulate to the standard of review. *K & T Enters., Inc. v. Zurich Ins. Co.*, 97 F.3d 171, 175 (6th Cir. 1996). Here, the particular discovery issue goes to the application of the attorney-client privilege. Thus, our review is de novo. *See, e.g., Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005).

[11] It should be noted that the magistrate judge discussed *Diversified* in response to the Authority's reliance on *In re Bieter Co.*, 16 F.3d 929 (8th Cir. 1994), another decision of the Eighth Circuit. Even then the magistrate judge did so only to describe the standard applied in the *Bieter* case.

Case: 5:03-cv-00494-KSF-JBT   Doc #: 258-16   Filed: 09/15/06   Page: 14 of 16 - Page
Case 5:03-cv-00494-KSF   Document 226-3   Filed 08/18/2006   Page 14 of 17
ID #: 5536

No. 05-5754  *Regional Airport Authority v. LFG, LLC, et al.*  Page 14

kind is sought . . . ."), *with Diversified*, 572 F.2d at 609 ("[T]he attorney-client privilege is applicable to an employee's communication if (1) the communication was made for the purpose of securing legal advice . . . ."); *see also Fisher v. United States*, 425 U.S. 391, 403 (1976) (stating that the attorney-client privilege "protects only those disclosures . . . necessary to obtain informed legal advice"). Because the Authority has not challenged the magistrate judge's finding that the communications at issue were not made for the purpose of obtaining legal advice, we will not attempt a discussion of the matter. *Cf. Cruz v. Am. Airlines, Inc.*, 356 F.3d 320, 333-34 (D.C. Cir. 2004) ("[The courts of appeals] are not self-directed boards of legal inquiry and research, but essentially arbiters of legal questions presented and argued by the parties." (internal quotation omitted)).

### 2. Attorney opinion work product provided to testifying experts

The Authority also challenges the district court's order requiring disclosure of certain documents the Authority gave to its testifying experts. The Authority had opposed disclosure on the ground that the documents were protected by the attorney opinion work product doctrine. The district court concluded that the Federal Rules of Civil Procedure require that all documents given to testifying experts be turned over to the opposing party upon request. There is no dispute as to any factual findings; the Authority contests only the district court's legal conclusion.

"[T]he work product doctrine 'is distinct from and broader than the attorney-client privilege.'" *In re Antitrust Grand Jury*, 805 F.2d 155, 163 (6th Cir. 1986) (quoting *United States v. Nobles*, 422 U.S. 225, 238 n.11 (1975)). While the attorney-client privilege protects only confidential communications, the work product doctrine generally protects from disclosure documents prepared by or for an attorney in anticipation of litigation. *Id.*; *see also Hickman v. Taylor*, 329 U.S. 495, 510-12 (1947). Prior to 1993, there was general agreement that Federal Rule of Civil Procedure 26 excluded categorically the discovery of attorney opinion work product, even when provided to testifying experts. *See, e.g., Toledo Edison Co. v. G A Techs., Inc.*, 847 F.2d 335, 339-41 (6th Cir. 1988); *Bogosian v. Gulf Oil Corp.*, 738 F.2d 587, 595 (3d Cir. 1984).

In 1993, however, Rule 26 was amended to require parties to submit expert reports for all testifying experts. *See* Fed. R. Civ. P. 26(a)(2)(A) ("[A] party shall disclose to other parties the identity of any person who may be used at trial to present evidence . . . ."); *see also* Fed. R. Civ. P. 26 advisory committee note, 1993 amendments (noting the addition of paragraphs (a)(1)-(4) imposes "a duty to disclose"). Subsection (a)(2) now states:

> (A) In addition to the disclosures required by paragraph (1), a party shall disclose to other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.
>
> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

No. 05-5754     *Regional Airport Authority v. LFG, LLC, et al.*                              Page 15

