919670

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.,   ) CIVIL ACTION NO. O3-494 KSF
                           )
            Plaintiff,     )
                           )
      vs.                  )
                           )
LIBERTY MUTUAL INSURANCE   )
COMPANY, et al.,           )
                           )
            Defendants.    )
_____)

DEPOSITION OF DAVID W. O'BRIEN

Woodland Hills, California

Tuesday, August 29, 2006

Volume 2

Reported by:
KARIN E. GLAAB
CSR No. 2638
JOB No. 919670

1           UNITED STATES DISTRICT COURT
              EASTERN DISTRICT OF KENTUCKY
2                   LEXINGTON DIVISION

Page 1

**EXHIBIT SS**

919670

18  night, that that probably pertained to David Spruhance,
19  because that's the only David, other than myself, that I
20  know that has been involved in this case.
21       So I probably -- as I was thinking last night,
22  Floyd Skeren was probably there or Tom -- I mean, Floyd --
23  John Floyd, excuse me, or Tom Skeren.  Fedde was obviously
24  there, whoever he is.  And I would a suspect that David
25  Spruhance was probably there because that David appears,

240

1   and I wouldn't put my own name there.
2        So I wanted to go back and try to search my
3   memory of that meeting, and I can vaguely remember being
4   at a restaurant in Anaheim, and we were there for some
5   period of time.  I think the record shows three hours,
6   three hours and a half.
7        And so it would be my suspicion that he was
8   probably of counsel or something.  Otherwise, I wouldn't
9   have -- have noted him.  And I wouldn't have noted him
10  unless there was something about this case that was
11  discussed.
12       In other words, if I go to a meeting with -- I
13  indicated we went to a meeting one time or a social
14  gathering with David Spruhance.  I wouldn't have noted it
15  because I would have charged for it.
16       But if I went to a meeting with David Spruhance
17  or somebody else that was just a social gathering where
18  I'm invited, and this case is not discussed, then you
19  would not find an entry in my book.
20       And if you read carefully all my notes, I

Page 7

**EXHIBIT SS**

919670

21  document every moment that I'm involved in this case.
22       So it bothered me that I didn't recall this
23  gentleman.
24       The second thing that bothered me last night was,
25  you asked me about this payment of medical bills within

241

1   certain time frames, and I told you that in the time frame
2   involved here, medical bills by statute are supposed to be
3   paid within 60 days.
4   Q    Yeah.
5   A    And now it's been dropped down to 45 days on the
6   new cases, 2/06, with the exception of county or state.
7        But I should have added but only if the medical
8   billings are supported by a medical report that is
9   reasonable and supported by the official medical treatment
10  fee schedule.  So I should have added that little
11  addition.
12       And if there's a medical legal report, then it
13  has to be paid within that same time frame, but then again
14  only if it's according to the official medical fee
15  schedule, that difference on the treatment schedule, and
16  that at the time it was prepared a claim form had been
17  filed, and there was a dispute as to an issue.
18       In other words, the carrier has no responsibility
19  to pay a medical legal bill unless there is an issue in
20  dispute for which that medical doctor was asked to render
21  an opinion.
22       So I wanted to make sure I corrected that.
23  Q    Okay.

**EXHIBIT SS**

919670

24    A    And then the last thing that I wanted to remember

25    I thought about last night.  You asked me about this

242

1    business of sound medical practices that are recognized in
2    California in workers' compensation, as far as I'm
3    concerned.  And I should have added the best business
4    practices standards and any special standards that a
5    client may agree with or the insured may agree with the
6    insurance company.  And I should have emphasized that
7    those are standards, not guidelines.
8        So, if I can just make those updates.
9    Q    Okay.  Let me -- on the last thing you were
10    talking about, you were talking about standards versus
11    guidelines, I wasn't following you.
12    A    As I understand, the best practices are --
13    they're standards, not guidelines.  I mean, you're
14    supposed to follow them, because they're in the interest
15    of everybody involved, the worker and the insurance
16    company and insured.
17        So we use guidelines a lot in California
18    nowadays, about the utilization review guidelines, the
19    official medical -- we call it the -- we call it the ACOEM
20    guidelines, A-C-O-E-M, Academy of -- those are guidelines,
21    and so they are not standards.  As I understand standards,
22    that you apply those.
23        And I also meant to correct, I used the word 24
24    hours, and what I should have been saying is that equals
25    to one business day.  So, when I said 24 hours that the

