UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

REPUBLIC SERVICES, INC.,

       PLAINTIFF

v.

LIBERTY MUTUAL INSURANCE
COMPANY, LIBERTY INSURANCE
ACQUISITION CORPORATION f/k/a
LIBERTY MUTUAL FIRE INSURANCE
COMPANY, LIBERTY INSURANCE
CORPORATION, LM INSURANCE
CORPORATION, THE FIRST LIBERTY
INSURANCE CORPORATION and
HELMSMAN MANAGEMENT SERVICES,
INC.,

       DEFENDANTS.

CIVIL ACTION NO. 03-494 KSF

***ELECTRONICALLY FILED***

**DEFENDANT'S RESPONSE TO REPUBLIC SERVICES, INC.'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

\*    \*    \*    \*    \*

## I.    INTRODUCTION

      This case is about whether Defendants, Liberty Mutual Insurance Company, et al. (the

"Liberty Companies") mishandled Republic Services, Inc.'s ("Republic") workers'

compensation claims.  Relying on the mistaken assumption that the Liberty Companies bear the

burden of proof in this case, Republic asks this Court to hold that (i) the Liberty Companies have

not met their alleged burden of proof "to disprove that the joint and several conduct in handling

Republic's claims caused material and substantial damage to Republic"; and that (ii) the Liberty

Companies "materially breached their agreement with, and express and implied duties to,

Republic."  Republic then asks this Court to award it "actual damages."

      Rather than setting forth a statement of undisputed facts as Republic's own burden of

proof on summary judgment would require it to do, Republic launches an attack on the Liberty Companies, accusing them of being "disingenuous," of "mislead[ing] this Court," and of "coaching" witnesses to give less than truthful testimony.  Republic's attacks only serve to highlight the lack of factual and legal support for their arguments.  Republic has not established, as matter of law, that the Liberty Companies mishandled Republic's claims and therefore, this Court cannot award damages to Republic on summary judgment.

## II.   COUNTERSTATEMENT OF FACTS

Republic and the Liberty Companies entered into a contractual relationship beginning on June 30, 1998.[1]  The Liberty Companies had been providing workers' compensation claims management services to Republic Industries, Inc.  When Republic "spun-off" from Republic Industries, Inc., and formed a completely separate entity, the parties agreed that the Liberty Companies would provide workers' compensation claims management services to Republic.[2] The parties' agreement for the 1998-1999 policy year was memorialized in a series of documents which are more particularly described in Section V(A)(1) of this Response.

After the first year policies were in place, in September of 1998, representatives from the Liberty Companies and representatives from *Republic Industries, Inc.* met to discuss, among other things, *Republic Services'* workers' compensation program.  Dan Dunne and others compiled materials containing details about Republic Industries' workers' compensation program to use as discussion points in their meeting about what services would be provided to Republic.[3]  "The only items that were really of any concern to [the Republic Industries, Inc.

---

[1] Transcript of the deposition testimony of Dan Dunne ("Dunne Depo"), attached in relevant portions as Exhibit 1, at 27:12-28:25.

[2] Id.

[3] Republic refers to this compilation of materials, in their Memorandum, as the "Stewardship Document" and claims that "Dunne testified that he drafted the Stewardship Document in preparation for a 'meet and greet' with representatives of Republic Industries (on behalf of Republic) and Willis to discuss the workers' compensation policies for Republic."  Republic's Motion at 9.  Republic's characterization of Dunne's testimony is misleading, at

representatives] were the insurance program itself, [and] the parameters of the financial part of the program."[4]

The parties renewed their relationship in May of 1999 and again in June of 2000.  In both of those years, the parties entered into policy contracts similar to those in year 1.  The only significant changes in the parties' relationship over the years was the termination of an agreement for the provisions of claims services by Helmsman Management Services, Inc. that was in place for the first year of the contract,[5] and the addition of a Partnership Agreement providing an incentive for both parties to engage in a mutual effort to reduce RSI's workers compensation claims costs.[6]

Each year of the parties' relationship, Liberty Mutual Insurance Group made the same commitments in the core policies:

- To "promptly pay when due the benefits required of [Republic] under workers compensation law."[7]

- To "defend at [Liberty's ] expense any claim, proceeding or suit against [Republic] for benefits payable by this insurance" (reserving the right to investigate and settle these claims, proceedings or suits).[8]

- To pay other costs delineated in the policy as part of any claim, proceeding or

---

best.  Dunne never uses the word "Stewardship Document" and he never testified that he "drafted" the materials that were used at the "meet and greet".  As described above, he testified that he prepared the document with input from others, (Dunne Dep at 54:9-15), and that the "document" was really a compilation of materials relating to Republic Industries.  He also testified that their meeting concerned a number of items, not just Republic's workers' compensation program.  Dunne Depo at 80:7-19.

[4] Dunne Depo. at 80:25-81:6.

[5] See Section V(A)(2) of this Response.

[6] See Section V(A)(3) of this Response.

[7] See, e.g., PART ONE – WORKERS COMPENSATION INSURANCE, B of Exhibit 3 to Defendants' Motion for Partial Summary Judgment on Counts One and Two of Their Counterclaim [DKT # 261].

[8] See, e.g., Id. at C.

suit that they defended.[9]

Each policy contains a clear and unambiguous integration clause prohibiting amendment of the policies without an endorsement signed by the Liberty Companies.[10]  No evidence exists that the contractual agreement between the parties was ever modified pursuant to the integration clauses contained in the policies to impose any further duties regarding claims handling upon the Liberty Companies.

## III.    REPUBLIC HAS NOT MET THE STANDARD FOR SUMMARY JUDGMENT

Republic, in its own motion, states that "[u]nder FED. R. CIV. P. 56(c), summary judgment is proper if the pleadings, depositions, written discovery and affidavits (if any) demonstrate there is no genuine issue of material fact requiring a trial."[11]  "All facts, and any inferences therefore, must be viewed in the light most favorable to the non-moving party [in this case, the Liberty Companies]."[12]  Nonetheless, Republic asks this Court to grant summary judgment based on clearly disputed facts and expects the Court to view such facts in the light most favorable to Republic.

Republic's entire motion is based on the premise that the burden in this case has shifted from Republic to the Liberty Companies.  While the Liberty Companies do not concede that this is an accurate statement of the law, and indeed, argue in response to Republic's other motion for partial summary judgment pending before this Court that it is not an accurate statement, the fact that Republic's entire motion is based on the proposition, in and of itself precludes summary judgment.  The time has not come for the Liberty Companies to put on their case and meet their burden of proof, if any.  Republic asserts in its Motion that "the Liberty Companies have failed

---

[9] See, e.g., Id. at D.

[10] See citations to various policies contained in Section V(A) of this Response.

[11] Republic's Memorandum at 16.

[12] Id. at 17 *citing* Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

-4-

to meet their burden of proof to disprove that their claims handling caused Republic to sustain substantial damages" and cite *only* to the testimony of the Liberty Companies' experts as proof. There are a number of witnesses identified in the Liberty Companies' Rule 26 disclosures that can and will be called to testify regarding the Liberty Companies' handling of claims for Republic. Republic does not establish in its motion that, as a matter of law, the Liberty Companies *cannot* meet the purported burden of proof in this case through either their experts or the numerous other witnesses they have identified. Instead, Republic asserts that the Liberty Companies have failed to meet a burden of proof, when even if such burden was applicable, the time to "meet" it has not come.

Republic further asserts that "the Liberty Companies failed to abide by the claims handling standards agreed to by Republic and the Liberty Companies, thereby breaching tort and contract duties owed to Republic."[13] Again, Republic cannot establish this proposition as a matter of law. All of Republic's claims that the Liberty Companies "breached duties" to Republic are based on the premise that the Special Service Instructions ("SSIs"), Minimum Customer Requirements ("MCRs") and Best Practices were part of the contract between the parties. Whether these documents were part of the contract is a question of law. The Liberty Companies have argued in their Motion for Partial Summary Judgment on Counts One and Two of the Counterclaim that this Court should grant summary judgment holding that they *are not* part of the contract between the parties. Similarly, the Liberty Companies ask this Court to deny Republic's motion that the documents *are* part of the contract.

The Liberty Companies respectfully request that this Court enter an order denying Republic's motion for partial summary judgment.

---

[13] Republic's Memorandum at 38.

-5-

## IV.   RSI HAS NOT ESTABLISHED, AS A MATTER OF LAW, THAT THE LIBERTY COMPANIES CANNOT PROVE THAT THEY APPROPRIATELY HANDLED WORKERS COMPENSATION CLAIMS.

Foremost, as a threshold matter, Republic cannot establish that the burden of proof has shifted to the Liberty Companies. As fully explained by the Liberty Companies in their Response to Plaintiff's Motion For a Partial Summary Adjudication Concerning the Burden of Proof, Plaintiff's burden shifting argument is without basis in both law and fact.[14] As explained in the Liberty Companies' Response, Republic's burden shifting motion is founded entirely upon an erroneous statement of fact concerning the nature of the Liberty Companies' retrospective premium adjustments.[15] Further, for a multiplicity of other reasons, the case law cited by Republic in its burden shifting argument is inapplicable to the facts of this case.[16] Accordingly, for the reasons set forth in the Liberty Companies' Response to that motion and consistent with the well-established body of jurisprudence addressing this issue, the burden of proof is not shifted from Plaintiff Republic.

### A.   If the Burden of Proof Shifts to the Liberty Companies, it Shifts Only with Respect to Disputed Issues Contained in Disputed Claims Files.

The Liberty Companies maintain that this Court should follow the virtually universal rule that the plaintiff has the burden of proving liability and damages in all tort and contract actions. Nonetheless, if this Court in inclined to adopt Republic's request to shift the burden of proof to the Liberty Companies, the burden should *only* shift with regard to the specific issues presented within the 164 claims files criticized by Republic and its team of FRCP 26 experts. The burden should not shift with regard to the Liberty Companies' claims handling in the more than 7,000

---

[14] Liberty Companies' Response Concerning Burden of Proof.

[15] Id. at Counterstatement of Facts and Argument I. A..

[16] Id. at Argument I. A.-D.

remaining claims handled for Republic.[17] Likewise, the burden should not shift with regard to any issues not presented within the 164 claims files criticized by Republic and its team of FRCP 26 experts.

By merely criticizing specific actions or inactions within 164 claims files and alleging resulting damages, Republic cannot successfully shift the burden of proof to the Liberty Companies to prove that its actions in all 7,740 files were reasonable and proper.  Similarly, by merely criticizing specific actions or inactions within 164 claims files and alleging resulting damages, Republic cannot successfully shift the burden of proof to the Liberty Companies to prove that *all* of its actions in 164 claims files handled over a period of several years was reasonable and proper.  Such would amount to forcing the Liberty Companies to prove a multitude of negatives.