Since the amendments, two lines of cases have formed regarding protections of work-product associated with those experts. The first holds that attorney work product is not discoverable merely because it has been shared with a testifying expert. *See Haworth, Inc. v. Herman Miller, Inc.*, 162 F.R.D. 289, 292-96 (W.D. Mich. 1995); *see also Smith v. Transducer Tech., Inc.*, 197 F.R.D. 260, 261-62 (D.V.I. 2000); *Krisa v. Equitable Life Assurance Soc'y*, 196 F.R.D. 254, 259-61 (M.D. Pa. 2000); *Estate of Moore v. R.J. Reynolds Tobacco Co.*, 194 F.R.D. 659, 663-64 (S.D. Iowa 2000). The second holds that Rule 26 creates a bright-line rule requiring disclosure of all information provided to testifying experts, including attorney opinion work product. *See In re Pioneer Hi-Bred Int'l, Inc.*, 238 F.3d 1370, 1375 (Fed. Cir. 2001); *Karn v. Ingersoll Rand*, 168 F.R.D. 633, 637-41 (N.D. Ind. 1996); *Gall v. Jamison (In re Gall)*, 44 P.3d 233, 238-39 (Colo. 2002); *cf. Fid. Nat'l Title Ins. Co. of N.Y. v. Intercounty Nat'l Title Ins. Co.*, 412 F.3d 745, 751 (7th Cir. 2005) (noting that Rule 26(a)(2)(B) requires a party to disclose all data that a testifying expert "considered"). The issue is one of first impression in this Court.

The first line–the so-called *Haworth* line–represents the minority view. The *Haworth* court felt that the amendments to Rule 26 did not change the pre-amendment rule that attorney opinion work product disclosures to experts were privileged from discovery. Relying largely on the Supreme Court's decision in *Hickman*, the *Haworth* court stated, "For the high privilege accorded attorney opinion work product not to apply would require clear and unambiguous language in a statute." *Haworth*, 162 F.R.D. at 295. Finding no such language in Rule 26, the court followed pre-amendment Sixth Circuit precedent that attorney opinion work product is absolutely privileged. *Id.* (citing *Toledo Edison*, 847 F.2d at 340).

The contrary view–adopted by a majority of courts that have considered the issue, including the only court of appeals to have done so–relies mostly on statements in the Advisory Committee Notes in holding that Rule 26 as amended creates a bright-line rule requiring disclosure of all information provided to testifying experts. *See In re Pioneer*, 238 F.3d at 1375.

The district court adopted the majority view in holding that all materials the Authority provided to its testifying experts must be disclosed to Defendants. The Authority claims this was in error, arguing that Rule 26(b)(3) and (4) requires disclosure of attorney opinion work product given to testifying experts only in "exceptional circumstances." The *Haworth* line of cases makes a similar argument. *See, e.g., Krisa*, 196 F.R.D. at 259-60; *Haworth*, 162 F.R.D. at 292-94. Rule 26(b)(3) states, in relevant part:

> Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means.

Subsection (b)(4) states, in relevant part:

> (A) A party may depose any person who has been identified as an expert whose opinions may be presented at trial. If a report from the expert is required under subdivision (a)(2)(B), the deposition shall not be conducted until after the report is provided.
> (B) A party may, through interrogatories or by deposition, discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or preparation for trial and who is not

Case: 5:03-cv-00494-KSF-JBT  Doc #: 258-16  Filed: 09/15/06  Page: 16 of 16 - Page
Case 5:03-cv-00494-KSF  Document 265538 Filed 08/18/2006  Page 17 of 17

No. 05-5754    *Regional Airport Authority v. LFG, LLC, et al.*    Page 17

canons of statutory interpretation, we must interpret statutes as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute inconsistent, meaningless or superfluous.'" (quoting *Lake Cumberland Trust, Inc. v. EPA*, 954 F.2d 1218, 1222 (6th Cir. 1992))). Thus, we read this provision to require disclosure of more than facts.

It is unclear from the text alone the extent of the required disclosure. The Advisory Committee Notes are equally ambiguous: "Given this obligation of disclosure, litigants should no longer be able to argue that materials furnished to their experts . . . are privileged or otherwise protected from disclosure when such persons are testifying or being deposed." Since neither the text of the Rule nor the Advisory Committee Notes places any qualifier as to the extent of the "information," Fed. R. Civ. P. 26(a)(2)(B), or "materials," Fed. R. Civ. P. 26, advisory committee note, 1993 amendments, given to testifying experts, we must conclude that none was intended. Thus, we read Rule 26(a)(2) as requiring disclosure of *all* information provided to testifying experts.

The bright-line approach is the majority rule, represents the most natural reading of Rule 26, and finds strong support in the Advisory Committee Notes. Therefore, we now join the "overwhelming majority" of courts, *Herman v. Marine Midland Bank*, 207 F.R.D. 26, 29 (W.D.N.Y. 2002), in holding that Rule 26 creates a bright-line rule mandating disclosure of all documents, including attorney opinion work product, given to testifying experts. Accordingly, we affirm the order of the district court.

### IV. Conclusion

For the foregoing reasons, the judgments of the district court are **AFFIRMED**.