243

**EXHIBIT SS**

919670

1  justice should do this or the justice should do that, I
2  should have added business days, because there could be a
3  Sunday in there.
4      And when I said 48 hours for maybe the doctor or
5  the supervisor, I also was assuming that I would be
6  interpreted as meaning two business days.
7  Q   Okay. Sir, let me ask you about some of the
8  things you have testified to this morning.
9      Talking about best practices or standards,
10 which -- now, yesterday you mentioned several different
11 best practices. Are we talking -- when you say best
12 practices or standards, which best practices are you
13 talking about?
14 A   Well, the best practices --
15     MR. ADREANI:  Object to form.
16     THE WITNESS:  The best practices that were agreed
17 upon, I presume agreed upon between Republic and Liberty
18 and the best practices that I alluded to, the ESIS,
19 E-S-I-S, which I made reference to. And other -- Counsel,
20 other best practices that I have encountered.
21     When I have done expert testimony, sometimes the
22 insurance company shares with me documents that I agree
23 that I will give back, and I have encountered two or three
24 best practices standards that different entities have used
25 and have always given them back. But I have that ESIS one

244

1  because they mailed me that, or somebody mailed me that

Page 10

**EXHIBIT SS**

919670

2  one, so I felt that wasn't private.
3  BY MR. HIXSON:
4      Q    Okay.  I am getting a little lost here from where
5  you're going here.
6           What was your point today of bringing up best
7  practices to me in terms of being standards versus
8  guidelines?
9      A    Well, I didn't want to leave the impression,
10 because I may have yesterday, that I just felt they were
11 guidelines, and you didn't have to strictly follow them.
12     Q    Okay.
13     A    Because I think that McCoy says in his book that
14 it's in the best -- it's in the best interest of the
15 employer to keep the cost down to make certain that the
16 best practices are followed.
17          Now, McCoy is talking generally about employers,
18 but if you read McCoy carefully, which I have, he is also
19 talking to claims management, because at one point he
20 talks about, for example, it's in the best interest of the
21 employer to -- he used the word not put the pressure on,
22 but insist that the claims adjuster close down the case as
23 quickly as possible.
24     Q    Okay.  Let's focus on best practices here for a
25 second.  You think in this case that there are best

245

1  practices that Liberty needed to strictly follow.  Am I --
2  are we on the same page?
3      A    Yeah.
4           MR. ADREANI:  Object to form.
Page 11

**EXHIBIT SS**

919670

5      Go ahead.
6           THE WITNESS: Yeah. I think that Liberty has
7   come up with nationwide best practices that they offer to
8   the customer that they are going to follow in order to
9   insure a good result for the injured worker, the employer,
10  and themselves.
11  BY MR. HIXSON:
12     Q    Okay. And you think in this case that there are
13  best practices that -- I think using your words, that
14  Liberty needed to strictly follow.
15          MR. ADREANI: Object to form.
16          THE WITNESS: Absolutely.
17  BY MR. HIXSON:
18     Q    Okay. And those best practices are what and
19  where are they?
20     A    We alluded to them yesterday quite often, and we
21  backed them up with the special instructions standards.
22     Q    Okay. Well, let's talk -- let's try to focus on
23  best practices for a sec. Bear with me here.
24          Let's go ahead and -- I'm going to show you a
25  copy of best practices -- Workers' Compensation Lost Time

246

1   Cases Claims Best Practices/Service Standards. Are those
2   the best practices that you're talking about? And if you
3   need to look at your notebook, you can do that, too.
4           MR. ADREANI: I would like to see that, Judge.
5           THE WITNESS: Yes, Counsel.
6           MR. HIXSON: I don't have an extra copy, sir.
7           THE WITNESS: Those are the ones.