Of the myriad of cases cited by Republic in support of its attempt to shift the burden of proof to the Liberty Companies, few discuss the extent to which the burden is shifted.  The court in Transport Indemnity Company v. Dahlen Transport, Inc., 161 N.W.2d 546, 549 (Minn. 1968),[18] as the court which apparently first dealt with this issue, provides some specifics regarding how the  burden-shift works, noting only that the insurer's right to increased premiums would be contingent upon proof of good faith and reasonableness.  Dahlen did not delineate a standard requiring the insurer to present evidence of good faith and reasonableness with respect to every aspect of every claim handled by the insurer.

On the other hand, Deerfield Plastics Co., Inc. v. The Hartford Insurance Co. 536 N.E.2d 322 (Mass. 1989) discussed the burden shift in relation to an insured that had already paid an

---

[17] On page 20 of its Memorandum, Republic suggests that the burden shifts to the Liberty Companies to disprove that Republic sustained damages by reason of mishandling and mismanagement of the "Republic Workers Compensation Program."  Republic defines this phrase in its Complaints as including approximately 7,740 claims files.

[18] An index and copy of all non-Kentucky state cases cites in this Response are attached as Exhibit 2.

-7-

allegedly inflated premium.  However, as applied to the immediate case, Deerfield  addressed a

single disputed claim, not the 164 claims which Republic disputes.  In Deerfield, the insured

presented evidence that its insurer overpaid settlement funds.  The Deerfield court ultimately

held that "Hartford had the burden to prove that the amount of the settlement did not exceed the

highest reasonable amount at which the claim would probably have been settled if the claim had

been properly investigated." Id. at 324.  Implicitly, the Deerfield court limited the burden shift to

the specific claims raised by the insured. In fact, other courts have quoted Deerfield for the

proposition that when evidence is shown for "a claim," the burden shifts on that particular claim,

never mentioning what happens with the remaining undisputed claims.  National Surety v. Fast

Motor, 572 N.E.2d 1083, 1087 (Ill. App. 1991); Liberty Mutual v. Tribco, 185 F.R.D. 533, 540

(N.D.Ill. 1999).

The Court in Insurance Co. of North America v. Binnings Construction Co., 288 So.2d

359 (La. App. 1974) did make a determination regarding the scope of burden shifting.  In

Binnings, the insurer settled approximately 130 claims and the insured sought to shift the burden

of proving reasonable settlement upon the insurer.  288 So.2d at 362.  However, the insured cast

doubt on all but two claims. The court noted:

> The insurer need not give evidence, as to each claim settled, of circumstances of
> the accident or of what the medical reports indicated so as to indicate probability
> of liability and quantum; nor should a court be obliged to decide the
> reasonableness of each settlement.

Id.  Instead, the Court decreed that since the insured had only "cast sufficient doubt" upon the

insurer's handling of two (2) claims, only the reasonableness of the settlement in those claims

need be defended and proved reasonable by the insurer.  Id.  The progeny of Binnings have held

similarly, finding that this approach avoids "needless extended litigation over claims which are

not seriously in dispute . . .." National Fire Union Ins. Co. v. Roubin & Janeiro, Inc. 38 Va. Cir.

-8-

344, 346 (1994).  <u>See Also</u>, <u>Liberty Mutual Fire Insurance Company v. Marty's Express, Inc. et al</u>, 910 F.Supp. 221, 224 (E.D. Pa. 1996) (avoiding "protracted proceedings and production of evidence concerning matters not legitimately at issue.")

The issue of whether the burden shifts to an insurer regarding claims files and issues not brought into question by the insured was squarely addressed in <u>Royal Insurance Co. v. Latrobe Construction</u> 2006 U.S. Dist. LEXIS 324, at *16-*18 (W.D.Pa. 2006).  In <u>Latrobe</u>, the insured Latrobe's expert identified specific errors in 14 workers compensation claims files.  However, Latrobe asked the court to conclude that Royal Insurance failed to meet its burden of persuasion regarding seven files which Latrobe's expert did not identify as containing errors.  In response, the court held:

> At the onset, the court finds Latrobe's argument somewhat disingenuous.  In light of Ms. Haley's [Latrobe's expert] failure to criticize the seven files, Royal and Mr. Weber [its expert] limited their discussion of the individual files to the other fourteen claimants.  This approach was consistent with the good litigation practice of limiting the parties' analysis to areas of genuine dispute.  Such narrowing of the issues is essential to the judicial process, and Latrobe's suggestion to the contrary carries at least a hint of gamesmanship.

Id. at 16.

Here, Republic is promoting the same type of gamesmanship and unnecessary expansion of the issues. Republic retained its experts to review a specific number of files and thereafter identify criticisms.  In response, the Liberty Companies' experts addressed the files, issues and resulting damages identified by Republic's experts.[19]  Now, Republic urges that because the Liberty Companies' claims handling experts did not expressly address every claims handling

---

[19] The Liberty Companies take great exception with Republic's characterization and description of the opinions from the Liberty Companies' experts as included on pages 38-43 of Republic's Memorandum in Support of its Motion for Summary Judgment concerning the burden of proof [DKT #265], and Motion for Summary Judgment pages 18-38 [DKT #267].  Suffice it to say, the Liberty Companies' experts patently disagree with both the methodology and conclusions presented by Republic's experts.  The Liberty Companies submit that the analysis employed by its experts is not germane to the Summary Judgment issues presented by Republic.  In the event the Court prefers additional discussion and argument regarding this matter, the Liberty Companies are certainly willing to fully defend the qualifications and opinions of its experts by way of supplemental memoranda.

element within every file (even those files and activities to which Republic's experts relate no

resulting damage), the Liberty Companies therefore cannot meet their burden of proof as a

matter of law.  Republic promotes a rule that if it criticizes the settlement activity in a single file,

then the Liberty Companies have the burden of proving the reasonableness of its settlement

activities *as well as* the reasonableness of every other file activity from the beginning to the end

of every claim.  It is significant to note that some of Republic's  files have remained open for

approximately eight (8) years and contain literally thousands of file entries.  With regard to any

individual file, litigating the disputed issues presented by Republic and its experts will be

incredibly time consuming and document intensive.  Expanding this effort to include issues not

raised by Republic's experts within all claims files would be completely unnecessary, wholly

unfair to the Liberty Companies, and an utter waste of judicial resources.

>   **B.**    **Irrespective of the Burden of Proof, the Liberty Companies Can and Will**
>   **Present Evidence Sufficient To Rebut The Evidence Put Forward By**
>   **Republic.**

Even if this Court finds that the Liberty Companies have the burden of proving the

reasonableness of its claims handling beyond the issues presented by Republic and its experts,

the Liberty Companies are able satisfy such a burden.  Specifically, at the trial of this case, the

Liberty Companies anticipate presenting multiple claims handlers and team managers to discuss

the handling of individual claims files. These claims handlers and team managers will be able to

thoroughly educate the trier of fact regarding the claims handling process as well as the reasons

for various file activities.  These witnesses manage claims files on a daily basis, for Republic as

well as other customers, and will be able to provide a wealth of relevant information to the trier

of fact. Their testimony, alone and in conjunction with the Liberty Companies' experts, will

allow the Liberty Companies to defend their claims handling efforts irrespective of which party

bears the burden of proof.

## V.   REPUBLIC HAS NOT PROVED ANY OF ITS CAUSES OF ACTION AS A MATTER OF LAW

### A.   Republic Cannot Establish, As a Matter of Law, That Any of the Liberty Companies Have Committed Breach of Contract.

Republic correctly states in its Motion that, "[u]nder both Massachusetts and Florida law, a breach of contract claim requires the plaintiff to prove (i) the existence of a valid contract; (i) a material breach; and (iii) damages."[20]  As Republic notes in their motion, "no party in this case disputes the existence of a series of contracts and agreements between the parties,"[21] and therefore the fact that element number one has been met.  Specifically, no dispute exists regarding whether the parties entered into the contracts identified in the Liberty Companies' Counterclaim at paragraph 2.[22]  All of these are either the policies from the three years at issue in this case or are signed agreements which reference one or more of the policies.  Republic has not, to date, presented evidence of any other policies or signed agreements referencing the policies.  And according to Republic, "[i]n determining what document and agreements constitute the contracts between the parties, the Court should look to the fundamental tenet of insurance law that 'an insurer, as the writer of an insurance policy, *is bound by the language of the policy*, which is to be construed liberally in favor of the insured and strictly against the insurer.'"[23]  Therefore, keeping with Republic's own statement of the law, the Court should look to the terms of the agreements identified in the Counterclaim to determine whether the second element exists – material breach.

---

[20] Republic's Memorandum at 39.

[21] Id. at 38.

[22] Amended Answer and Counterclaim [DKT #28].

[23] Republic's Memorandum at 39 *citing* Berkshire Life Ins. Co. V. Adelber, 698 So.2d 828, 830 (Fla. 1997) and August A Busch & Co. of Mass., Inc. v. Liberty Mut. Ins. Co., 158 N.E. 2d 351, 354 (1959) (emphasis added).

-11-

1.     The 1998-1999 Agreements.

There were two Workers' Compensation and Employer Liability Policies for the policy periods of June 30, 1998 to June 30, 1999.  One policy was issued for states that had approved the large deductible option and the other for the "handful" of states that had not approved the large deductible option.  The second policy included a paid loss, retrospective rating plan that mirrors the large deductible plan.[24]  Both of these policies contain the following provision:

A.  The Policy

This policy includes at its effective date the Information Page and all endorsements and schedules listed there.  It is a contract of insurance between you (the employer named in item 1 of the Information Page)[Republic]and us (the insurer named on the Information Page) [Liberty Mutual Insurance Group].  The terms of this policy may not be changed or waived except by endorsement issued by us to be part of this policy.[25]

The parties also agreed upon an Excess Insurance Policy for Self-Insurance of Workers' Compensation and Employers Liability and an Excess Indemnity Insurance Policy.  Both of these policies contain the following provision:

A. THE POLICY

This is a contract of excess insurance between you [Republic] and us [Liberty Insurance Corporation].  It includes the Information Page.  The only agreements relating to this excess insurance are stated in the policy.  The terms of this policy may not be changed or waived except by an endorsement issued by us to be part of this policy.[26]

Also included in the documentation memorializing these first agreements was a Policy Jacket for Workers' Compensation and Employer's Liability and Insurance Policy.[27]  The Policy Jacket

---

[24] Transcript of the Deposition of Mike Pisari ("Pisari Depo"), attached in relevant portions as Exhibit 3, at 140:1-15.

[25] See, e.g., General Section, A of Exhibit 3 to Defendants' Motion for Partial Summary Judgment on Counts One and Two of Their Counterclaim [DKT # 261].

[26] See, e.g., Exhibit 4, Excess Insurance Policy for Self Insurance of Workers' Compensation and Employers Liability at General Section, A.

[27] Attached as Exhibit 5.

-12-

contains the same integration clause as the policies.