Page 12

**EXHIBIT SS**

919670

8  BY MR. HIXSON:
9     Q    Are these the same best practices that you have
10 in your notebook?  And if you need to confirm, you're free
11 to do that.
12         (Discussion off the record.)
13 BY MR. HIXSON:
14    Q    Are the dates on that bottom right-hand corner
15 the same, sir?  I didn't write down the date you have from
16 yesterday.
17    A    The one you handed me, Counsel, the one I'm
18 looking at is the same, April 30, '01.
19    Q    Okay.  So let's break down, if we can, what we
20 were talking about this morning.  When you were talking
21 about the best practice standards that Liberty needed to
22 strictly follow, you were talking about this document that
23 I'm going to mark as exhibit next.  Let me take --
24         Exhibit 3?
25         THE REPORTER:  Yeah.

247

1          (Deposition Exhibit 3 was marked for.
2           identification by the court reporter.)
3  BY MR. HIXSON:
4     Q    Is that -- was that statement correct?
5     A    Well, Counsel, I don't want to infer that all
6  that Liberty had to do was follow this best practices
7  standards, because they had to follow the laws of the
8  State of California, rules and regulations and the
9  statutes.
10    Q    Let me clarify that question, then.  One of the

Page 13

**EXHIBIT SS**

919670

11     things that Liberty had to do, in your opinion, is that it
12     needed to strictly follow the best practices that are
13     attached as Exhibit 3.
14     A    When you say the word "strictly," Counsel, I
15     realize that sometimes the law says you only can go 30
16     miles, but for an emergency you've got to go 80. So there
17     can be a little deviation here.
18         I don't say that -- I don't like the word
19     "strictly," but, yes, you're supposed to follow -- if you
20     issue standards, and you entice the community to come into
21     your store because of what you promised to do, then I say
22     you should follow what you promised.
23     Q    Okay. So, when you start the day off talking
24     about the best practices as standards, one of the best
25     practices you were talking about is Exhibit No. 3.

248

1     A    Well, see, what happened, you were asking me
2     yesterday late in the day, and it bothered me that I kept
3     having to go and look at my 21 or 25 points where I said
4     Liberty perhaps didn't follow so-and-so.
5         And I said to myself last night I should have
6     mentioned to Mr. Hixson that I was also looking at
7     Liberty's best practices standards and the SSIs and
8     California law.
9     Q    Okay.
10     A    Particular -- special California regulations that
11     may cut across. That's all I meant.
12     Q    Okay. Let's talk about best practices. Are
13     there any other best practice standards that you think

Page 14

**EXHIBIT SS**

919670

14   Liberty should have followed while handling Republic's
15   claims other than the best practice standards that we have
16   marked as Exhibit No. 3?
17        MR. ADREANI:  Asked and answered.  We spent two
18   hours on that yesterday.
19   BY MR. HIXSON:
20    Q   Go ahead.  And here's what I'm trying to get at.
21   You mentioned some other best practices yesterday.  Do you
22   believe that there are any other best practices standards
23   which Liberty should have followed while handling Republic
24   claims other than those in Exhibit 3?
25    A   Yes, I do.  And I think I gave you some examples

249

1   yesterday that there are certain principles, you might
2   call them, or common sense things that a claims adjuster
3   should do.
4    Q   Okay.  Let me --
5    A   Can I explain myself?
6    Q   Let me clarify my question, and it might -- might
7   save us some time here.
8        MR. ADREANI:  Are you going to strike the
9   previous question?
10       MR. HIXSON:  I'll withdraw the previous question.
11       MR. ADREANI:  Thank you.
12   BY MR. HIXSON:
13    Q   Are there any other written best practices
14   standards that you think Liberty should have followed
15   while handling Republic's claims, other than the written
16   best practices standards in Exhibit No. 3?