In February of 1999, the parties entered into an Indemnification Agreement and a Surety Bond Security Schedule (Guarantee Agreement).  The Guarantee Agreement guarantees deductible reimbursement and premium payment of all Republic's obligations to Liberty Mutual arising out of or in connection with the two Workers' Compensation and Employer Liability Policies.  The Indemnification Agreement provides that Republic will reimburse Liberty Mutual for specified taxes and assessments to the extent attributable to the deductible amount under the policies.  The Indemnification Agreement specifically references the Guarantee Agreement. These Agreements have effective dates of June 30, 1998.

During this first year of the relationship between Republic and the Liberty Companies, Republic purchased a "combined product" from the Liberty Companies whereby certain services would be handled by Helmsman Management Services in lieu of Liberty Mutual Insurance Company.[28]  This agreement was memorialized in a document, with two amendments, that has been referred to in this litigation as the "Helmsman Agreement."[29]  The Helmsman Agreement has an effective date of June 30, 1998 and was originally set to expire on January 1, 2000.  The Helmsman Agreement contains the following provision:

IV. <u>CHANGES</u>

Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or change in any part of this Agreement or prevent Helmsman from asserting any right under the terms of this Agreement.  The terms of this Agreement may not be waived or changed except by the mutual agreement of the parties as evidenced by a written amendment which is signed by a duly authorized officer of Helmsman.[30]

The Helmsman Agreement contains a choice of law provision indicating that it shall be

---

[28] Pisari Depo at 125:17-126:6.

[29] <u>See</u> Exhibit 6 to Defendants' Motion for Partial Summary Judgment on Counts One and Two of Their Counterclaim [DKT # 261].

[30] Id. at §V, "Terms and Conditions."

-13-

"construed under and governed by the law of the Commonwealth of Massachusetts." "With respect to claims serviced pursuant to [the Helmsman Agreement]," the agreement provides that "Helmsman will act as agent for the Customer and its Relevant insurer to investigate, negotiate, adjust or settle such claims in accordance with agreed upon Special Claim Service Instructions, *if any*."[31] There are no attachments to the Helmsman Agreement.  Section XI(D) says that "Helmsman shall perform its obligations under this Agreement *in a manner that is reasonable and prudent for the services provided*; but Helmsman *does not warrant that its performance will be error free*."[32]

        2.      The 1999-2000 Agreements.

In May of 1999, the Liberty Companies provided Republic with a renewal proposal.[33] After negotiations, the parties decided to renew their relationship.  The parties executed Amendment Two to the Helmsman Agreement, terminating the agreement at the end of the 1998-1999 policy year instead of in 2000.[34]  Dunne testified that Gezzer elected to terminate the Helmsman Agreement and go to . . . more of a traditional deductible program mainly because he didn't like getting field investigation service charges separately." [35]  In June of 1999, Liberty Mutual Insurance Group issued a renewal binder pending issuance of the 1999-2000 policies.[36]  Upon expiration of the renewal binder, four policies went into effect– two Workers' Compensation and Employer Liability Policies, an Excess Insurance Policy for Self-Insurance of Workers' Compensation and Employers Liability and an Excess Indemnity Insurance Policy.

---

[31] Id. at §XI(C) (emphasis added).

[32] Id. at §XI(D) (emphasis added).

[33] See Exhibit 6 to the Dunne Depo.

[34] See Exhibit 6 to Defendants' Motion for Partial Summary Judgment on Counts One and Two of Their Counterclaim [DKT # 261].

[35]  Dunne Depo at 92:7-11.

[36] Attached as Exhibit 6.

CM61:36901:243711:2:LEXINGTON

The parties also entered into an indemnification agreement and a Letter of Credit and Surety Bond Security Schedule (Guarantee Agreement) for the 1999-2000 policy year.

At no time during the negotiations for the 1999-2000 renewal did the parties agree that minimum customer requirements, special service instructions or best practices would be part of any of the contracts between the parties.  Despite Republic's contentions that parts of the "1999 Sold Plan" serve as evidence that the parties agreed to particular claims service instructions, Dunne has testified that these were simply instructions that the Liberty Companies provided to their claims handlers, in their internal claims handling system, to reflect the expectations of Republic.  They were "guidelines" that the claims handlers would work to meet as "best as possible," but they "were not part of the contracts that [Republic and the Liberty Companies] agreed to."[37]   Republic cannot present any evidence to the contrary and they are bound by their 30(b)(6) witness designated to testify regarding contract formation, David Spruance, who does not know anything about the formation of the contracts between the parties.  Aerel, S.R.L. v. PCC Airfoils, L.L.C., 2006 U.S. App. LEXIS 12601, 26-27 (6th Cir. 2006); see also . Penny v. U.P.S., 128 F.3d 408, 415 (6th Cir. 1997), and Reid v. Sears, Roebuck & Co., 790 F.2d 453, 459 (6th Cir. 1985).

As with the 1998-1999 policy year, no evidence exists that any signed documents, other than those described above, were part of the agreement between the parties for the 1999-2000 policy year.

       3.       The 2000-2001 Agreements.

On June 30, 2000, the Liberty Companies presented Republic with a renewal proposal for Year 3.  The parties renewed their relationship and again entered into four policy agreements, an

---

[37] Dunne Depo 97:21-99:24.

Indemnification Agreement and a Letter of Credit and Surety Bond Security Schedule (Guarantee Agreement) for the 2000-2001 policy year.[38]  The parties also entered into a 2000 Workers' Compensation Partnership Agreement for this policy year.  The Partnership Agreement provides an incentive for both parties to engage in a mutual effort to reduce RSI's workers compensation claims costs.  No evidence exists that any other signed documents were part of the agreement between the parties for the 2000-2001 policy year and as with the other years, no evidence exists that the parties intended for any other documents to be a part of the their agreement.[39]

### 4.    "Other" Documents

The above described negotiated contracts describe the entire agreement between Republic and the Liberty Companies.  Nonetheless, Republic contends that at least three other documents constitute the contract: Minimum Customer Requirements, Special Service Instructions, and Best Practices.  Republic has not and cannot meet its burden of proof to establish, as a matter of law, that these documents were part of the contractual relationship between the Liberty Companies and Republic.

The Minimum Customer Requirements is a document contained in the materials compiled by Dunne and others for the "meet and greet" with *Republic Industries* representatives who were possibly going to be involved with Republic.[40]  The document clearly states that it relates to Republic Industries, not Republic Services.[41]  It is not signed and it is not referenced in

---

[38] See Exhibit 11 to Defendants' Motion for Partial Summary Judgment on Counts One and Two of Their Counterclaim [DKT #261].

[39] Republic claims that because the year 3 proposal indicated that "Claims services included in the pricing will continue at current levels," the Special Service Instructions should be incorporated by reference into the policy. Republic's Motion at 12.  Again, Republic cites no authority for this proposition and provides no cites to the record to indicate that this was the understanding of anyone involved in the negotiations for the 3rd policy year.

[40] Dunne Depo. at 54:2-55:4.

[41] See Exhibit H to Republic's Memorandum at LM-009466-LM-009475.

any of the policies over the course of the parties' three year relationship.  Dunne testified that the document was never discussed in the September meeting.  In fact, "there were no workers' compensation claims management minimum customer requirements for Republic Services in place for the period of June 30th, 1998, forward."[42]  Additionally, not a single Liberty claims handler of the 39 that Republic deposed has ever seen the document upon which Republic relies.  Republic simply cannot establish, as a matter of law, that the Minimum Customer Requirements was part of the parties' agreement.

Republic claims that the evidence that the parties were bound by a December 14, 2000 version of the SSIs[43] is "unassailable."  But the only evidence that Republic then cites to is the testimony of claims handlers across the country.  Remarkably, Republic does not cite to testimony that the SSIs were part of the negotiated agreement between Republic and the Liberty Companies (because (1) there is no such testimony and (2) no claims handlers were involved in the contract negotiations), but they cite to the testimony of a team manager who said "I *think* it was an agreement between Sales and Republic and that agreement was *probably* input by Sales."[44]  Besides Mr. Renner's testimony and an incorrect citation to the testimony of a claims handler in Glendale, California,[45] Republic can only cite to the testimony of claims handling employees who say that they were not bound by the SSIs, but that they were simply guidelines for handling claims for a specific customer.  Republic dismisses this testimony by claiming that

---

[42] Dunne Depo at 81:8-12.

[43] See Exhibit A to Republic's Response In Opposition to defendants, the Liberty Companies' Motion for Preliminary Injunction Pursuant to FRCP 65(a) [DKT #120].  While Republic mention others versions of the SSIs in its Memorandum in support of this Motion, the 9/14/00 version is the only version relied upon by Republic's expert, Thomas Ballard, in his report.

[44] Republic's Memorandum at 47 *citing* deposition testimony of Steve Renner at 18 (emphasis added).

[45] Republic also cites to the deposition testimony of Danielle Adair, a claims handler in Glendale, California.  Republic attributes the following quote to Ms. Adair:  "Special Service Instructions . . . had been **_negotiated_** between . . .Liberty . . . and the customer."  Republic provides the following page cites for this quote:  44:5-45:5, 46:23-48:4 and 49:7-13.  It is unclear at which cite Republic *contends* this quote appears, but the fact is that Ms. Adair does not say this anywhere on pages 44 through 50.

-17-

the deponents were "coached" and baldly asserting that the claims handlers were never able to "effectively" reconcile their testimony with entries into the computerized claims handling system that, according to Republic's characterization, indicates that the employees considered the SSIs to be binding.[46]  Republic's characterization of the testimony of claims handlers is far from "unassailable" evidence that the SSIs were part of the contract between the parties and indeed, this Court has already noted that claims handlers have "no way of knowing" whether particular documents were contractual or binding.[47]

As with the minimum customer requirements, Dan Dunne testified that SSIs were not discussed at the September 1998 "meet and greet" between Republic Industries, Inc. and the Liberty Companies.  According to Dunne, there were no SSIs negotiated between Republic and the Liberty Companies.[48]  "No discussions regarding the service component of Republic Services even occurred until at least the spring of 1999 [,when Gary Gezzer was hired as risk manager.]."[49]  After Gezzer was hired, Mr. Dunne met with him and reviewed most of the financial program.[50]  They did not discuss Special Service Instructions.  Gezzer "didn't really have any specific claims instruction that he was looking for.  And it was not . . . a topic of discussion.  It was not high on [Gezzer's] priority list."[51]

The third document, outside of the signed agreements containing integration clauses, that

---

[46] Republic's Memorandum at 49-50.

[47] See. Transcript of Official Proceedings:  Hearing on Motion for Preliminary Injunction held on 6/5/06 before Judge Karl S. Forester, DKT#142 at 12:2-4.