**EXHIBIT SS**

919670

17      MR. ADREANI:  I will object to form.
18          You can answer.
19  BY MR. HIXSON:
20      Q   Go ahead.
21      A   Counsel, when you say best practices in
22  California, you are certainly talking about any standards
23  that an insurance company or TMP -- TPA sets forth as to
24  why we think we can do a good job for you.
25          So those, as far as I'm concerned, should be

250

1   followed because that is what you promised to do, and
2   that's why maybe I come on board and buy your product
3   rather than the other product.
4           But in addition, you and I can -- and it's done
5   here apparently -- negotiate that, and beyond the best
6   practices standards that you adopt across the country,
7   because it's called nationwide -- you and I can agree
8   we're going to go beyond this.  I'm going to be more
9   involved in the litigation, and here's what you have to
10  do.
11          So I say once you adopt those standards, they
12  also become in a sense best practices standards.  But,
13  Counsel, outside of that, if you're going to sell
14  insurance in California or across this country, there are
15  certain basic principles that -- I just call them common
16  sense principles that everybody should follow.  If they
17  don't follow them, they are mismanaging the claim.  And I
18  want to get to an example, if I could.
19      Q   Well, sir, I appreciate you offering an example.

Page 16

**EXHIBIT SS**

919670

20  I would really like an answer to my question, and the
21  question, I think, is very simple.
22        Are there any other written best practices
23  standards that you think Liberty should have followed when
24  handling Republic claims, other than the written standards
25  that are marked as Exhibit 3?  Are there any other written

251

1   standards or not?  Other written best practices standards
2   or not?
3         MR. ADREANI:  The question has been asked, and
4   the answer was interrupted.
5   BY MR. HIXSON:
6    Q    So I -- what I would like for you to do is to
7   give me a yes or no, and then you can explain.
8    A    Yes.
9    Q    Okay.  What are those other written best
10  practices that you think Liberty should have followed and
11  where can I find them?
12        MR. ADREANI:  Asked and answered.
13        THE WITNESS:  You don't call them best practices,
14  per se, but the rules and regulations of the Division of
15  Workers' Compensation, the rules and regulations of the
16  Workers' Compensation Appeals Board, the rules and
17  regulations of the Audit Department, the rules and
18  regulations of the Division of Safety and Workers'
19  Compensation, just to start off to name a few.
20  BY MR. HIXSON:
21   Q    And you --
22   A    You're supposed to follow those rules.

Page 17

**EXHIBIT SS**

919670

23    Q    In your daily workers' compensation practice, do
24    you refer to the rules and regulations as best practices?
25    MR. ADREANI:  Object --

252

1    THE WITNESS:  No.
2    MR. ADREANI:  Object to form.
3    BY MR. HIXSON:
4    Q    Okay.  Then, let's focus our -- let's -- I want
5    to focus here on what you refer to as best practices.  I
6    don't want to talk about statutes, and I don't want to
7    talk about regulations.  I want to talk about best
8    practices.
9    Are you aware of any other best practices
10    documents, not statutes, not regulations, best practice
11    documents that you believe Liberty should have followed
12    other than the best practice document you have in front of
13    you marked as Exhibit No. 3?
14    MR. ADREANI:  Object to form.
15    THE WITNESS:  Well, if you want to -- Mr. Hixson,
16    you want to sweep aside all of California's rules and
17    regulations, all the requirements of an insurance company
18    that they must follow in the state of California, if they
19    are going to adjust and sell insurance on workers' comp,
20    then I agree with you.  If you want to sweep that all
21    side, I have no problem with your answer.
22    MR. HIXSON:  Okay.
23    THE WITNESS:  But, as far as I am concerned,
24    those rules and regulations are supposed to be followed,
25    and if you follow them -- and you brought it up