[48] Id. at 83:11-21.  Republic contends that "[i]t naturally follows that the MCR were meant to be read in conjunction with the provision of the Helmsman Contract requiring Helmsman (as designee of the Liberty Companies and as Republic's agent) to conform to 'agreed upon Special Claims Service Instructions; the difference here is one of form, not substance."  Republic's Motion at 9.  It is not entirely clear to the Liberty Companies what Republic means by this statement, but to the extent Republic is suggesting that a page from the materials relating to Republic Industries that Dunne and others compiled for the September meeting is to be read as part of the Helmsman Agreement, the Liberty Companies note that Republic has cited no authority for such a proposition and has no cite to the record to indicate that anyone involved in the negotiations relied on this page as part of the contract.

[49] Dunne Depo at 84:7-9

[50] Id at 84:11-15

[51] Id. at 84:16-27.

-18-

Republic claims is part of the parties' contract is the Liberty Companies' internal Best Practices. Republic admits in its own Memorandum that Best Practices were not even in place until after the policies were issued for the third year of the parties' relationship, but still contends, with no explanation, that they were part of the parties' agreement from the beginning.[52]  Again, Republic relies on the testimony of claims handlers who did not participate in the negotiation of the contracts to support their position that Best Practices were part of the contract.  And again, Republic accuses those claim handlers whose testimony they did not like of being "disingenuous."

In addition, Republic relies on two other sources as support for the proposition that Best Practices were part of the contract between the parties:  (1) an email from Mark Sydney, of Liberty Mutual Insurance Companies' home office, to the managers of the regional claims offices distributing the Best Practices and indicating that they represent the company's "commitment to providing the highest quality work product to all of [their] customers," and (2) the fact that the Liberty Companies perform internal audits to monitor compliance with Best Practices.  Neither of these establish, as a matter of law, that Republic and the Liberty Companies intended for Best Practices to be a part of their contract.  At best, they establish that the Liberty Companies hold their employees to a high standard.  Surely Republic is not suggesting that companies who encourage their employees to go above and beyond what is required of them should be held liable for breach of contract if and when those employees do not meet those high standards.  The policy implication of such a position would be to discourage businesses from challenging their employees and to encourage them to provide only the bare minimum in customer service.[53]

---

[52] Republic's Memorandum at 50.

[53] Courts have held that internal claims handling guidelines are just that – guidelines.  See, Royal Insurance

The attachments to the email upon which Republic relies are consistent with the Liberty Companies' position and the testimony of its claims handlers that best practices are "guidelines" to be followed and not part of the agreement with any customer.  See, for example, Exhibit 7 at LM-029225 - 029227:

> Should customers expect 100% compliance with the Best Practices on all cases?
>
> No. In fact we have prepared an internal document for use in helping us set reasonable expectations per activity.  The majority of the standards are 90% or greater, however, there are some that are set at 85%.  The standards are intended to account for claims judgment and other known factors that impact execution (for example he may be some instances where we do not want the check to go out in xx days).
>
> Will we share our Best Practices audits with customers?
>
> No.
>
> Are Best Practices just more protocols to be followed?  Are they really expected to improve outcomes and customer service?
>
> Yes, Best Practices are protocols, but we are working hard to insure that all of our case handlers understand that the activities are not the end product.  Our goal is to ensure that each Best Practice correlates the best final case outcome (e.g. initial claimant contact is intended to gather facts and establish a relationship, not just meet time frames).

It was Republic's questioning of Dan Dunne regarding this email and accompanying questions and answers that prompted Mr. Dunne to say "you know, we've set a lofty goal, I guess." Contrary to Republic's characterization that this was some sort of admission by Mr. Dunne that the Liberty Companies failed to live up to its duties, Mr. Dunne is acknowledging that the Liberty Companies expect the highest level of customer service from their employees.[54]

---

company of America v. Latrobe Construction Co., 2006 U.S. Dist. LEXIS 324, *42 (W.D. Penn. 2006) ("As fact finder, the Court concludes that Royal's 'Best Practices' guidelines. . . were just that: discussion of *best* practices for claims handling in general, not taking into account the facts and circumstances present in any case.")

[54] Dunne Depo at 162:8-12; 162:21-163:6.

Q. Okay.  Wouldn't you agree with me that the commitments that are evidenced by the Best Practices which I've just identified represent how your company will handle claims files going forward of Republic, going forward from January 1st, 2001?

-20-

Republic can offer no evidence to refute these facts regarding contract formation because they are bound by the testimony of their risk manager, David Spruance, who was designated as a 30(b)(6) witness on the subject. Aerel, S.R.L. v. PCC Airfoils, L.L.C., 2006 U.S. App. LEXIS 12601, 26-27 (6th Cir. 2006); see also . Penny v. U.P.S., 128 F.3d 408, 415 (6th Cir. 1997), and Reid v. Sears, Roebuck & Co., 790 F.2d 453, 459 (6th Cir. 1985). But Mr. Spruance has no knowledge of the contract formation. Mr. Spruance was not employed by Plaintiff when the policies with Defendants were negotiated. He testified that he did not "review any materials that memorialize any discussions or negotiations between Liberty Mutual and Republic prior to the effective date of the Workers' Compensation program," [55] that no one at Republic Services spoke to him "about the details of any negotiations between Liberty Mutual and Republic regarding the Workers' Compensation program prior to its effective date,"[56] that he does not "know who handled the discussions between Liberty Mutual and Republic leading up the formation of the Workers' Compensation program,"[57] and that he never asked who handled such negotiations.[58]

The entire agreement between Republic and the Liberty Companies is contained in the documents identified in the Counterclaim and described in subparts V(A)(1)-(3) above. As this Court has preliminarily recognized, documents outside of the parties' express written agreement cannot be considered "amendments to the policies."[59]

---

. . .

A. These Best Practices are, again, just as they've kind of indicated, they're Best Practices that we strive to meet. There are certain things in these that you cannot go back and do after the fact. Three-point contact, for example, is one of those. I am not a claims expert by any means, sir, so I cannot answer all of those questions specifically, but it's not -- our goal, as I stated earlier, was 100 percent compliance. But even in this document, it is through the questions and answers shown that that's our goal but that's -- you know, we've set a lofty goal, I guess.

[55] Transcript of the testimony of David Spruance ("Spruance Depo."),attached in relevant portions as Exhibit 8, at 159:1-8

[56] Id. at 160:5-19

[57] Id. at 160:10-13

[58] Id. at 160:14-15.

[59] June 7, 2006 Opinion and Order on Preliminary Injunction, DKT #143 at 8.

-21-

> Each policy contains a merger clause limiting the agreement between the parties to the express terms of the policy and limiting changes or waivers to endorsements issued by Liberty.  The SSI's and MCR's are not signed by either party and were not issued as party of any Liberty endorsement.  They are internal directives or guidelines or instructions to Liberty personnel regarding how to handle specific matters that may arise in administering the WC Program.[60]

Both this Court and Republic recognize that the "policy language controls" the relationship between an insured and an insurer.[61]  Accordingly, Republic has not, and cannot, establish the second element of its breach of contract claim because its entire claim rests upon alleged breaches of documents outside the parties' agreement.

### B. Republic Cannot Establish, As a Matter of Law, That the Liberty Companies Have Committed Any of the Various Torts They Allege

As a threshold matter, Plaintiff's motion for partial summary judgment on its various tort claims is irrelevant because, as the Liberty Companies explain in its own previously filed partial summary judgment motion, those claims are barred by the well-established rule of economic loss.[62]  The Liberty Companies adopt, incorporate, and reiterate herein their partial summary judgment argument.

In short, under long-standing Massachusetts law, and "in accordance with the majority of jurisdictions that have considered the issue, purely economic losses are unrecoverable in tort and strict liability actions in the absence of personal injury or property damage.'" Aldrich v. ADD, Inc., 770 N.E.2d 447, 454-455 (Mass. 2002), quoting FMR Corp. v. Boston Edison Co., 613 N.E.2d 902 (Mass. 1993) (rejecting claims for economic losses of a business arising out of power outages); Garweth Corp. v. Boston Edison Co., 613 N.E.2d 92, 93 (Mass. 1993) (holding that plaintiff's claims were thwarted by economic loss rule limiting recovery for economic losses in

---

[60] Id. at 8 and 9.

[61] Id.; Republic's Memorandum at 39.

[62] Memorandum in Support of Motion For Partial Summary Judgment on Plaintiff's Claims for Breach of Fiduciary Duty and For Partial Summary Judgment Based On the Rule of Economic Loss at pp. 15-16, DKT # 254.

tort-based strict liability or negligence).  Most significantly, Republic alleges no physical injury

or damage to property whatsoever, and Republic has made no showing and the record contains

no evidence that the Liberty Companies are responsible for any personal injury or physical

damage.  Republic's claim for damages is entirely pecuniary.[63]  Indeed, Republic in each of its

three complaints states or reiterates that this case entirely "arises from a contractual relationship"

between Republic and the Liberty Companies.[64]  For these reasons and all of the reasons set forth

in the Liberty Companies' Motion For Partial Summary Judgment based on the rule of economic

loss, Republic's claims for negligence, bad faith, fraud, intentional misrepresentation, and

negligent misrepresentation are barred.  Nonetheless, the Liberty Companies will briefly address

Republic's extra-contractual claims below.

       1.     Negligence

The elements of negligence under both Massachusetts and Florida law are (1) a duty

recognized by law, (2) breach of the duty, (3) a causal relation between the breach and the

resulting injury and (4) actual loss or damage.  Jupin v. Kask, 447 Mass. 141 (Mass. 2006);Clay

Electric Cooperative, Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003).  Contrary to Plaintiff's

assertion that "summary judgment for the insured is proper once the duty and breach are

established," proof of damage resulting from an alleged breach of duty is essential to the

negligence cause of action and summary judgment without such proof is inappropriate.[65]

Under the section of its brief titled "Negligence", Republic does not identify what

specific duties the Liberty Companies have allegedly breached to subject them to liability for

---

[63] Id.; Republic's Supplemental Rule 26(e)(1) Disclosures, attached as Exhibit 9.

[64] Complaint at Introduction attached to Notice of Removal (emphasis added), DKT #1; First Amended Complaint at 1, DKT #34; Second Amended Complaint at 1, DKT #61.

[65] Plaintiff cites two cases after its assertion that "summary judgment for the insured is proper once the duty and breach are established," but neither case stands for this proposition.  See Herbert A. Sullivan, Inc. v. Utica Mut. Ins. Co., 788 N.E. 2d 522; 531-32 (Mass. 2003); see also Hartford Cas. Ins. Co. v. New Hampshire Ins. Co., 628 N.E. 2d 14 (Mass. 1994).

negligence except to say that "[a] tort action may also be utilized to seek redress for negligent performance of a contractual duty." While the Liberty Companies do not concede that such remedy is actually available under either Massachusetts or Florida law, even taking Republic's statement as true for purposes of this Motion, Republic cannot establish, as a matter of law, that any of the Liberty Companies negligently performed a contractual duty. The only "contractual duties" Republic alleges the Liberty Companies have breached are contained in the MCRs, SSIs and Best Practices. As discussed above, none of these were part of the contract between the parties and therefore they cannot be the basis for Republic's negligence claim.