Page 18

**EXHIBIT SS**

919670

253

```
 1   yourself -- pay the medical bill within 60 days if
 2   so-and-so happens.  To me, that's a common practice, and
 3   that's a requirement.
 4           MR. HIXSON:  Okay.
 5           THE WITNESS:  It's mandatory.
 6   BY MR. HIXSON:
 7       Q   Okay.  Let's -- let's try to be clear here.  I
 8   know -- I'm going to concede that laws, rules and
 9   regulations to some extent regulate Liberty Mutual.  I'm
10   going to put all those aside.  I'm only talking about one
11   thing.  I'm putting everything else aside right now, and
12   the one thing I want to talk about is best practices.
13   We're not talking about anything else.
14           Are you aware of any other best practices that
15   you think Liberty should have followed other than the best
16   practices in Exhibit 3?
17           MR. ADREANI:  Object to form.
18   BY MR. HIXSON:
19       Q   Written best practices.
20       A   I recall attending a seminar put on by the State
21   of California last February over at a hotel at the
22   airport, and there was 900 people, mostly claims
23   adjusters, and that seminar was put on by the Division of
24   Workers' Compensation and the Work Comp Appeals Board in
25   order to educate all of us as to things that we're
```

254

**EXHIBIT SS**

919670

1  supposed to be doing to better manage workers'
2  compensation to bring down the cost.  And I wish I had it,
3  but I had a list of everybody in that room.  And I was
4  impressed by how many people were there from not just
5  Liberty Mutual, the vice-president, I recall, but all of
6  these claims adjusters that over the years I have
7  encountered, and all of these defense attorneys.  And that
8  seminar is put on every year in February, north and south,
9  Oakland north, L.A. south, to train and teach claims
10 adjusters and all of us lawyers how to better follow these
11 rules and regulations and what has changed.
12         So I count that in as part of good claims sound
13 management.
14    Q    Okay.  So is the answer to my question, yes,
15 there are other written best practices that you believe
16 Liberty should have followed?
17    A    We don't call them best practices, Counsel.
18    Q    Okay.  If they're not best practice, I don't care
19 about them right now.  I want to know:  Are there any
20 other written best practices?  If there are not, just tell
21 me.
22         MR. ADREANI:  Object to form.
23         THE WITNESS:  Well, Counsel, I don't want to
24 argue with you, but I'm sure there are, but I've never
25 seen them.

255

1          MR. HIXSON:  Okay.
2          THE WITNESS:  Otherwise, I would tell you about

Page 20

**EXHIBIT SS**

919670

3   them.
4   BY MR. HIXSON:
5   Q   Do you think there are other written best
6   practices that you think Liberty should have followed when
7   handling Republic's claims, other than the written best
8   practices in Exhibit 3?  That's all I want to know.
9   A   No, I don't think Liberty has any obligation to
10  follow best practices that are prepared by ESIS or the
11  State Compensation Insurance Fund, but they are required
12  to follow their own best practices, their SSIs and all of
13  the rules and regulations in the state of California, plus
14  the case law.  We assume that --
15  Q   Sir, I think you've answered my question.  Thank
16  you.
17  A   Can I finish, though?
18  Q   Sir, you've answered the question, so, no, you
19  can't.
20      MR. ADREANI:  How do you know he's answered the
21  question?
22      MR. HIXSON:  Because he started off by answering
23  with the word "yes."
24      MR. ADREANI:  All right.  You're not letting him
25  finish, for the record, again.

256

1   BY MR. HIXSON:
2   Q   Sir, let's talk about special service
3   instructions.  How would you describe the special service
4   instructions in this case?
5       MR. ADREANI:  Object to form.

Page 21

**EXHIBIT SS**