### 2.      Fiduciary Duty

This Court has recently recognized that whether the contracts in this case created a fiduciary relationship is "governed by Massachusetts law." And Massachusetts law "is clear that a business relationship is not transformed into a business relationship merely because trust was reposed by one party in the other party." Order at 13 *citing* <u>Davidson v. General Motors Corp.</u>, 786 N.E. 2d 845, 850 (Mass. App. 2003). This Court went on to say that:

> Instead, a fiduciary relationship is generally found when certain indicia are present, including when one party is in a position of great disparity or inequality relative to the other party, or the disparity in a relationship has been abused to the benefit of the more powerful party. <u>General Corp. v. Sequoia Pacific Systems Corp.</u>, 44 F.3d 40, 44 (1st Cir. 1995).

> Here, the parties entered into a complex contractual relationship. Republic, a sophisticated, publicly traded corporation, negotiated multiple, comprehensive contracts with the Liberty Companies, including the Partnership Agreement. The Partnership Agreement requires both parties to seek to reduce workers' compensation claims costs. The Court finds no disparity in the sophistication or bargaining power of the parties. Moreover, there is no evidence that the Liberty Companies had knowledge of or willingly accepted a fiduciary duty to Republic. While the Liberty Companies did have access to Republic's bank account to facilitate its contractual duties, this was merely a banking relationship creating no fiduciary responsibilities. <u>See In re Greenburg</u>, 212 B.R. 422, 428-29 (Bank. D. Mass. 1997).

The Court denied the portion of Republic's Motion for Partial Summary Judgment

-24-

seeking to impose a fiduciary duty on the Liberty Companies with regard to the Partnership Agreement. The evidence before the Court regarding the sophistication of the parties and the lack of a disparity or inequity in bargaining power has not changed. There is no evidence suggesting that the Liberty Companies "had knowledge of or willingly accepted a fiduciary duty to Republic" for any of the agreements into which the parties entered. Accordingly, this Court should apply the same reasoning it applied in its order on Republic's Motion for Partial Summary Judgment regarding the Partnership Agreement and deny summary judgment on all of Plaintiff's claims for breach of fiduciary duty.

3.      Breach of the Implied Covenant of Good Faith and Fair Dealing

Massachusetts courts recognize only one category of misconduct, relevant to this case, that breaches the implied duty of good faith and fair dealing: "when a party to a contract knowingly violates an express term of the contract in order to obtain benefits beyond that agreed in the contract from the other party." Marx v. Globe Newspaper Company, Inc., 15 Mass. L. Rep. 400, *15 (Sup. Ct. Mass. 2002). Or, as Republic asserts, "when a party does something that will have the effect of destroying or injuring the contractual rights of the other party.[66] Under Florida law, there are two restrictions on causes of action for breach of the implied covenant of good faith and fair dealing. 'First, the implied covenant of good faith should not be invoked to override the express terms of the agreement between the parties. Second, a claim for breach of the implied covenant of good faith and fair dealing cannot be maintained under Florida law absent an allegation that an express term of the contract has been breached." Insurance Concepts and Design, Inc. v. Healthplan Service, Inc., 785 S.2d 1232, 1234-35 (Fla. App. 2001)

Republic has not established, as a matter of law, that the Liberty Companies have

---

[66] Republic's Memorandum at 41 *citing* Tufankjian v. Rockland Trust Co., 782 N.E.2d 1, 5 (Mass App. 2003).

violated an express term of the contracts between the parties.  Therefore, Republic has failed to establish a claims for unjust enrichment under either Massachusetts or Florida law.  Additionally, while Republic does not identify what the "implied covenants" are that the Liberty Companies have allegedly breached, one can only assume that it is the standards set forth in the SSIs, MCRs and Best Practices.  Because the parties entered into express contractual agreements containing integration clauses, any violation of an "implied duty" premised on outside documents would "override the express terms of the agreement between the parties" and is therefore prohibited by Florida law.

> 4.   Unjust Enrichment

Under the section entitled "<u>Unjust Enrichment</u>" in its brief, Republic sets for the elements of unjust enrichment:  "(i) a benefit conferred on the defendant by the plaintiff; (ii) knowledge or appreciation by the defendant of the benefit; and (iii) acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without payment of its value."[67]  Republic does not articulate what "circumstances" make it inequitable for the Liberty Companies to retain any benefit conferred on them by Republic nor does it make any attempt to apply the facts of this case to the elements of the cause of action.  Republic has not established its cause of action for unjust enrichment as a matter of law.

> **C.   Republic Has Not Presented Sufficient Evidence Establishing, As a Matter of Law, That the Liberty Companies Breached Any Duties Owed to Republic.**

With respect to summary judgment motions, all facts and inferences therefrom must be viewed in the light most favorable to the non-moving party.  <u>Matsushita Elec. Indus. Co. v.</u>

---

[67] Republic' Memorandum at 42 *citing* <u>Rollins, Inc. v. Butland</u>, 932 So.2d 1172, 1187 (Fla. App. 2d Sit. 2006); <u>Mass Cash Register, Inc. v. Comtrex Sys. Corp.</u>, 901 F. Supp. 404, 424 (D Mass 1995) and <u>Dines v. Liberty Mutual Ins. Co.</u>, 548 N.E. 2d 1268, 1270.

-26-

<u>Zenith Radio Corp.,</u> 475 U.S. 574, 587 (1986).[68] Similarly, Republic acknowledges that with regard to its tort and contract causes of action, "each of those causes of action requires the demonstration of a duty and the breach of that duty as the predicate for the imposition of liability."[69] The facts demonstrated by Republic, viewed in the light most favorable to the Liberty Companies, do not establish that the Liberty Companies breached any duties owed to Republic. Therefore, this Court should not enter summary judgment against any of the Defendants.

Republic's proof of alleged breaches by the Liberty Companies is limited to three sources: (1) testimony from Republic's broker Suzanne Flynn,[70] (2) depositions of the Liberty Companies' claims handlers,[71] and (3) opinions from Republic's FRCP 26 experts Tom Ballard and David O'Brien.[72] As will be further discussed below, these three sources, individually and/or together, wholly fail to establish the Liberty Companies' breach of any duties owed to Republic.[73]

      1.    <u>Republic's FRCP 26 claims experts fail to establish, as a matter of law, the Liberty Companies' breach of any duties.</u>

Republic presents its FRCP 26 claims experts, Tom Ballard and David O'Brien, to establish the Liberty Companies' failures to comply with applicable claims handling standards.[74] However, the reports and deposition testimony of Ballard and O'Brien fall far short of

---

[68] Republic's Memorandum at 16 [DKT #267].

[69] Id. at 72 [DKT #267].

[70] Id. at 12-16[DKT #267].

[71] Id. at 19, 61-72 [DKT #267].

[72] Id. at 58 [DKT #267].

[73] At first blush, the specific proof upon which Republic predicates its Motion is confusing. Within its Motion, Republic frequently makes blanket conclusory statement regarding Liberty Companies' alleged breaches. For example "[i]t is beyond question that the Liberty Companies failed to adhere to these standards; and that the failure to adhere materially damaged Republic." (Republic's Memorandum at 2 [DKT #267]). A careful reading of Republic's Motion ultimately identifies three sources supporting Republic's claims of breach.

[74] Republic's Memorandum at 56 (heading C) and 57 [DKT #267].

-27-

establishing the Liberty Companies' liability as a matter of law.  In fact, the Liberty Companies previously moved this Court to completely exclude the opinions of Ballard and O'Brien.[75]

With regard to Ballard's opinions, his stated mission was to "identify and evaluate deviations of the Liberty Companies from a series of standards" which are set forth within his August 15, 2005 report.[76]  Ballard ultimately reviewed a total of 292 workers compensation claims accruing between 7/1/98 and 6/27/01.  His claims review process included reviewing electronic and paper claims files, and then assessing the Liberty Companies compliance with a defined set of claims handling standards, including:

> 1. Generally accepted industry standards for the handling of workers compensation claims;
>
> 2. A set of guidelines and standards referred to as "Special Service Instructions" (dated 12/14/00);
>
> 3. A set of guidelines and standards referred to as "Minimum Customer Requirements" (dated 6/26/98); and
>
> 4. The Liberty Companies internal guidelines referred to as "Workers Compensation Lost Time Cases Claims Best Practices/Service Standards" (dated 4/30/01).[77]

For each of the 292 claims reviewed, Ballard created a summary page including disallowed (damage) amounts relative to each file.[78]  A sampling of summary pages are collectively attached as Exhibit 11.  The summary pages set forth the foundation of Ballard's opinions and why he "did something"[79] [i.e., why he disallowed particular amounts].

In response to Ballard's report of August 15, 2005, the summary pages generated for each

---

[75] DKT # 260 and 258.

[76] See, Ballard report dated August 15, 2005 at 1, Exhibit 10.

[77] Id. at  5-10, 13.

[78] Transcript of the deposition testimony of Tom Ballard ("Ballard Depo."), attached in relevant portions as Exhibit 12, at 78:20-25 .

[79] Ballard Depo. at 88:9-12.

file, and other supporting documentation identified by Ballard, the Liberty Companies retained

Doug McCoy ("McCoy") as an expert witness.  In his nearly 500 page report dated April 26,

2006, McCoy comprehensively responded to, and generally disagreed with Ballard's

methodology and ultimate conclusions.[80]  Admittedly, McCoy did acknowledge that some claim

handling costs should be disallowed.  At the end of his report, McCoy summarized his opinions

as follows:

> The Republic auditor's conclusions are impossible to objectively quantify, other
> than his assertion that [initial] contact of 24/48/48 [hours]not being made.  In
> many instances he is not correct.  In other instances contact with the employee
> was not possible due to attorney representation or hospitalization.
>
> Contact within a set period of time is easy to quantify.  In the claim management
> industry, we believe that early contact will result in a better outcome, however
> this is not easily quantified.  For instance we know that making 24 hour contact
> will not insure a better outcome any more than the failure to make 24 hour contact
> will result in a poor outcome.
>
> In this instance McCoy Consulting, Inc. was able to identify 251 of the files in
> which the dates the claims were reported to Liberty Mutual by Republic was
> noted. (See Exhibit E)  This shows that the average time it took Republic to report
> the claim once they were aware of the accident was 13 days.  The median time
> was 3 days.  If Republic reports the claim 3 to 13 days after they were aware of an
> accident the effect of 24 or 48-hour contact is diminished.
>
> In addition the Republic auditor asserts, "Repeated and systematic failure to
> handle claims in accordance with policy provisions and applicable standards,
> statutes, rules, regulations."
>
> McCoy Consulting, Inc. found that to the contrary, the Republic auditor is not
> familiar with applicable standards and specific statutes, rules and regulations in
> the nineteen jurisdictions these files were handled in.
>
> The individual response by McCoy Consulting, Inc. to the Republic auditor's
> comments on each file speaks for themselves.  The Republic auditor failed to
> demonstrate knowledge of claim management in general and workers'
> compensation claim management specifically.  Of the amount the Republic

---

[80] McCoy's complete report responsive to O'Brien is attached as Exhibit 13.  Normally, the Liberty Companies
would avoid tendering such a voluminous exhibit to the Court.  However, because Republic urges that O'Brien's
opinions establish liability as a matter of law, the Liberty Companies provide McCoy's complete report in an effort
to highlight the multiple occasions upon which he challenges the validity O'Brien's opinions based on both the facts
and the applicable workers compensation laws.

auditor disallowed, $16,209,342.20, McCoy Consulting, Inc. agrees with $77,768.82 (see Exhibit D).

In all cases McCoy Consulting, Inc. found that Liberty Mutual handled the claims reasonably and in good faith.

To the extent Ballard opines that the Liberty Companies provided poor claims handling which resulted in financial damages to Republic, McCoy squarely rebutted all of these opinions, with the exception of $77,768.82. For purposes of background, McCoy is a claims expert with 32 years of workers compensation claims experience. He has spoken on numerous occasions concerning claims management throughout the country and has edited a book titled Workers' Compensation: The Survival Guide for Business, which is published by Lexis-Nexis.[81] The voluminous contents of McCoy's report alone, viewed in the light most favorable to the Liberty Companies, directly disputes the methodology and conclusions of Ballard. This factual dispute is sufficient to withstand summary judgment.

Republic spends two full pages of its Motion highlighting Ballard's opinions regarding the need for timely investigation and avoiding claims investigation delays.[82] However, Republic's own delays in initially reporting claims to the Liberty Companies were prominent. Republic's recurring problems timely reporting claims was discussed by James O'Connor, its Chairman and Chief Executive Officer, in a August 4, 2000 memorandum to all general managers. O'Connor noted that Republic's first reporting of workers compensation claims to the Liberty Companies "is unacceptable and needs immediate improvement."[83] Without the benefit of this memorandum, McCoy independently came to the same conclusion. Ballard's complete failure to consider Republic's own contribution to alleged inflated claims costs raises sufficient

---

[81] See, McCoy curriculum vitae attached as Exhibit 14; Copy of book cover attached as Exhibit 15.

[82] Republic's Memorandum at 56-58 [DKT #267].

[83] See, Exhibit 16.

questions of fact to defeat summary judgment.

With regard to Republic's California FRCP 26 claims expert, David O'Brien, two quotes from his deposition testimony (which were also quoted by Republic) speak volumes regarding the inherent unreliability of his opinions:

> "you're supposed to follow [best practices], because they're in the interest of everyone involved, the worker, the insurance company and insured."[84]

> "Liberty has come up with nationwide best practices that they offer to the customer . . . that they are going to follow to ensure good result . . . If they don't follow them, they are mismanaging the claim."[85]

At no point in O'Brien's report or his deposition testimony did he suggest that the Liberty Companies' Best Practices did not apply.  Yet, Republic acknowledged on page 50 of its Motion that Best Practices were not widely disseminated by the Liberty Companies until January 18, 2001, well after the beginning of the third consecutive policy period.[86]  O'Brien applied the Best Practices to all claims and claims activities that he reviewed, even though the Best Practices were not implemented until mid-way through the third and last policy year.  The inherent unreliability of this approach is further set forth within the Liberty Companies' Motion to Exclude Testimony from O'Brien.[87]

Republic retained O'Brien to review and focus exclusively on 27 claims originating in California.[88]  Ultimately, when O'Brien examined Liberty's claims personnel activities, he related their performance to several standards, including:

1.   Liberty's own Special Service Instructions (dated 12/14/00);

---

[84] Transcript of the testimony of the deposition of David O'Brien ("O'Brien Depo."), attached in relevant portions as Exhibit 17 at 243:13-15; Republic's Memorandum at 58 [DKT #267].

[85] O'Brien depo at  246:6-10; 251:16-18; Republic's Memorandum at 58 [DKT #267].

[86] Republic's Memorandum at 50 [DKT #267].

[87] DKT #258.

[88] O'Brien's initial report of January 15, 2006 refers to 29 claims, but the actual counted total is 27, See, Exhibit 18.

    2.      Liberty's own Minimum Customer Requirements (dated 6/26/98);

    3.      Liberty's own Best Practices (dated 4/30/01); and

    4.      Applicable California workers compensation statutes and regulations. [89]

After O'Brien assessed the Liberty Companies' compliance with a defined set of standards, he formulated opinions as to the amount of costs that should be either allowed or disallowed in each file.  Effectively, if O'Brien does not  disallow a portion of an individual claim, then Republic has not and cannot link any alleged file mishandling to a resulting financial loss or damage.  Further, after exchanging his January 15, 2006 report, O'Brien tendered a March 11, 2006 report where in conclusory fashion he adopts the opinions of Ballard with "no material disagreement with Mr. Ballard's conclusions concerning the 292 claims files."[90]

In response to O'Brien's reports of January 15, 2006 and March 11, 2006, the Liberty Companies again retained Doug McCoy.  In his 102 page report dated April 25, 2006, McCoy compressively responded to, and generally disagreed with O'Brien's methodology and ultimate conclusions. [91] To the extent O'Brien opines that the Liberty Companies provided poor claims handling which resulted in financial damages to Republic, all of these opinions are squarely rebutted by McCoy. The voluminous contents of McCoy's report alone, viewed in the light most favorable to the Liberty Companies, directly disputes the methodology and conclusions of O'Brien.    This factual dispute is sufficient to withstand summary judgment.

In addition to retaining Doug McCoy to rebut the opinions of O'Brien, the Liberty Companies also retained Judge Steven Siemers.  Within his written report dated April 20, 2006, Siemers comprehensively responded to, and generally disagreed with O'Brien's methodology

---

[89] O'Brien Depo. at 222:4-23.

[90] See, O'Brien supplemental report dated March 11, 2006, Exhibit 19.

[91] See, Exhibit 20.

and conclusions.[92]  To the extent O'Brien opines that the Liberty Companies provided poor claims handling which resulted in financial damages to Republic, all of these opinions are squarely rebutted by Siemers.  The voluminous contents of Siemers report alone, viewed in the light most favorable to the Liberty Companies, directly disputes the methodology and conclusions of O'Brien.  This factual dispute is sufficient to withstand summary judgment

> 2.      The Liberty Companies' own claims handlers fail to establish, as a matter of law, the Liberty Companies breach of any duties.

Beginning on page 60 of its Motion, Republic urges that the Liberty Companies' own claims handling employees, "confirm in all respects the systematic failure to comply with the most basic claims handling standards."  However, Republic's support of this assertion by citation to claims handler depositions is simply misleading.  Irrespective of whether Republic categorizes purported claims handler testimonial admissions as mistakes, breaches, violations, "blew," mishandling, failure to achieve, or deficiencies,[93] throughout this litigation, no Liberty Companies' claims handling employee has ever admitted that their claims handling activities deviated from any applicable standard, rule or regulation.  Certainly, no claims handling employee has ever testified that they failed "to comply with the most basic claims handling standards."

Notably, many of the claims files are very long and contain literally thousands of entries.  No claims handler can fully assess any claims file without first spending hours going through and reviewing the file.  Danielle Adair testified that in order to "grasp what was going on in the file,"[94] she generally needs to review it for two hours.  Similarly, the Plaintiff's counsel stated

---

[92] See, Exhibit 21.

[93] Republic's categorization of claims handler testimony in its Memorandum at 61-72 [DKT #267].

[94] Transcript of the deposition of Danielle Adair ("Adair Depo."), attached in relevant portions as Exhibit 22 at 41:1-24.

during the same deposition that it took him "six hours just to go through the file to kind of figure out what the file was like.  I've been doing this for about 20 years."[95]  Obviously, a thorough analysis of any file take several hours.  Because the Liberty Companies claims handlers did not have a workable[96] list of claims to be discussed prior to giving their deposition, to the extent that claims handlers provided deposition testimony relative to specific file activities, all such testimony followed a brief review of the computer file notes during the deposition.  In effect, the claims handlers merely recited information contained in the electronic files—information already in the possession of Republic by and through RISKTRAC.   Because of the claims handlers' inability to thoroughly review each claim file in advance, they were unable to comprehensively assess, defend or criticize the various file activities.

With regard to the claims handler testimony cited by Republic, many portions are either taken out of context, are misleading, or do not qualify as per se breaches of any claims handling standard.  Further, even though Republic's FRCP 26 experts have collectively spent thousands of hours reviewing files and have billed more than one million dollars ($1,000,000) reviewing files,[97] they failed to recognize or otherwise mention many of the breaches allegedly admitted by the claims handlers.  In fact, in the Andrew Robertson file originating in Tampa, Florida (page 63 of Republic's Motion), Ballard finds no disallowed/damage amounts for this file.[98]

In the interest of brevity, the Liberty Companies will highlight some examples of Republic's overreaching relative to each claims office.

---

[95] Adair Depo. at 41:11-14.

[96] With regard to each deposed claims handler, Republic provided lists of all Republic claims in which the claims handler made entries.  However, the lists occasionally included upwards of 20 claims files per claims handler.   No claims handler could realistically review in detail 20 electronic and paper claims files in preparation for discovery depositions.  This became especially true after Republic failed to ask any claims file questions of several claims handlers.  Throughout claims handler deposition discovery, Republic spent a majority of its time on issues unrelated to specific claims files.

[97] See, Republic supplemental FRCP26(a) disclosures, Exhibit 23.

[98] See, Tom Ballard Summary Sheet for Andrew Robertson, Exhibit 24.

-34-

**Sacramento, California Claims Office**

Rafael Pena

Derrick Scott did not testify that he failed to conduct a proper initial investigation of the claim.  Instead, he testified that the initial investigation was completed prior to his involvement in the file.[99] In fact, the investigation questions posed to Derrick Scott were expressly limited to his handling of the file only, not the actions of the prior or subsequent claims handlers.[100]

Similarly, Derrick Scott did not testify that he disregarded "red-flags" associated with the Rafael Pena file. Scott never testified that an un-witnessed injury is necessarily a red-flag or that an employee retaining counsel with aggressive medical treatment is necessarily a red flag. Instead, Scott repeatedly testified that whether a specific fact qualifies as a "red-flag" therefore requiring additional investigation is "case by case." [101]

Finally, Derrick Scott never admitted violating Best Practices and Republic's SSI's "by failing to obtain either an activity check or surveillance."  In fact, he was never asked and was not otherwise "unable" to explain, as suggested by Republic.

Aldalfo Aldalco

Gerry Abracosa's testimony on page 200 of his deposition seems to have no relation whatsoever to the statement made by Republic on page 62 of its Motion. Further, at no point during his deposition did Mr. Abracosa use the word "unilaterally" or "violation."

**Tampa, Florida Claims Office**

Andrew Robertson:

Jennifer Mazar adjusted the reserves by $5,000 to account for ongoing defense costs and

---

[99] Transcript of the Deposition of Derrick Scott ("Scott Depo."), attached in relevant portion as Exhibit 25 at 74:12-75:16.

[100] Scott Depo. at 74:1-5.

[101] Scott Depo. at 37:10-23; 67:1-7.

CM61:36901:243711:2:LEXINGTON

medical bill review charges.  She did not testify that these charges are unwarranted, or that the Liberty Companies' desire to "pay itself" had any bearing on the reserve change.

### Ismet Delalic

Aimee Ross did not testify that she failed to insure that a timely compensability investigation was completed. In fact, the deposition excerpts cited by Republic do not mention the word "compensability."

### Dennis Hicks

Steve Renner did not testify that he "dramatically" raised reserves or that he "violated the SSI's."  In fact, Steve Renner testified that with regard to the three subject reserve changes, he sent notifications to the customer, Republic.

### **Tarrytown, New York Claims Office**

### Evelyn Miranda

Notably, Republic is asking for a judgment as a matter of law.  In support, Republic urges that the testimony of Winifred Burton establishes that the Liberty Companies never interviewed the other driver, and failed to provide sufficient evidence of damage to support subrogation.  In reality, Burton was asked to find in the file whether the Liberty Companies interviewed the other driver, and before answering the question, Burton was interrupted and therefore did not answer.[102]  Further, Burton admitted that it is merely "possible" that the Liberty Companies didn't appropriately attach evidence of subrogation damages.[103]

### L. Flanagan

Allison Chance did not testify that there was no investigation until 3 ½ years after the

---

[102] Transcript of the Deposition of Winifred Burton ("Burton Depo."), attached in relevant portions as Exhibit 26 at 102:10-18.
[103] Burton Depo. at 106:12.

accident.  Instead, the Liberty Companies did not request a home activity check of the claimant until then.  Soon after the accident, the Liberty Companies interviewed the treating physician, the Republic supervisor and the injured worker.

### **Glendale, California Claims Office**

#### Raymundo Galvan

Danielle Adair did not testify that the Liberty Companies "inexplicably mistakenly closed the file during the period it should have been investigated." Instead, Adair testified that the file might have been accidentally closed, it might have been transferred from another office, and she does not know the facts of what happened to give the file a re-open date.[104]

#### Adrian Aguilar

Danielle Adair never testified that she "forgot" to send out a "NOPE" letter or that sending such a letter would have made a difference on the file.

### **Bala Cynwyd, Pennsylvania Claims Office**

#### Robert Hubbard

Suzanne Dunlevy never testified that the Liberty Companies failed to investigate the intentional act/horseplay issue. Instead, she testified that if the worker was the victim of horseplay, the same would make no difference under Pennsylvania law.

#### Mark Vought

Janine Justice never testified that the Liberty Companies "failed to properly monitor litigation."  In fact, the word "monitor" is not used in Justice's deposition.

#### Christopher Pergolese

Denise Augustine did not testify that obtaining a recorded statement is required by the

---

[104] Adair Depo. at 124.:8-9.

CM61:36901:243711:2:LEXINGTON

SSI's and Best Practices.  In fact, when Mr. Pergolese was injured on 11/24/98, implementation of the Best Practices was 2 ½ years short of their rollout in January, 2001.[105]

### Schaumburg, Illinois Claims Office.

The various mishandling cited by Republic does not appear to be supported by the deposition excerpts cited by Republic.  With regard to the cited excerpts, the claims handlers do not admit any wrongdoing, poor claims handling, or violations of any applicable standards.

### Irving, Texas Claims Office

Delilah Gill testified repeatedly that indemnity claims in Texas cannot be settled in the sense that they cannot be permanently closed and never re-opened as the term "settlement" is traditionally used.  Her opinions regarding this issue are summarized in the following dialogue:

> Q.   Could Liberty Mutual have settled this claim in Texas when Ms. Followell reached MMI in November of 2002?
>
> A.   No, sir.  The Texas state statute does not allow settlements in the claim -- the general  understanding of what a settlement is in claims management, which would mean some sort of compromise of the entire claim allowing us to close that file down.  In Texas the only issues that can be resolved are disputed matters such as the length of disability, the impairment rating, you know, this type of treatment being related to the work injury or that type of treatment being related to the work injury but not -- the claim in its entirety cannot be settled.[106]

This understanding of Texas workers compensation law is shared by every other deposed Texas claims handler presented with the same inquiry.[107]  Further, this view is also shared by Republic's broker, Suzanne Flynn, who knew that indemnity and medical claims cannot be settled in Texas.[108]  In fact, the Texas Statutes evidence the perpetual ability of claimants to keep

---

[105] See, Exhibit 7.

[106] Transcript of the Deposition of Delilah Gill ("Gill Depo."), attached in relevant portions as Exhibit 27 at 126:11-21.

[107] Excerpts from the Depo of Mary Anders, pp. 40-42; Depo of Brett Pearce p. 93; Depo of Mary Ellen Cozart, pp. 24-26; Depo of Beth Dempsey p. 52-53; Depo of Hema Harrison-Johnson, pp. 56-58; Depo of Junie Wolf, pp. 21-23.  These excerpts are attached as collective Exhibit 28.

[108] Transcript of the Deposition of Suzanne Flynn ("Flynn Depo."), attached in relevant portions as Exhibit 29 at 203:17-21.

-38-

claims open and continue to receive benefits.[109]  The only "stubbornness" regarding settlements

in Texas is the refusal of Thomas Ballard to finally admit that Delilah Gill and her co-workers

are right, and that experienced claims handlers in Texas have more knowledge of Texas workers

compensation laws than Ballard.  Interestingly, Ballard's curriculum and five days of deposition

testimony are wholly devoid of any suggestion that Ballard ever had an occasion to handle a

Texas workers compensation claim, or even read a Texas workers compensation statute, prior to

this case.

      In addition to mis-citing the testimony of the Liberty Companies' claims handlers as

evidence that the Liberty Companies mishandled claims, Republic contends that "[t]he Liberty

Companies do not adequately prepare adjusters to handle claims."[110]  Republic asserts that the

Liberty Companies failed "to provide their adjusters with any formal training before they began

handling claims" and cite to the testimony of a number of Liberty claims handlers.  This simply

does not reflect the testimony of these Liberty Companies' employees.  For example, Republic

cites to the testimony of Dara Warner, a California Team Manager.  Ms. Warner never testified

that she did not receive "formal" training when she began her job.  She testified that she received

on the job training, that she shadowed other employees and that she attended various in-office

training sessions *every week*.[111]  Republic cites to the testimony of Marianne Truax for the

proposition that the Liberty Companies only provided "non-state specific training" to their

claims handling employees, however, Ms. Truax never uses the words "non-state specific" and

simply testifies that she received training on "how to handle claims files."[112]  She goes on to say

---

[109] See, Texas Workers Compensation Act, §408.005, Exhibit 30.

[110] Republic's Memorandum at 59.

[111] Transcript of the Deposition of Dara Warner ("Warner Depo"), attached in relevant portions as Exhibit 31 at 21:18-24:4 (emphasis added).

[112] Transcript of the Deposition of Marianne Truax ("Truax Depo."), attached in relevant portions as Exhibit 32 at 13:7-20.

that she is licensed to handle claims by the state of Kentucky.[113]

Republic goes on to cite the testimony of Michelle Garvey for the proposition that adjustors, even when trained, were not instructed in "core claims handling."  But Ms. Garvey testified that she was trained on a number of claims handling procedures.  She testified that, in training, they "went over topics and did practicing of interviews and going into a file and posting the information and getting feedback from a trainer," that they practiced "with a coworker asking questions as far as how an injury occurred, what treatment they've had, disability status, that type of thing," and that she was trained to ask "the facts of the accident, where they've sought treatment, if there were any witnesses, what their disability status is, prior injuries, prior accidents, health conditions, what treatment they're receiving at the present time."[114]

Based upon these and various other mischaracterizations of the testimony of the Liberty Companies' claims handlers, Republic concludes that "this critical information gap substantially impacted adjusters' ability to adequately handle claims . . .."[115]  There is no factual or legal support for Republic's conclusion and the cited "evidence" certainly does not establish that claims were mishandled as a matter of law.

3.    Republic's broker, Suzanne Flynn, fails to establish, as a matter of law, the Liberty Companies breach of any duties.

Even though Republic's Broker, Suzanne Flynn, is only mentioned within the "Relevant Facts" section of Republic's Motion, Republic insists that her deposition testimony "establish[es] that claims mishandling occurred."[116]  However, Suzanne Flynn's testimony falls short of establishing the Liberty Companies' liability as a matter of law.  Further, to the extent that Flynn

---

[113] Id. at 13:24-14:3.

[114] Transcript of the Deposition of Michelle Garvey ("Garvey Depo."), attached in relevant portions as Exhibit 33_ at 15:16-17:12.

[115] Republic's Memorandum at 60.

[116] Republic's Memorandum at 16 [DKT #267].

-40-

presents opinion testimony, such must be excluded because Republic has not identified her as a FRCP 26 expert witness.

Suzanne Flynn was Republic's insurance broker.  She still maintains a close working relationship with Republic, and further takes the position that her communications with Republic's counsel are protected by the attorney/client privilege.[117]  With regard to supervising and overseeing Republic's workers compensation claims from a risk management perspective, she described her role as "an ex-officio member of his [Gary Gezzer of Republic] risk management team . . . I was given settlement authority [on behalf of Republic]… So by all extent I was part of his team and was asked to be provided with the same authority and respect."[118]

Suzanne Flynn generally described the problems she experienced with the Liberty Companies' claims handling.[119]  However, Flynn was never able to relate her general complaints to any specific claim file.  Throughout her deposition, Suzanne Flynn never linked any claims mishandling to any specific claim file, Liberty Mutual Claim office or Liberty Mutual employee. She did not link her opinions of mishandling to any of the 292 claims files at issue in this case. She did not identify a specific agreement ever breached by any of the six (6) Defendants. Throughout Flynn's deposition, the Liberty Companies challenged her general complaints by seeking specific examples or percentages of purported mishandling.  Flynn was never able to provide specifics.  By way of example, Flynn complained of  significant delinquencies in responding to inquiries.  However, Flynn did not identify any specific claim file and could not better define her opinion of "significant."[120]  Similarly, Flynn occasionally asked for supplemental information from adjustors, to which she indicated that they "seldom" responded.

---

[117] Flynn Depo at 7:2-21; 42:18-44:7.

[118] Id. at 91:11-92:11.

[119] Id. at 246:20-250:15.

[120] Id. at 131:20-135:7.

-41-

However, she did not identify a specific claim file and could not better define her opinion of "seldom."[121] Throughout her deposition, Flynn complained about a myriad of claims activities, without providing a single file example or otherwise providing a reliable estimate of frequency. She complained of late payments but "can't give you a specific" about how often.[122] With regard to several complaints, she could not give a percentage of the files in which these things occurred.[123]

Flynn has not identified any alleged file mishandling sufficient to allow the Liberty Companies to investigate and adequately respond. The Liberty Companies handled thousands of claims for Republic in offices around the country. Flynn's general complaints of mishandling such as incomplete investigations, questionable compensability decisions, improper payment of medical bills and inappropriate settlement payments are so non-specific that investigating and rebutting these allegations is literally impossible. Therefore, in the light most favorable to the Liberty Companies, Flynn's deposition testimony does not establish, as a matter of law, that the Liberty Companies breached any duties owed to Republic.

**D.    Republic Has Not Established Joint and Several Liability Against Each of the Six Defendants.**

Republic seeks summary judgment, jointly and severally, against each of the six Defendants.[124] In support of this position, Republic cites no contractual provisions whereby any defendant assumed contractual liability for the others. Similarly, Republic cites no case law for the proposition that the Defendants' liability should be joint and several. Instead, the various

---

[121] Id. at 141:23-142:18.

[122] Id. at 246:3-24.

[123] Id. at 250:7-15.

[124] Republic's proposed order granting Partial Summary Judgment [DKT #267]; Republic's Memorandum at 3 [DKT #267].

contractual agreements stand alone and only obligate specifically identified parties.[125]  As evidenced by the Liberty Companies' answers to written discovery, each of the Defendants is a separate corporation, some of which are incorporated in different states.[126]

The Liberty Companies submit that no evidence compiled throughout discovery establishes that the six Defendants agreed to be responsible for the obligations and debts of the others, or that the six Defendants acted as agents of each other with regard to any duties owed to Republic.  Instead, the various contract documents stand alone and only obligate specific parties.  By way of example, the policy for the second policy year was written by Defendant Liberty Mutual Fire Insurance Company to its insured Republic Services, Inc.[127]  This obligation to provide insurance coverage existed by and between two parties.  Nothing within this policy suggests that five additional corporations assumed responsibilities to provide coverage to Republic during the second policy year.  In fact, any such finding would substantially modify the language of the policy.

Alternatively, Republic's claims for joint and several liability against all Defendants violates the law of Massachusetts and Florida.  As discussed within the Liberty Companies' Motion for Partial Summary Judgment relevant to breach of fiduciary duty and the economic loss doctrine [DKT #254], the substantive laws of Massachusetts, or alternatively Florida, apply to Republic's claims.  In its Motion, Republic seeks partial summary judgment relative to breach of contract, as well as several tort claims including negligence, duty of good faith, fiduciary duty, and unjust enrichment.[128]

---

[125] Admittedly, throughout motion practice, the Defendants have generally referred to themselves as "the Liberty Companies."  However, this consolidation in the interest of brevity does not negate the Plaintiff's obligation to prove its prima facie case against each and every defendant.

[126] See, the Liberty Companies response to Interrogatory No. 4, Exhibit 34

[127] See, coverage from second year policy, Exhibit 35.

[128] Republic's Memorandum at 38-42 [DKT #267].

Florida requires the apportionment of fault in all negligence claims, including professional negligence claims whether couched in contract or tort. Fla. Stat. §768.81(4).[129] This statute was enacted to replace joint and several liability.  <u>Association for Retarded Citizens-Volusia, Inc. v. Fletcher</u>, 741 So. 2d 520 (Fla. Dist. Ct. App. 5th Dist. 1999).  Similarly, Massachusetts has adopted the Uniform Comparative Fault Act (UCFA) which provides that each party shall only bear their respective percentages of fault.  <u>The Shantigar Foundation v. Bear Mountain Builders</u>, 804 N.E. 2d 324 (Mass. 2004).   The clear language of these statutes prohibits a joint and several judgment against all six Defendants. Instead, to the extent that each of the six Defendants may have contributed to Republic's alleged damages, then the trier of fact should apportion fault amongst the six Defendants.

## VI.   <u>REPUBLIC HAS NOT PROVED ENTITLEMENT TO DAMAGES, AS A MATTER OF LAW, AS CALCULATED BY FRCP 26 EXPERT TIMOTHY SNODDY.</u>

Republic seeks judgment as a matter of law that the Liberty Companies' breaches have damaged Republic in an amount calculated Tim Snoddy.[130]  Not only do the Liberty Companies vigorously dispute the liability opinions of Republic's experts as highlighted above, but the Liberty Companies vigorously dispute the damage opinions of Snoddy.  In response to Snoddy's report,  the Liberty Companies retained Marc T. Ray, CPA, as an expert witness.  In his report dated May 1, 2006, Ray comprehensively responded to, and generally disagreed with Snoddy's methodology and ultimate conclusions.[131]  Ray opined that Snoddy's collaborative damage assessment is grossly overstated, and lacks any measure of reasonableness or fairness.[132]  Ultimately, Ray opined that "the damages alleged by Republic, through its experts, are grossly

---

[129] <u>See</u>, Exhibit 36.

[130] Republic's Memorandum at  74 [DKT #267].

[131] Ray report, Exhibit 37.

[132] <u>Id</u>. at 1.

-44-

overstated."[133]  The contents of Ray's report alone, viewed in the light most favorable to the Liberty Companies, directly disputes the methodology and conclusions of Snoddy.  This factual dispute is sufficient to withstand summary judgment.

Even if Marc Ray did not directly dispute the conclusions and analysis of Snoddy, Republic is still not entitled to damages as a matter of law because the reliability of Snoddy's opinions are expressly contingent upon the reliability of Ballard's opinions.  Because the Liberty Companies dispute the validity of Ballard's opinions, the same dispute applies to Snoddy's opinions.  As discussed above, Republic's proof of alleged breaches by the Liberty Companies is limited to three sources including: (1) testimony from Republic's broker Suzanne Flynn,[134] (2) depositions of the Liberty Companies' claims handlers,[135] and (3) opinions from Republic's FRCP 26 experts Tom Ballard and David O'Brien.[136]  However, Snoddy's opinions are expressly limited to damages flowing from alleged breaches identified by Tom Ballard, not the remaining sources.[137]

Republic seeks three categories of damages including:

1. Excess bonus payments;

2. Excess claims costs; and

3. Costs for Impairment of Capital.[138]

The excess bonus payments are separate and apart from the relief sought within Republic's Motion for Partial Summary Judgment and have been recently adjudicated by this

---

[133] Id. at  9.

[134] Republic's Memorandum at 12-16[DKT #267].

[135] Id. at  19, 61-72 [DKT #267].

[136] Id. at  58 [DKT #267].

[137] See, Snoddy report dated August 15, 2005, Exhibit 38.

[138] See, Republic's supplemental FRCP 26 disclosures exchanged 6/1/06, Exhibit 23.

CM61:36901:243711:2:LEXINGTON

Court.[139]  Damages associated with excess claims costs and impairment of capital hinge exclusively on the alleged breaches identified by Ballard.  Ballard reviewed the claims files and identified "a point in time or . . . an occurrence (specific to each claim) at which the file, if properly handled, administered and managed, would not have resulted in the Liberty Companies incurring any further/inappropriate/unnecessary costs on Republic's behalf."[140]  Effectively, if Ballard does not  disallow a portion of an individual claim, then Republic has not and cannot link any alleged file mishandling to a resulting financial loss or damage.

After Ballard determined a cut-off point in each file, Snoddy addressed the financial impact of  the cut-off point and calculated a "corresponding cost to Republic."[141]  Snoddy's damage opinions regarding excess claims costs represent a collaboration of individual claim file damages derived from Ballard's cut-off points.  Snoddy's damages opinions regarding excess claims costs are solely derived from the cut-off points opined by Ballard.[142]  Snoddy did not attempt to link excess claims costs to the testimony and/or opinions of  David O'Brien, Suzanne Flynn or the Liberty Companies' claims handlers.   Further, within its most recent FRCP 26 disclosure exchanged 6/1/06, Republic does not seek damages other than those calculated by Snoddy.

Similarly, Republic's claim for impairment of capital damages[143] hinges exclusively on the alleged breaches identified by Ballard.  In order to calculate alleged impairment of capital,

---

[139] Republic's Memorandum at  74 [DKT #267]; Opinion and Order [DKT#277].

[140] See,  Ballard report dated August 15, 2005, Exhibit 10.

[141] See, Snoddy report dated August 15, 2005, at  4.

[142] See generally Snoddy Report.

[143] The methodology employed by Snoddy in calculating alleged impairment of capital damages, and the shortfalls of the same, are further discussed in the Liberty Companies' Motion to Exclude testimony from Tim Snoddy and Ed Davenport. [DKT #249]

Snoddy relied on excess claims costs data provided exclusively by Ballard.[144] Snoddy did not utilize claims costs data from the testimony and/or opinions of David O'Brien, Suzanne Flynn or the Liberty Companies' claims handlers.

Republic has presented no claim for, and has no proof to support, damages other than those calculated by Snoddy. Every element of damage calculated by Snoddy (other than Excess Bonus Payments which are not a part of this Motion) relies on claims mishandling opinions provided exclusively by Ballard. As discussed above, the Liberty Companies and its expert Doug McCoy strongly dispute the conclusions of Ballard. To the extent that the opinions of Ballard present a material issue of fact in the light most favorable to the Liberty Companies, then the same issues of material fact flow to Snoddy because his damage calculations are based on the opinions of Ballard.

## VII.  <u>CONCLUSION</u>

For the foregoing reasons and authorities, the Liberty Companies respectfully request that this Court enter an order denying Republic's Motion for Partial Summary Judgment.

Respectfully submitted,

/s/ J. Clarke Keller

J. Clarke Keller
Gregory P. Parsons
Marshall R. Hixson
STITES & HARBISON, PLLC
250 West Main Street
Suite 2300
Lexington, KY  40507-1758
Telephone: (859) 226-2300
Facsimile: (859) 253-9144
E-Mail: ckeller@stites.com
COUNSEL FOR DEFENDANTS,
THE LIBERTY COMPANIES

---

[144] <u>See,</u> Snoddy Report at 12-13.

<u>CERTIFICATE OF SERVICE</u>

This is to certify that on October 3, 2006
I electronically filed the foregoing with the clerk
of the Court by using the CM/ECF system
which will send a notice of electronic filing to the following:

Brent L. Caldwell, Esq.
Robert E. Maclin, III, Esq.
McBrayer, McGinnis, Leslie & Kirkland, PLLC
201 East Main Street, Suite 1000
Lexington, Kentucky 40507

Nick Roxborough, Esq.
Michael Adriani, Esq.
Craig S. Pynes, Esq.
Roxborough, Pomerance and Nye, LLP
5820 Canoga Avenue, Suite 250
Woodland Hills, CA 91367

  _/s/ J. Clarke Keller_
Attorney for Defendants

-48-